# EXHIBIT 3

POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUSSELL HAWKINS, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | |
| v. | CLASS ACTION COMPLAINT |
| SAMUEL BANKMAN-FRIED, CAROLINE ELLISON, ZIXIAO "GARY" WANG, NISHAD SINGH, ARMANINO, LLP, and PRAGER METIS CPAS, LLC, | DEMAND FOR JURY TRIAL |
| Defendants. | |

Plaintiff Russell Hawkins ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents and announcements published by Defendants, analysts' reports and advisories, and information readily obtainable on the Internet. Plaintiff believes that substantial,

additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a class action on behalf of a class consisting of all persons and entities other than Defendants that have been unable to withdraw funds deposited into a yield-bearing account ("YBA") with FTX Trading LTD d/b/a FTX ("FTX or "the Company") or West Realm Shires Services Inc. d/b/a FTX US ("FTX US") (collectively, the "FTX Entities"), seeking to recover damages caused by Defendants' violations of the California Unfair Competition Law, the California False Advertising Law, as well as common law claims for fraudulent concealment, civil conspiracy, and declaratory judgment.

2. FTX was a cryptocurrency exchange started in 2019 by Defendant Samuel Bankman-Fried ("Bankman-Fried"), who served as its Chief Executive Officer ("CEO") at all relevant times, FTX's United States ("U.S.") affiliate, FTX US, was founded in 2020. The FTX Entities offered a range of trading products, including derivatives, options, volatility products, and leveraged tokens. The FTX Entities also provided spot markets in more than 300 cryptocurrency trading pairs, including the native token FTT/USDT ("FTT Tokens"), thereby enabling FTX customers to trade with leverage and short certain markets by borrowing from other FTX users. Importantly, however, each of the FTX Entities' terms of service expressly stated that customer assets belonged solely to the customer and would not be transferred to FTX trading.

3. The FTX Entities constituted one half of Bankman-Fried's "cryptocurrency empire," the other being a crypto-trading firm called Alameda Research ("Alameda"), which Bankman-Fried founded in 2017. Bankman-Fried served as CEO of Alameda until 2021, when he was succeeded by Defendant Caroline Ellison ("Ellison"). After stepping down as CEO of

CLASS ACTION COMPLAINT

Alameda and at all relevant times thereafter, Bankman-Fried consistently maintained that the FTX Entities and Alameda were separate and distinct.

4.     From 2019 to 2022, the FTX Entities and Bankman-Fried undertook a major promotional marketing campaign.  The campaign, which included social media posts, interviews, sports partnerships, internet and television advertisements, and naming rights deals, rapidly increased the FTX Entities' valuation, growing from $1.2 billion to $32 billion in only three years.

5.     In addition to the promotional marketing campaign, throughout 2021 and 2022, Bankman-Fried touted that the FTX Entities had completed several successful GAAP audits.  In March 2022, two auditors, Defendants Armanino, LLP ("Armanino") and Prager Metis CPAs, LLC ("Prager Metis"), issued certified reports which purportedly found the FTX Entities to be in good financial health.  Further, Armanino and Prager Metis each published statements in support of Bankman-Fried and the FTX Entities in 2021 and 2022, respectively.

6.     The FTX Entities' rapid growth abruptly halted on November 2, 2022, when the cryptocurrency publication *CoinDesk* published an article entitled "Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet", which questioned the financial health of both Alameda and the FTX Entities, and asserted that Alameda's balance sheet was made up primarily of FTT tokens, indicating that Alameda "rest[ed] on a foundation largely made up of a coin that a sister company invented, not an independent asset like a fiat currency or another crypto."

7.     Shortly after the *CoinDesk* article was published, the FTX Entities saw massive customer withdrawals, resulting in a liquidity crisis.  Ultimately, Bankman-Fried elected to freeze all withdrawals of customer assets.

8.     Then, on November 8, 2022, rival cryptocurrency exchange Binance announced that it had reached a non-binding deal to acquire FTX.  However, just one day later, Binance

3

reversed its decision, stating that a review of FTX's finances uncovered liquidity issues that were "beyond [Binance's] control or ability to help."

9.      On November 10, 2022, Bankman-Fried took to Twitter and issued a series of twenty-two tweets apologizing to customers and attempting to offer an explanation for the crash.

10.     Finally, on November 12, 2022, *The Wall Street Journal* reported that Bankman-Fried, Ellison, Defendant Zixiao "Gary" Wang ("Wang"), FTX's Chief Technical Officer, and Defendant Nishad Singh ("Singh"), FTX's Chief Engineering Officer, were aware that FTX had used customer assets to cover Alameda's trading losses and repay its outstanding debts.

11.     Shortly after the foregoing disclosures, Bankman-Fried resigned as CEO of FTX and the FTX Entities and Alameda filed for bankruptcy.  In a Delaware Bankruptcy Court filing, FTX's new CEO John J. Ray III stated that he had never seen "such a complete lack of corporate controls and such a complete absence of trustworthy financial information as occurred here . . . the situation is unprecedented."

12.     As a result of Defendants' wrongful acts described herein, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to the California Unfair Competition Law, and the California False Advertising Law, as well as common law claims for fraudulent concealment, civil conspiracy, and declaratory judgment.

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $5,000,000.00, exclusive of interest and costs, and in which at least one class member is a citizen of a state different than the Defendants.

CLASS ACTION COMPLAINT

15.     This Court has personal jurisdiction over Defendants because at least one Defendant conducts business in California, and/or have otherwise intentionally availed themselves of the State of California's consumer market through the promotion, marketing, and sale of FTX's YBAs in California, which constitutes committing a tortious act within the state of California. Defendants have also marketed and participated and/or assisted in the sale of FTX's unregistered securities to consumers in California.  This purposeful availment renders the exercise of jurisdiction by this Court over Defendants permissible under traditional notions of fair play and substantial justice.

16.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this Judicial District.  Specifically, Alameda was founded in Berkeley, California.  In addition, Defendants Bankman-Fried, Ellison, Wang, and Singh directed FTX customers—including Plaintiff—to make deposits in their FTX accounts by directing wire transfers to FTX US, which maintained its payee address at 2000 Center Street in Berkeley, California.  On information and belief, customers directed at least tens of millions of dollars the Defendants' Berkeley address.

17.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## **PARTIES**

18.     Plaintiff Russell Hawkins, as set forth in the attached Certification, deposited funds into a YBA with the FTX Entities and has since been unable to withdraw his deposited funds.

19.     Defendant Bankman-Fried is the founder and former CEO of FTX and Alameda.

20.     Defendant Ellison is the former CEO of Alameda.

21.     Defendant Wang is the co-founder of Alameda and FTX and served as FTX's Chief Technical Officer.

22.     Defendant Singh is the co-founder FTX and served as FTX's Chief Engineering Officer.

23.     Defendants Bankman-Fried, Ellison, Wang, and Singh are sometimes referred to herein as the "Individual Defendants."

24.     Defendant Armanino is an accounting and consulting firm that maintains a principal place of business at 12657 Alcosta Boulevard, Suite 500, San Ramon, California.

25.     Defendant Prager Metis is an accounting and consulting firm that maintains five offices in California and maintains its principal place of business at 14 Penn Plaza, Suite 1800, New York, New York, 10122.

26.     Defendants Armanino and Prager Metis are sometimes referred to herein as the "Auditor Defendants."

27.     The Individual Defendants and the Auditor Defendants are sometimes collectively, in whole or in part, referred to herein as "Defendants."

## FACTUAL ALLEGATIONS

### FTX's Rise to Success

28.     In 2017, Defendants Bankman-Fried and Wang founded Alameda in Berkeley, California.  The crypto-trading firm first rose to prominence by arbitraging the price of bitcoin between different markets before venturing into other types of trades and investments in cryptocurrency projects.  Bankman-Fried and Wang were later joined by Defendants Ellison and Singh.  Bankman-Fried served as CEO of Alameda until 2021, when he was succeeded by Ellison. After stepping down as CEO of Alameda, Bankman-Fried consistently maintained that the FTX Entities and Alameda were separate and distinct.

6

29.     In 2019, Bankman-Fried co-founded FTX, an abbreviation of "futures exchange," with Wang and Singh.  FTX offered investors a range of trading products such as derivatives, options, volatility products, and leveraged tokens.  FTX also provided spot markets in more than 300 cryptocurrency trading pairs, including its native token FTT/USDT.  One of the attractive features of FTX's digital assets came from its terms of service, which provided that customer assets belonged *solely* to the customer and would *not* be transferred or otherwise used in FTX's trading.  Indeed, FTX's terms of service stated, in relevant part:

8.2.6. All Digital Assets are held in your Account on the following basis:

a)  ***Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading.*** As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.

b)  ***None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading***; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.

c)  ***You control the Digital Assets held in your Account***. At any time, subject to outages, downtime, and other applicable policies (including the Terms), ***you may withdraw your Digital Assets*** by sending them to a different blockchain address controlled by you or a third party.

(Emphasis added.)   Moreover, the FTX US terms of service contained similarly reassuring language, stating, in relevant part:

a.  As part of your FTX.US account, FTX.US provides qualifying users access to accounts for you to store, track, transfer, and manage your balances of cryptocurrency and/or dollars or other supported currency.  ***All cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX.US for your benefit***.

b.  ***Title to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US***.

c.  ***FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US***.

CLASS ACTION COMPLAINT

(Emphasis added.)

30. From 2019-2022, the FTX Entities experienced a meteoric rise in success due in no small part to an aggressive promotional campaign. Throughout this period, Bankman-Fried established himself at the forefront of the cryptocurrency space and soon became known and referred to worldwide under the abbreviation "SBF." Indeed, as Bankman-Fried achieved his celebrity status, he was hailed by some market analysts as the "savior of crypto." Bankman-Fried burnished this reputation through myriad Twitter posts, television and podcast interviews, and political donations. Significantly, Bankman-Fried described himself as a proponent of a charitable movement called "Effective Altruism" and promised to donate the wealth he was accruing to a variety of charities.

31. During the same period, FTX became one of the largest crypto-trading companies in the world, with nearly $15 billion in assets being traded on its platform daily. FTX's marketing efforts involved partnering with popular names in sports and entertainment. Specifically, the FTX Entities secured several celebrity "brand ambassadors" and released a series of internet and television advertisements to promote these partnerships. Further, the FTX Entities entered into various sponsorships and naming rights deals with high profile sports programs such as UC Berkeley Athletics and the Miami Heat.

32. These promotional efforts resulted in a rapid increase in the FTX Entities' valuation. By July 2021, FTX had attained a valuation of $18 billion after securing funding from major financial players such as multinational conglomerate SoftBank Capital Group ("Softbank") and venture capital firm Sequoia Capital, among others. By October 2021, after securing another series of investments, FTX had reached a valuation of $25 billion. By January 2022, FTX US itself had attained a valuation of $8 billion after securing funding from investors such as Softbank. Combined, the FTX Entities had attained a valuation exceeding $32 billion in only three years.

33.     In addition to these promotional efforts, throughout 2021 and 2022, Bankman-Fried touted that the FTX Entities had purportedly completed several successful GAAP audits.  For example, on July 31, 2021, Bankman-Fried tweeted that FTX was the "first (?) crypto exchange to complete a GAAP audit."



34.     Then, on August 26, 2021, Bankman-Fried tweeted that FTX and FTX US had officially passed US GAAP audits.



35.     In addition, the security policy published on the FTX website affirmed the 2021 audits and stated plans for future audits.

**Financial Audit**

FTX has successfully undergone a US GAAP financial audit for 2021 and plans to continue undergoing regular audits.

9

CLASS ACTION COMPLAINT

36.     In March 2022, Defendants Armanino and Prager Metis, the FTX Entities' auditors, issued certified reports which found the FTX Entities to be in good financial health.  Moreover, Armanino and Prager Metis each went so far as to issue public statements in support of the FTX Entities and Bankman-Fried.  First, on December 8, 2021, Armanino tweeted "[l]et's go buddy!" while tagging Bankman-Fried in advance of his testifying before Congress.



Second, in June 2022, Prager Metis's website featured a photo stating that the firm was "proud to support FTX US."



37.     The Auditor Defendants' validation of the FTX Entities through their certified reports and other public statements was crucial to the FTX Entities' continued growth, as it offered

10

CLASS ACTION COMPLAINT

assurance to customers—falsely, as it turned out—that any assets deposited with FTX were in responsible hands.

### The Truth Emerges

38.     The FTX Entities' rapid growth abruptly halted on November 2, 2022, when an article published by the cryptocurrency publication *CoinDesk* questioned the financial health of Alameda and the FTX Entities.  Specifically, the article, entitled "Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet" stated, in relevant part:

> Billionaire Sam Bankman-Fried's cryptocurrency empire is officially broken into two main parts: FTX (his exchange) and Alameda Research (his trading firm), both giants in their respective industries.

> But even though they are two separate businesses, the division breaks down in a key place: on Alameda's balance sheet, according to a private financial document reviewed by CoinDesk. (It is conceivable the document represents just part of Alameda.)

> That balance sheet is full of FTX – specifically, the FTT token issued by the exchange that grants holders a discount on trading fees on its marketplace. While there is nothing per se untoward or wrong about that, it shows Bankman-Fried's trading giant Alameda rests on a foundation largely made up of a coin that a sister company invented, not an independent asset like a fiat currency or another crypto. The situation adds to evidence that the ties between FTX and Alameda are unusually close.

> The financials make concrete what industry-watchers already suspect: Alameda is big. As of June 30, the company's assets amounted to $14.6 billion. Its single biggest asset: $3.66 billion of "unlocked FTT." The third-largest entry on the assets side of the accounting ledger? A $2.16 billion pile of "FTT collateral."

> There are more FTX tokens among its $8 billion of liabilities: $292 million of "locked FTT." (The liabilities are dominated by $7.4 billion of loans.)

> "It's fascinating to see that the majority of the net equity in the Alameda business is actually FTX's own centrally controlled and printed-out-of-thin-air token," said Cory Klippsten, CEO of investment platform Swan Bitcoin, who is known for his critical views of altcoins, which refer to cryptocurrencies other than bitcoin (BTC).

***

11

CLASS ACTION COMPLAINT

Other significant assets on the balance sheet include $3.37 billion of "crypto held" and large amounts of the Solana blockchain's native token: $292 million of "unlocked SOL," $863 million of "locked SOL" and $41 million of "SOL collateral." Bankman-Fried was an early investor in Solana. Other tokens mentioned by name are SRM (the token from the Serum decentralized exchange Bankman-Fried co-founded), MAPS, OXY and FIDA. There is also $134 million of cash and equivalents and a $2 billion "investment in equity securities."

Also, token values may be low. In a footnote, Alameda says "locked tokens conservatively treated at 50% of fair value marked to FTX/USD order book."

Owners of the FTT token get discounts on FTX trading fees, increased commissions on referrals and earn rewards. The value of FTT is maintained by FTX's rolling program of buying back and burning tokens, a process that eats up a third of the exchange's trading commissions, which will continue until half of all tokens are burned, according to FTX.

39. Shortly after the *CoinDesk* article was published, the FTX Entities saw massive customer withdrawals, resulting in a liquidity crisis. Ultimately, Bankman-Fried elected to freeze all withdrawals of customer assets.

40. Then, on November 8, 2022, rival cryptocurrency exchange Binance announced that it had reached a non-binding deal to acquire FTX. However, only one day later, Binance announced that "as a result of corporate due diligence" . . . [Binance had] decided that [it would] not pursue the potential acquisition of FTX[]" and that "the issues [were] beyond [Binance's] control or ability to help."



**Binance** ✔
@binance
✅ Official                                          ...

As a result of corporate due diligence, as well as the latest news reports regarding mishandled customer funds and alleged US agency investigations, we have decided that we will not pursue the potential acquisition of FTX.com.

4:00 PM · Nov 9, 2022

CLASS ACTION COMPLAINT

1



2

3

4

5

6

7    41.    On November 10, 2022, Bankman-Fried took to Twitter and issued a series of

8    twenty-two tweets apologizing to customers and attempting to offer an explanation for the crash.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

 SBF ✔
@SBF_FTX
···

9) Anyway: right now, my #1 priority--by far--is doing right by users.

And I'm going to do everything I can to do that.  To take responsibility, and do what I can.

9:13 AM · Nov 10, 2022

SBF ✔
@SBF_FTX
···

11) There are a number of players who we are in talks with, LOIs, term sheets, etc.

We'll see how that ends up.

9:13 AM · Nov 10, 2022

SBF ✔
@SBF_FTX
···

13) Because at the end of the day, I was CEO, which means that "I" was responsible for making sure that things went well.  "I", ultimately, should have been on top of everything.

I clearly failed in that.  I'm sorry.

9:13 AM · Nov 10, 2022

SBF ✔
@SBF_FTX
···

15) First, one way or another, Alameda Research is winding down trading.

They aren't doing any of the weird things that I see on Twitter--and nothing large at all.  And one way or another, soon they won't be trading on FTX anymore.

9:13 AM · Nov 10, 2022

SBF ✔
@SBF_FTX
···

17) All of the stakeholders would have a hard look at FTX governance.  I will not be around if I'm not wanted.

All of the stakeholders--investors, regulators, users--would have a large part to play in how it would be run.

Solely trust.

9:13 AM · Nov 10, 2022

SBF ✔
@SBF_FTX
···

19) A few other assorted comments:

This was about FTX International.  FTX US, the US based exchange that accepts Americans, was not financially impacted by this shitshow.

It's 100% liquid.  Every user could fully withdraw (modulo gas fees etc).

Updates on its future coming.

9:13 AM · Nov 10, 2022

SBF ✔
@SBF_FTX
···

10) So, right now, we're spending the week doing everything we can to raise liquidity.

I can't make any promises about that.  But I'm going to try.  And give anything I have to if that will make it work.

9:13 AM · Nov 10, 2022

SBF ✔
@SBF_FTX
···

12) Every penny of that--and of the existing collateral--will go straight to users, unless or until we've done right by them.

After that, investors--old and new--and employees who have fought for what's right for their career, and who weren't responsible for any of the fuck ups.

9:13 AM · Nov 10, 2022

SBF ✔
@SBF_FTX
···

14) So, what does this mean going forward?

I'm not sure--that depends on what happens over the next week.

But here are some things I know.

9:13 AM · Nov 10, 2022

 SBF ✔
@SBF_FTX
···

16) Second, in any scenario in which FTX continues operating, its first priority will be radical transparency--transparency it probably always should have been giving.

Giving as close to on-chain transparency as it can: so that people know  "exactly" what is happening on it.

9:13 AM · Nov 10, 2022

 SBF ✔
@SBF_FTX
···

18) But all of that isn't what matters right now--what matters right now is trying to do right by customers.  That's it.

9:13 AM · Nov 10, 2022

 SBF ✔
@SBF_FTX
···

20) At some point I might have more to say about a particular sparring partner, so to speak.

But you know, glass houses.  So for now, all I'll say is:

well played; you won.

9:13 AM · Nov 10, 2022

14

CLASS ACTION COMPLAINT



42.     Then, on November 12, 2022, *The Wall Street Journal* published an article entitled "Alameda, FTX Executives Are Said to Have Known FTX Was Using Customer Funds." The article stated, in relevant part:

> Alameda Research's chief executive and senior FTX officials knew that FTX had lent its customers' money to Alameda to help it meet its liabilities, according to people familiar with the matter.
>
> Alameda's troubles helped lead to the bankruptcy of FTX, the crypto exchange founded by Sam Bankman-Fried. Alameda is a trading firm also founded and owned by Mr. Bankman-Fried.
>
> Alameda faced a barrage of demands from lenders after crypto hedge fund Three Arrows Capital collapsed in June, creating losses for crypto brokers such as Voyager Digital Ltd., the people said.
>
> In a video meeting with Alameda employees late Wednesday Hong Kong time, Alameda CEO Caroline Ellison said that she, Mr. Bankman-Fried and two other FTX executives, Nishad Singh and Gary Wang, were aware of the decision to send customer funds to Alameda, according to people familiar with the video. Mr. Singh was FTX's director of engineering and a former Facebook employee. Mr. Wang, who previously worked at Google, was the chief technology officer of FTX and co-founded the exchange with Mr. Bankman-Fried.
>
> Ms. Ellison said on the call that FTX used customer money to help Alameda meet its liabilities, the people said.
>
> Alameda had taken out loans to fund illiquid venture investments, the people said. On Friday, FTX, Alameda, FTX US and other FTX affiliates filed for bankruptcy protection.
>
> Bankruptcy means that it could be a long time before individual investors and others owed their funds are able to potentially recover any of them, if ever.

15

CLASS ACTION COMPLAINT

43. *The Wall Street Journal* article's revelation that customer assets were being used to cover Alameda's trading losses and repay its outstanding debts demonstrated that Defendants had been operating in direct contradiction of the FTX Entities' terms of service, which explicitly stated that customer assets would not be transferred to FTX trading.

44. Shortly after the foregoing disclosures, Bankman-Fried resigned as CEO of FTX and the FTX Entities and Alameda filed for bankruptcy. In a Delaware Bankruptcy Court filing, FTX's new CEO John J. Ray III stated that he had never seen "such a complete lack of corporate controls and such a complete absence of trustworthy financial information as occurred here . . . the situation is unprecedented."

45. Thereafter, on November 30, 2022, Bankman-Fried granted a tele-interview to *New York Times* reporter Andrew Ross Sorkin, during which Bankman-Fried fundamentally accepted responsibility for FTX and Alameda's failures. Among other statements, Bankman-Fried acknowledged: "***I was responsible for doing the right things and I mean, we didn't. Like, we messed up big.***"

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

46. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of a Class, consisting of all those who have been unable to withdraw funds deposited into YBAs with the FTX Entities (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the FTX Entities, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

47. The members of the Class are so numerous that joinder of all members is impracticable. At least tens of thousands of depositors of FTT Tokens are presently unable to

16

CLASS ACTION COMPLAINT

withdraw their assets from FTX YBAs. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the FTX Entities or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in class actions.

48.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of laws that are complained of herein.

49.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

50.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal or applicable laws were violated by Defendants' acts as alleged herein;

- whether the YBAs were unregistered securities under federal or applicable law;

- what the type and measure of damages suffered by Plaintiff and the Class may be;

- whether Plaintiff and Class members have sustained monetary loss and the proper measure of that loss;

- whether Plaintiff and Class members are entitled to injunctive and/or declaratory relief;

- whether Plaintiff and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of Defendants' conduct.

17

CLASS ACTION COMPLAINT

51.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

**Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq.**
**(Individually and on Behalf of the Class)**

52.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

53.     This Count is asserted against the Individual Defendants and is based upon the California Unfair Competition Law ("UCL"), which prohibits any "unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code §17200.

54.     The Individual Defendants' unfair and deceptive practices described herein are likely to mislead—and clearly have misled—consumers acting reasonably in the circumstances into depositing funds into YBAs with the FTX Entities.

55.     <u>Unlawful</u>: The Individual Defendants have advertised the YBAs using false and/or misleading claims, such that the Individual Defendant's actions as alleged herein violate at least the following laws:

- The False Advertising Law, California Business & Professions Code § 17500, *et seq*.

56.     <u>Fraudulent</u>: A practice is "fraudulent" if members of the general public were or are likely to be deceived. The Individual Defendants' statements regarding the legality, nature and viability of YBAs are deceptive to the public. Further, Defendant Bankman-Fried and the FTX

18

CLASS ACTION COMPLAINT

Entities' operation of the FTX Entities and Ponzi-scheme type behavior is further fraudulent and deceptive to the public related to the viability and nature of the FTX Entities.

57.     <u>Unfair</u>: The UCL gives courts maximum discretion to address improper business practices that are "unfair."  The Individual Defendants' collective conduct with respect to the marketing and sale of YBAs is unfair because the Individual Defendants' conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers in inducing them to deposit funds into YBAs with the FTX Entities and the utility of their conduct, if any, does not remotely outweigh the gravity of the harm to its victims.   Plaintiff and the Class would not have deposited funds into YBAs with the FTX Entities had they known that the statements were misrepresentations and deliberately deceiving.

58.     Defendant Bankman-Fried and the FTX Entities' conduct with respect to the operation of the FTX Entities is also unfair because the consumer injury is substantial, not outweighed by benefits to consumers or competition, and not one that consumers, can reasonably avoid.

59.     The harm suffered by Plaintiff and the Class was directly and proximately caused by the deceptive and unfair practices of the Individual Defendants related to YBAs and the operation of the FTX Entities, as described herein.

60.     In accordance with California Business & Professions Code § 17203, Plaintiff seeks an order enjoining the Individual Defendants from continuing to conduct business through fraudulent or unlawful acts and practices and to commence a corrective advertising campaign.  On behalf of the Class, Plaintiff also seeks an order for the restitution of all monies made into YBAs with the FTX Entities, which were made resulting from acts of fraudulent, unfair, or unlawful competition.

CLASS ACTION COMPLAINT

## <u>COUNT II</u>

### Violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, et seq.
### (Individually and on Behalf of the Class)

61.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

62.     This Count is asserted against Individual Defendants and is based upon California's False Advertising Law ("FAL"), which prohibits any statement in connection with the sale of goods "which is untrue or misleading." Cal. Bus. & Prof. Code § 17500.

63.     As set forth herein, the Individual Defendants made statements regarding YBAs and the FTX Entities that were untrue or misleading.  They publicly represented that the FTX Entities and YBAs were a viable and safe way to invest in crypto, a statement designed to deceive consumers into investing with the FTX Entities.

64.     The Individual Defendants' claims that YBAs and the FTX Entities were viable and safe for investing in crypto are untrue due to the house of cards nature of the FTX Entities' business and movement of funds, as evidenced by the immense collapse in fall 2022.

65.     The Individual Defendants knew, or reasonably should have known, that all these claims relating to the viability and safety of YBAs and the FTX Entities were untrue or misleading. The Individual Defendants failed to adequately inform Plaintiff and the Class of the true nature of YBAs and the FTX Entities.

66.     When the true nature of the FTX Entities and YBAs became publicly known in the fall of 2022, the immediate public outrage, bankruptcy proceedings, and government investigation reflected the degree to which consumers and the public at large felt they were deceived by the Individual Defendants and the FTX Entities' business practices.

67.     By reason of the above conduct, the Individual Defendants are liable pursuant to Cal. Bus. & Prof. Code § 17500.

**COUNT III**

**Fraudulent Concealment**
**(Individually and on Behalf of the Class)**

68.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

69.     This Count is asserted against the Individual Defendants and is based upon the claim of fraudulent concealment under common law.

70.     The Individual Defendants omitted an existing fact about the FTX Entities and YBAs when it failed to disclose information regarding the true nature of the FTX Entities and YBAs.

71.     The omission is material because Plaintiff and the Class would not have transacted with the FTX Entities had they known true nature of the FTX Entities and YBAs.

72.     The Individual Defendants marketed and sold to Plaintiff and the Class despite having knowledge of the true nature of the FTX Entities and YBAs.

73.     The Individual Defendants intended that consumers and purchasers would rely on the Individual Defendants' statements regarding the safety and nature of the FTX Entities and YBAs to bolster sales.

74.     Plaintiff and the Class were not aware of the true nature and safety of YBAs and the FTX Entities' platform and could not reasonably have discovered those true characteristics.

75.     Plaintiff and the Class relied on the Individual Defendants' statements in that they deposited any amount of funds into YBAs with the FTX Entities, which they would not have done had they known the true risky nature of the products.

76.     Plaintiff and the Class had the right to rely on the Individual Defendants' statements and omissions that created the false impression that the FTX Entities and YBAs were safe and

CLASS ACTION COMPLAINT

reliable investment accounts based on reasonable purchaser expectations that the exchange would remain solvent.

77.     The Individual Defendants had an affirmative duty to disclose the true nature of the FTX Entities and YBAs to potential purchasers and investors because they were in a superior position to know the true nature of the FTX Entities and YBAs.

78.     The Individual Defendants fraudulently concealed the nature of the FTX Entities and YBAs, causing damages to Plaintiff and the class.

## COUNT IV

### Civil Conspiracy
### (Individually and on Behalf of the Class)

79.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

80.     This Count is asserted against all Defendants and is based upon the claim of civil conspiracy under common law.

81.     The Individual Defendants made innumerable misrepresentations and omissions to Plaintiff and Class Members regarding the nature and safety of the FTX Entities and YBAs in order to induce confidence in the platform and convince consumers to invest in what was a patently misleading and deceptive scheme, thus deceiving consumers and potential customers that their investments in the FTX Entities were safe.

82.     Bankman-Fried entered into at least one agreement with the other Defendants for the express purpose of making misrepresentations or omissions in order to induce and convince Plaintiff and consumers to invest in YBAs and put their money in the FTX Entities.

83.     Defendants engaged in concerted unlawful acts, particularly in the form of misrepresentations and omissions made to Plaintiff and the Class for the purposes of inducing them to invest with the FTX Entities and in YBAs.

22

84. The conspiracy substantially aided the wrongdoing conducted by the FTX Entities and Bankman-Fried. Additionally, the Auditor Defendants had knowledge of the fraud and wrongdoing by the FTX Entities as a result of their experience and relationship with the FTX Entities, and thus knew or should have known that the representations they made were deceitful and fraudulent.

85. This conspiracy caused damages to Plaintiff and the Class in the amount of the money they invested in the FTX Entities that was lost as a result of the insolvency.

## **COUNT V**

### **Declaratory Judgment, Cal. Code Civ. Proc. § 1060**
### **(Individually and on Behalf of the Class)**

86. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

87. This Count is asserted against the Individual Defendants under Cal. Code Civ. Proc. § 1060.

88. There is a bona fide, actual, and present need for the declaratory relief requested herein; the declaratory relief prayed for herein deals with a present, ascertained or ascertainable state of facts and a present controversy as to that state of facts; contractual and statutory duties and rights are dependent on those facts and law applicable to the facts; the parties have an actual, present, adverse, and directly antagonistic interest in the subject matter; and the antagonistic and adverse interests are all before this Court by proper process for final resolution.

89. Plaintiff and the Class have an obvious and significant interest in the outcome of this lawsuit.

90. Plaintiff and the Class deposited funds into YBAs with the FTX Entities, based in part on justifiable reliance on the Individual Defendants' statements and misrepresentations regarding the nature of YBAs and the FTX Entities' platform.

23

91. If Plaintiff and the Class knew the true facts surrounding YBAs and the FTX Entities, including but not limited to that YBAs are unregistered securities, Plaintiff and the Class would not have deposited funds into YBAs with the FTX Entities in the first place.

92. Thus, there is a justiciable controversy over whether the YBAs were sold illegally and whether the Defendants illegally solicited their deposits from Plaintiff and the Class.

93. Plaintiff and the Class thus seek an order declaring that the YBAs were unregistered securities and needed to be registered with the SEC and state regulatory authorities, that the FTX Entities did not work as represented, and that the Individual Defendants were paid to misrepresent the FTX Entities and YBAs to the nation at large.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: December 2, 2022

Respectfully submitted,

POMERANTZ LLP

*/s/ Jennifer Pafiti*

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024

24

Telephone: (310) 405-7190
jpafiti@pomlaw.com

POMERANTZ LLP
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC
Peretz Bronstein
(*pro hac vice* application forthcoming)
Eitan Kimelman
(*pro hac vice* application forthcoming)
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com
eitank@bgandg.com

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT