# EXHIBIT 2

Marshal J. Hoda, Esq.
TX Bar No. 24110009
THE HODA LAW FIRM, PLLC
12333 Sowden Road, Suite B, PMB 51811
Houston, Texas 77080
o. (832) 848-0036
marshal@thehodalawfirm.com
*Pro hac vice pending*

Steven C. Vondran, Esq.
CA Bar No. 232337
THE LAW OFFICES OF STEVEN C. VONDRAN, PC
One Sansome Street, Suite 3500
San Francisco, California 94104
o. (877) 276-5084
steve@vondranlegal.com

*Attorneys for Plaintiff & the Class*

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO & OAKLAND DIVISION

| | |
|---|---|
| **Stephen Pierce, individually and on behalf of all others similarly situated,** | Case No. |
| Plaintiff; | _____ |
| v. | |
| **Samuel Bankman-Fried, Caroline Ellison, Zixiao "Gary" Wang, Nishad Singh, Armanino, LLP, and Prager Metis CPAs, LLC,** | **CLASS ACTION COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| Defendants. | |

1

# TABLE OF CONTENTS

2

**I.  INTRODUCTION**                                                    **3**

3

**II.  SUMMARY OF THE ACTION**                                   **4**

4

**III. PARTIES**                                                            **6**

5

**IV. JURISDICTION & VENUE**                                    **8**

6

A.  SUBJECT-MATTER JURISDICTION                              8

7

B.  PERSONAL JURISDICTION                                          8

8

C.  VENUE                                                                  10

9

D.  DIVISIONAL ASSIGNMENT                                        11

10

**V.  FACTUAL ALLEGATIONS**                                    **11**

11

A.  WELCOME TO CRYPTO-WORLD                                11

12

B.  ENTER: SBF                                                            12

13

C.  FTX LIFTS OFF                                                      13

14

D.  INSIDE FTX                                                          15

15

E.  FTX'S COLLAPSE                                                    17

16

F.  THE FALLOUT                                                        20

17

G.  HOW THE SCHEME WORKED                                    22

18

**VI. CAUSES OF ACTION & CLASS ALLEGATIONS**        **37**

19

A.  CLASS TYPE & DEFINITION                                      41

20

B.  RULE 23 REQUISITES                                              41

21

**VII. PRAYER FOR RELIEF**                                        **43**

22

**VIII.JURY DEMAND**                                                **44**

23

24

25

26

27

28

# CLASS ACTION COMPLAINT

*"It is sort of like real monetizable stuff in some senses … like you're the guy calling bullsh\*t and saying this thing's actually worthless but in what sense are you right?"*

- Sam Bankman-Fried, Defendant and founder of FTX Group, asked if he was running a Ponzi scheme.

*"How do I signal my genuinely sweet and feminine nature on my dating profile? Should it go before or after the section on wire fraud[?]"*

- Caroline Ellison, Defendant and former CEO of Alameda Research, on her personal blog.

*"I have been the Chief Restructuring Officer or Chief Executive Officer in several of the largest corporate failures in history … Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here … this situation is unprecedented."*

- John J. Ray III, FTX Group bankruptcy administrator, describing the FTX debacle in recent judicial pleadings.

## I.  Introduction

Sam Bankman-Fried built a cryptocurrency empire that made him a billionaire before the age of 30. That empire has now collapsed, and it has become clear that Bankman-Fried and his lieutenants misappropriated billions of dollars of their customers' assets. This is a RICO action against Sam Bankman-Fried and those who conspired in and facilitated his misdeeds.

The named Plaintiff, Stephen Pierce, is an individual who entrusted his savings to Bankman-Fried's now-defunct cryptocurrency exchange FTX US. Like many others, Mr. Pierce lost those savings when Bankman-Fried's house of cards collapsed.

He thus brings this complaint, on behalf of himself and all others similarly situated, against (1) Sam Bankman-Fried, (2) Caroline Ellison, (3) Zixiao "Gary" Wang, (4) Nishad Singh, (5) Armanino, LLP, and (6) Prager Metis CPAs, LLC (collectively, the "Defendants"). In support thereof, he would show the Court as follows.[1]

## II.    Summary of the Action

1.      This action arises from one of the great frauds in history. But, as is often true, what became a calamity started with runaway success. In 2017, Sam Bankman-Fried founded a cryptocurrency trading firm called **Alameda Research** in Berkeley, California. In 2019, he started a cryptocurrency exchange[2] called **FTX**—which quickly grew to become the world's second-largest. By 2022, Forbes estimated his fortune at $17 billion and ranked him the 41st richest person in the world. It was amongst the fastest accumulations of self-made wealth in history.

2.      Bankman-Fried didn't just get rich—he fashioned himself a prophet. In an endless stream of tweets, interviews, and appearances, he touted a prosperous future powered by a crypto bull market that would never end. He repeatedly proclaimed his intention to give away his fortune. He hobnobbed with the rich and famous and became one of the United States' largest political donors. In no time at all, Bankman-Fried became a celebrity in his own right—recognizable the world over by his initials: "SBF."

3.      Then it all fell apart.  In November 2022, a leaked balance sheet made clear that Alameda Research was in serious financial trouble. That spooked the

---

[1] Statements related to Mr. Pierce's own experiences are within his personal knowledge. All other allegations are the result of investigation by the undersigned attorneys.

[2] A cryptocurrency exchange is a business that provides customers a digital marketplace for buying, selling, and storing cryptocurrencies and making cryptocurrency-related financial transactions.

Class Action Complaint

market, leading to massive withdrawals from Bankman-Fried's cryptocurrency exchanges and a liquidity crisis. In response, Bankman-Fried froze withdrawals of customer assets—and then put his whole empire into bankruptcy. His companies went from collective valuations exceeding $40 billion to zero. It took nine days.

4. In the aftermath, Bankman-Fried and his top brass made a series of public statements about what went wrong. Bankman-Fried tweeted that he had "f*cked up" and was "sorry," without explaining precisely how or why. Then came the big reveal. Caroline Ellison—then-CEO of Alameda Research and Bankman-Fried's former girlfriend—admitted that she, Bankman-Fried, Gary Wang, and Nishad Singh had misappropriated FTX customer assets to cover Alameda's trading losses and repay its outstanding debts. FTX had a **$10 billion** hole in its balance sheet.

5. Bankman-Fried soon admitted that this misappropriation was not a one-time event, but part of a years-long pattern of malfeasance and deception that enriched him and his co-conspirators at the expense of their customers. He confessed to a journalist that "each step was in isolation rational and reasonable, and then when I finally added it up last week it wasn't." He even revealed that his altruistic public persona had been a sham, writing that it had all been part of "this dumb game we woke westerners play where we say all the right shibboleths so everyone likes us."

6. This is a unique case in many respects, but perhaps most of all in the brazenness of the scheme, the scale of the disaster, and Bankman-Fried's immediate confessions. Although there is much to be learned in discovery, the key facts are clear. Bankman-Fried's cryptocurrency exchanges' terms of service made clear that customers' assets belonged at all times to customers, and would not be transferred to or used by Bankman-Fried's companies. But Bankman-Fried and his inner circle treated those assets as a slush fund to fund their own proprietary investments and a variety of personal boondoggles. To top it off, they used inside knowledge and

technical expertise to systematically advantage their own trading efforts and cheat their customers. And they covered it all up by intentionally and systematically deceiving the public about the true nature of their enterprise.

7.      Bankman-Fried and his lieutenants did not act alone. They conspired with various professionals and firms who vouched for and facilitated their enterprise, lending a crucial veneer of respectability to their operation. Two of those co-conspirators, Armanino and Prager Metis, were the FTX Group's auditors.[3] Each of these firms facilitated the FTX Group enterprise by giving Bankman-Fried's entities clean bills of health, which Bankman-Fried used to convince customers and investors to trust him with their money. All the while, they remained willfully blind to the nature of the FTX Group enterprise for the sake of their own statuses in the crypto community and their bottom lines.

8.      In legal terms, all this adds up to a years-long pattern of racketeering and conspiracy charcterized by numerous instances of theft, wire fraud, bank fraud, money laundering, and trafficking in stolen property in violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"). This is a suit to hold the Defendants accountable to the victims they harmed.

**III.    Parties**

9.      Plaintiff Stephen Pierce is an individual United States citizen residing in Maryland. Mr. Pierce deposited $19,986.00 in an interest-bearing account with FTX US on January 5, 2022. He used the FTX US mobile app to request a withdrawal of $19,461.00 on November 7, 2022. Mr. Pierce has not received his money. He is one of more than a million depositors who lost their money in the FTX Group's collapse.

---

[3] The "FTX Group" is the RICO enterprise-in-fact at the heart of this matter, consisting of at least four different "Silos" and more than 130 individual business entities.

10.     Defendant Samuel "Sam" Bankman-Fried is an individual United States citizen. Bankman-Fried is the founder and former leader of the FTX Group. Bankman-Fried resides in The Bahamas. The most recent available information suggests that he remains there under the supervision of Bahamian authorities.

11.     Defendant Caroline Ellison is an individual United States citizen. Ellison is the former CEO of Alameda Research and part of Bankman-Fried's inner circle. Ellison resided until recently in The Bahamas. She is rumored to have absconded following the FTX Group's collapse. Her current whereabouts are unclear.

12.     Defendant Zixiao "Gary" Wang is an individual United States citizen. Wang is the co-founder of Alameda Research and the FTX cryptocurrency exchanges. He served as FTX's Chief Technical Officer and was part of Bankman-Fried's inner circle. Wang resided until recently in The Bahamas. He is rumored to have absconded following the FTX Group's collapse. His current whereabouts are unclear.

13.     Defendant Nishad Singh is an individual United States citizen. Singh is the co-founder of the FTX cryptocurrency exchanges. He served as FTX's Chief Engineering Officer and was part of Bankman-Fried's inner circle. Singh resided until recently in The Bahamas. He is rumored to have absconded following the FTX Group's collapse. His current whereabouts are unclear.

14.     Defendant Armanino, LLP ("Armanino") is an accounting and consulting firm that was engaged by the FTX Group to perform corporate audits. It is one of the top 25 largest independent accounting and business consulting firms in the United States, with more than 2000 employees and 24 offices—including ten offices in California. Armanino markets itself aggressively to companies in the cryptocurrency space, touting an "industry-focused practice" that "serves digital asset financial service firms, miners & stakers, token projects, and 'crypto-curious'

Class Action Complaint                                                    Page 7 of 45

1  companies … to fulfill the unique needs of the industry." Armanino has its principal
2  place of business at 12657 Alcosta Boulevard, Suite 500, San Ramon, California.

3      15.     Defendant Prager Metis CPAs, LLC ("Prager Metis") is an accounting
4  and consulting firm that was engaged by the FTX Group to perform corporate audits.
5  Prager Metis has more than 700 employees in offices around the United States and
6  the globe, including five offices in California. Prager Metis markets itself aggressively
7  to companies in the cryptocurrency space, announcing recently that it had become
8  "the first-ever CPA firm to officially open its Metaverse headquarters." Prager Metis
9  is a New York LLC with its principal place of business at 14 Penn Plaza, Suite 1800,
10 New York, New York, 10122.

11  **IV.     Jurisdiction & Venue**
12          **A.     Subject-Matter Jurisdiction**
13      16.     This Court has jurisdiction over the RICO claims in this lawsuit under
14  28 U.S.C. § 1331 because these claims arise under the laws of the United States.

15          **B.     Personal Jurisdiction**
16      17.     This Court has personal jurisdiction over Bankman-Fried, Ellison,
17  Wang, and Singh because each of them regularly conducts business in California and
18  has done so for many years. Bankman-Fried and Wang founded Alameda Research
19  in Berkeley, California in 2017 and operated that company from Berkeley for several
20  years. Ellison and Singh were early employees there.

21      18.     In addition, Bankman-Fried, Ellison, Wang, and Singh have for years
22  directed FTX and FTX US customers to deposit funds via wire transfer to Silvergate
23  Bank, a California business entity with its principal place of business at 4250
24  Executive Square, Suite 300, La Jolla, California. Bankman-Fried, Ellison, Wang,
25  and Singh further directed FTX US customers to submit those same wire transfers
26  to their "payee address" at 2000 Center Street in Berkeley. On information and belief,
27
28  Class Action Complaint                                                    Page 8 of 45

the FTX Group received billions of dollars in in incoming wire transfers through Silvergate, its California receiving bank, and at least tens of millions from FTX US depositors to its Berkeley payee address.

19.     In addition, Bankman-Fried, Ellison, Wang, and Singh have intentionally availed themselves of the California consumer market through the extensive promotion, marketing, and sale of their products and services in this state. In 2021, FTX US entered into a $17.5 million deal to sponsor the UC Berkeley Athletic Department and an approximately $10 million deal to sponsor the Golden State Warriors. In addition, the individual Defendants caused FTX and FTX US to engage in an extensive national marketing scheme, including by airing advertisements during Super Bowl LVI (2022) that touted their services as "a safe and easy way to get into crypto." These advertisements were directed at consumers across the United States, including consumers in California.

20.     In addition, Bankman-Fried, Ellison, Wang, and Singh have repeatedly and intentionally sought and received investments for their business enterprises in this state, including from some of the most noteworthy investment firms in Silicon Valley such as Sequoia Capital, Third Point Ventures, and Lightspeed Venture Partners (all headquartered in Menlo Park, California). On information and belief, each of them has personally traveled to this State or personally worked with individuals residing in this State as part of their efforts to secure such investments.

21.     This Court has general personal jurisdiction over Armanino because Armanino has its principal place of business in San Ramon, California. This is sufficient basis for this Court to exercise personal jurisdiction over Armanino in this matter. In addition, for the avoidance of doubt, this Court would have specific personal jurisdiction over Armanino even were Armanino not subject to general personal jurisdiction. Armanino maintains ten offices in California, including its

headquarters in San Ramon. On information and belief, individual accountants, auditors, and staff routinely performed work related to Bankman-Fried's companies from these California offices.

22.     This Court has personal jurisdiction over Prager Metis because Prager Metis regularly conducts business in California and has done so for many years. Prager Metis maintains five offices in California, with two offices in Los Angeles and one each in El Segundo, Santa Clara, and Torrance. On information and belief, individual accountants, auditors, and staff routinely performed work related to Bankman-Fried's companies from these California offices.

23.     The above-recounted allegations show that each of the Defendants is either "at home" in the State of California or otherwise has purposely availed itself of the privilege of doing business in this State such that they could reasonably anticipate being haled into court here. This Court's exercise of personal jurisdiction over each of the Defendants comports with traditional notions of fair play and substantial justice, the California long-arm statute, and the Due Process Clause of the United States Consitution.

### C.     Venue

24.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this judicial district. Specifically, as noted above, the individual Defendants' trading firm Alameda Research was founded in Berkeley, California. In addition, the individual Defendants directed their customers—including the named Plaintiff here—to make deposits in their FTX US accounts by directing wire transfers to West Realm Shire Services, Inc., which maintained its payee address at 2000 Center Street in Berkeley, California. On information and belief, customers directed at least tens of millions of dollars the Defendants' Berkeley address.

D. **Divisional Assignment**

25.     Divisional assignment to the San Francisco and Oakland Division of the Northern District of California is appropriate pursuant to Civil L.R. 3-2(c) because a substantial part of the events or omissions giving rise to the claims at issue occurred in Berkeley, California. Alameda Research, the cryptocurrency trading fund at the heart of this case, was founded in Berkeley. In addition, FTX US customers—including the named Plaintiff here—were instructed to and did deposit funds in FTX US accounts by submitting wire transfers to West Realm Shires Services, Inc., with its payee address at 2000 Center Street, Berkeley, California, 94704. On information and belief, customers directed at least tens of millions of dollars to the Defendants' Berkeley address.

V.     **Factual Allegations**

A.     **Welcome to Crypto-World**

26.     What would become the crypto craze began in 2009 with the publication of a whitepaper by a mysterious developer who called himself Satoshi Nakamoto.[4] This paper described a "peer-to-peer electronic cash system" that integrated a number of existing ideas in cryptography. Nakamoto called this system Bitcoin and soon released the first "Bitcoins" to the world. Over time, many other digital currencies emerged. These assets became known as cryptocurrencies—or "crypto," for short.

27.     All cryptocurrencies share some fundamental characteristics. Each runs on a distributed public ledger called a "blockchain." Each blockchain is a record of all transactions made between currency holders. Because each currency's blockchain is publicly distributed amongst many participants, the record created is tamper-evident and immutable. In this way, the blockchain makes it possible for each unit of a

---

[4] The person or persons who authored this paper have never been identified.

1 cryptocurrency to be transmitted from owner to owner without intermediaries such
2 as traditional banks.

3      28.     In the early days of cryptocurrency trading, technical sophistication was
4 required to buy, sell, and store these digital assets. Soon, **cryptocurrency**
5 **exchanges** emerged and lowered barriers to entry. These centralized exchanges
6 facilitated trade by calculating floating exchange rates, providing escrow services,
7 and giving users a place to store their assets. Over time, cryptocurrency exchanges
8 came to play a crucial role in the digital currency market, allowing non-technical
9 consumers to purchase crypto with just a few clicks.

10      29.     The cryptocurrency ecosystem has experienced mind-boggling growth
11 since the release of Nakamoto's paper. Exploding public interest has resulted in a
12 series of enormous swings in prices and repeated booms and busts. In 2017, the price
13 of a Bitcoin ballooned from $900 to nearly $20,000 over the course of a single year.
14 The events that led to this action began that same year.

15          **B.**    **Enter: SBF**

16      30.     The activities of Sam Bankman-Fried—or "SBF," as he is widely
17 known—are at the heart of this case. Bankman-Fried was born in California and
18 spent his early life there. He later attended the Massachusetts Institute of
19 Technology, where he studied physics and mathematics.

20      31.     In 2017, Bankman-Fried became interested in cryptocurrency. Before
21 long, he co-founded his own crypto-trading firm with Defendant Gary Wang in
22 Berkeley, California. They called it **Alameda Research**. Alameda quickly grew to
23 around 15 employees. Among their ranks were Caroline Ellison and Nishad Singh—
24 both Defendants here—who became part of Bankman-Fried and Wang's inner circle.

25      32.     Bankman-Fried was Alameda's head trader and agenda-setter. He
26 marked himself out as risk-hungry from the beginning, pushing back on efforts by his
27
28 Class Action Complaint                                 Page 12 of 45

subordinates to slow down some of the firm's riskier activities. This led to mixed results. Alameda reportedly saw huge losses on bungled trades, hacks, and unnecessary expenses. But one trade, in particular, was profitable enough to keep Alameda afloat: an arbitrage opportunity created by mismatched prices for cryptocurrency in the United States and Asia. For a time, this was immensely profitable. That was enough to mark Bankman-Fried as a rising star.

### C. FTX Lifts Off

33. In 2019, Bankman-Fried approached Changpeng "CZ" Zhao—the CEO of Binance, now the world's largest cryptocurrency exchange—with a proposal to launch a cryptocurrency futures trading desk under Zhao's umbrella. Zhao wasn't interested, but he did agree to help Bankman-Fried launch an exchange of his own. Using money from Zhao and other investors, Bankman-Fried soon co-founded **FTX**— an abbreviation for "futures exchange"—with Gary Wang and Nishad Singh.

34. FTX provided users the same core service as other cryptocurrency exchanges: a marketplace for buying, selling, and storing digital currencies. But, by 2019, the market for exchanges was well-developed and competitive. FTX needed to stand out. It did so by offering its users the largest menu of the most exotic financial instruments. FTX offered crypto derivatives trading, crypto futures trading, crypto options, leveraged tokens, and more. In 2020, Bankman-Fried, Wang, and Singh expanded their empire's reach by founding FTX US, a cryptocurrency marketplace specifically for U.S.-based consumers.

35. Though FTX offered users exotic trades, it promised not to do exotic things with their deposits. Neither FTX nor FTX US was set up to engage in "fractional reserve banking"[5] like a traditional bank. The FTX and FTX US Terms of

---

[5] Fractional reserve banking is the traditional system of banking that operates across the globe, pursuant to which banks take deposits from the public, hold a

1   Service promised to hold customers' assets 1:1, stating: "Title to your Digital Assets

2   shall at times remain with you and shall not transfer to FTX Trading" and that assets

3   would be maintained in customer accounts "for your [i.e., the customer's] benefit."

4       36.    From 2019 to 2022, FTX and FTX US dedicated mind-boggling sums to

5   marketing efforts, signing deals worth more than $375 million in sports partnerships

6   alone. The company spent a reported $6.5 million on a Superbowl ad featuring

7   *Seinfeld* creator Larry David that touted FTX as "a safe and easy way to get into

8   crypto," $17.5 million to sponsor UC Berkeley Athletics, $10 million to sponsor the

9   Golden State Warriors, and—to top it off—a reported $135 million for the naming

10  rights to the Miami Heat's NBA arena.

11      37.    Over the same period, Bankman-Fried set about building his personal

12  brand. He established himself as the world's most visible proponent of a charitable

13  movement called Effective Altruism, repeatedly proclaiming his intention to give

14  away the wealth he was rapidly accumulating. He tweeted constantly, gave numerous

15  television and podcast interviews, and became one of the United States' largest

16  political donors. He quickly became a celebrity.

17      38.    All these efforts had their intended effect: FTX and FTX US grew very

18  quickly. Within three years of opening its doors, FTX was valued at $1.2 billion. A

19  few months later, $25 billion. A few months after that, $32 billion. FTX US, for its

20  part, added another $8 billion. This meant that Bankman-Fried had suddenly become

21  very wealthy. In 2022, Forbes featured him on the cover of the 40th Annual Forbes

22  400, ranking him as the forty-first richest person in the world. The magazine noted

23

24

25  _____

26  proportion of their deposit liabilities in liquid assets as a reserve, and are at liberty

27  to lend the remainder to borrowers.

28  Class Action Complaint                                                          Page 14 of 45

1   that in all of human history only Mark Zuckerberg, founder of Facebook, had been so
2   rich so young. Bankman-Fried was twenty-nine years old.

3                    **D.    Inside FTX**

4        39.    As the FTX Group grew, Bankman-Fried and his associates moved
5   around the world in search of a business-friendly environment. They moved first to
6   Hong Kong, and later to The Bahamas. Bankman-Fried remained in charge
7   throughout, while his associates and co-owners Ellison, Wang, and Singh acted as his
8   trusted lieutenants.

9        40.    Once in The Bahamas, Bankman-Fried, Ellison, Wang, Singh, and at
10  least six other FTX Group employees lived together in a $40 million luxury penthouse
11  from which they oversaw FTX Group operations. According to FTX insiders, they
12  were and are close personal friends and have at various times had complex romantic
13  involvements. This "gang of kids"—as they have since been labeled in the press—
14  managed and directed the multi-billion-dollar FTX Group empire until its collapse.

15       41.    Given the amount of money at stake, the FTX Group's management,
16  internal processes, and corporate structure over this period were almost comically
17  deficient. The FTX Group did not maintain centralized control of its cash, failing even
18  to keep an accurate list of bank accounts and signatories. Nor did it keep a list of its
19  employees. Disbursements were granted through an online chat system where
20  supervisors blessed spending requests with personalized emojis. Perhaps most
21  shockingly, FTX—a company valued at $32 billion—had neither a board of directors
22  nor an accounting department. At one point, an experienced investor advised FTX to
23  implement a board of directors and other internal controls. An FTX employee
24  reportedly responded: "Go f*uck yourself."

25       42.    The FTX Group's digital security measures were similarly egregious. An
26  unsecured group email account was used to access critically sensitive data such as

27

28  Class Action Complaint                                        Page 15 of 45

private encryption keys. No effective firewalls were established between the FTX Group exchanges and their owners' proprietary trading activities. And the FTX Group failed to perform daily reconciliation of positions on the blockchain—perhaps the most basic function of a cryptocurrency exchange.

43.     Worst of all, it now appears that throughout the FTX Group's history, Bankman-Fried and his lieutenants treated their companies' and their customers' assets as an enormous slush fund. During the FTX Group's collapse, Ellison admitted that she, Bankman-Fried, Wang, and Singh had diverted $10 billion in customer assets to fund venture investments, cover trading losses, and pay Alameda's debts. Bankruptcy filings have confirmed that they "loaned" (i) $2.3 billion to Paper Bird, Inc., a Delaware corporation controlled by Bankman-Fried, (ii) another $1 billion to Bankman-Fried personally, (iii) $543 million to Nishad Singh, and (iv) $55 million to Ryan Salame.[6] They used hundreds of millions in corporate funds to purchase homes and other personal items for FTX Group employees and advisors. At least $1 billion more has simply vanished. They did all this using a custom "backdoor" in their businesses' accounting software, reportedly built and maintained by Gary Wang.

44.     Bankman-Fried and his lieutenants set about covering their tracks even as FTX Group grew. Bankman-Fried often communicated using applications that were set to auto-delete after a short period and encouraged other employees to do the same. And he and his lieutenants formed a complex web of more than 130 distinct business entities in jurisdictions across the globe. Many were simply shells—failing, in many instances, to hold a single board meeting.

45.     Bankman-Fried and his lieutenants also used the inside advantage gained from operating their cryptocurrency exchanges to the benefit of their

---

[6] Ryan Salame was co-CEO of FTX Digital Markets.

proprietary trading operations—and thus themselves—at the expense of the FTX Group's customers. They secretly exempted Alameda Research from the FTX auto-liquidation protocol, meaning—on information and belief—that unlike other traders, Alameda could make losing trades without forfeiting its collateral. In addition, independent blockchain analysis has revealed that FTX Group used inside knowledge about future listings on the FTX exchanges to "front run" the market and their own customers—purchasing stockpiles of soon-to-be-listed cryptocurrencies and selling them at inflated prices once their addition to FTX's menu was announced.

46.    Amidst this internal chaos, Bankman-Fried and his lieutenants were engaged in a calculated campaign to bring additional users to the FTX Group exchanges and secure investment funding. To do so, they needed to create the appearance that the FTX Group was a legitimate and trustworthy enterprise. Bankman-Fried thus devised and executed a scheme to convince the world of his personal magnanimity and the security of the FTX exchanges. Bankman-Fried repeatedly touted his exchanges' industry-leading security and liquidity, boasted that FTX and FTX US had completed GAAP audits, and even testified about FTX's virtues before the U.S. Congress.[7] This scheme had its intended effect. FTX and FTX US continued apace until just days before the FTX Group's collapse.

### E.    FTX's Collapse

47.    In early 2022, the FTX Group business appeared strong. But within months of Bankman-Fried's Forbes 400 cover, the crypto market began to show serious signs of weakness. The risk of contagion loomed. Bankman-Fried was quick to react, doling out lines of credit to keep foundering institutions afloat. This earned

---

[7] Specific false representations are set out in Section V(G), *infra*.

Class Action Complaint                                              Page 17 of 45

1  him numerous plaudits as the "JP Morgan of crypto." And it appeared, at least for a
2  time, that Bankman-Fried's plan to prop up the market might work.

3       48.     It didn't. In early November 2022, CoinDesk published a report setting
4  out never-before-seen details of Alameda Research's balance sheet. This report
5  showed that Alameda was enormously exposed to one asset—a cryptocurrency called
6  the **FTT token**, the "in-house" currency of FTX. This showed that both parts of
7  Bankman-Fried's empire were propped up by demand for an asset whose value was
8  inextricably tied up with perception of the FTX brand and Bankman-Fried himself.
9  Years of rumors about the ongoing interconnection between Bankman-Fried's trading
10  firm and his exchanges were confirmed. Fear, uncertainty, and doubt—"FUD" in
11  crypto argot—began to spread.

12       49.     Caroline Ellison, by this point Alameda's CEO, soon took to Twitter in
13  an attempt at defense. She claimed that Alameda had more than $10 billion in assets
14  and a variety of "hedges" that weren't reflected on the leaked balance sheet. But this
15  announcement did not have its intended effect. Within hours, Changpeng Zhao
16  announced that he would liquidate his holdings of the FTT token. Given the
17  importance of the FTT token price to both Alameda and the FTX exchanges, this
18  exacerbated concerns over the health of all parts of the FTX empire.

19       50.     Bankman-Fried himself took to Twitter after Zhao's announcement,
20  attempting to calm the market's fears. Bankman-Fried claimed: "FTX is fine. Assets
21  are fine. FTX has enough to cover all client holdings. **We don't invest client assets**
22  **(even in treasuries)**." Acknowledging the ongoing wave of withdrawals from FTX's
23  exchanges, he wrote: **"We have been processing all withdrawals, and will**
24  **continue to do so."**

25       51.     FTX stopped processing withdrawals less than 24 hours later.
26  Bankman-Fried then shocked the world by announcing that FTX—until just days

27

28  Class Action Complaint                      Page 18 of 45

1    earlier one of the world's largest cryptocurrency exchanges, valued at $32 billion—

2    would be acquired by its competitor Binance. Bankman-Fried claimed this acquisition

3    would "clear out the withdrawal backlog" and deal with FTX's "liquidity crunch." He

4    promised again that "**all assets will be covered 1:1**."

5         52.   Bankman-Fried's tweets made out the Binance acquisition as a done

6    deal. It was not. After getting a look at FTX's balance sheet, Binance walked away.

7    This set off a panic. Customers tried to withdraw assets from FTX and FTX US *en*

8    *masse*. FTX's website became unusable. Users received the message: "We're sorry,

9    something went wrong while processing your request. Please try again later."

10        53.   Bankman-Fried again took to Twitter. He began: "I'm sorry. That's the

11   biggest thing. I f*cked up, and should have done better." Over the course of twelve

12   tweets, he proceeded to admit that FTX did not have enough reserves to cover client

13   withdrawals, to reveal that Alameda Research would be "winding down," and to

14   apologize for the calamity. He wrote that he was "responsible for making sure that

15   things went well," and had "clearly failed in that." He concluded, again: "I'm sorry."

16        54.   Ellison soon revealed the $10 billion hole in FTX's balance sheet to a

17   gathering of Alameda Research employees. Bankman-Fried soon confirmed by

18   showing spreadsheets to potential investors that revealed these FTX client funds had

19   been transferred to Alameda. The documents further showed that approximately $2

20   billion of assets were altogether unaccounted for. Internal examiners soon discovered

21   the "backdoor" that had allowed Bankman-Fried and his lieutenants to move these

22   assets without detection.

23        55.   As these revelations poured in, another Twitter announcement from

24   Bankman-Fried: "**Hi all: Today, I filed FTX, FTX US, and Alameda for**

25   **voluntary Chapter 11 proceedings in the US.**" Bankman-Fried claimed that he

26   was "still piecing together all the details" but was "shocked to see things unravel the

27

28   Class Action Complaint                                      Page 19 of 45

way they did." Bankruptcy filings soon revealed that he had put the entire FTX empire—more than 130 individual companies—into bankruptcy. He resigned from all leadership positions and was soon replaced by John J. Ray III—the same administrator who managed the bankruptcy of Enron.

56.     Client withdrawals from FTX International had, by the time of the bankruptcy, been frozen for some time. But amidst his public apologies, Mr. Bankman-Fried had taken pains to emphasize that FTX's United States operation remained safe. He had tweeted that his statements revealing improprieties at his companies were "**ALL ABOUT FTX INTERNATIONAL**," and that "**FTX US USERS ARE FINE!**" The FTX US website proclaimed that "**withdrawals are and will remain open**." Around the same time Bankman-Fried put the FTX family of companies into bankruptcy, FTX US stopped processing withdrawals. The world over, FTX was dead.

57.     In January 2022, Stephen Pierce—the named Plaintiff in this suit—had deposited $19,986 in an interest-bearing account with FTX US. As directed by FTX US's website, he had wired his funds to FTX US's parent company, West Realm Shires Services, Inc., at 2000 Center Street in Berkeley, California—care of West Realm's "receiving bank" Silvergate, at 4250 Executive Square, La Jolla, California. Amidst the turmoil described above, on November 7, 2022, Mr. Pierce attempted to withdraw $19,461.00 using the FTX US mobile app. Although the app showed that his withdrawal was successful, Mr. Pierce has never received any incoming transfer. Numerous other FTX and FTX US customers have had the same experience.

### F.     The Fallout

58.     Less than 24 hours after the Bankman-Fried put the FTX empire into bankruptcy, its customers and the world still reeling, $600 million in assets were siphoned from FTX and FTX US crypto wallets. In FTX's official Telegram channel,

the company's General Counsel Ryne Miller shared a message that read: "**FTX has been hacked. FTX apps are malware. Delete them … Don't get on FTX site as it might download Trojans.**" Many FTX and FTX US users' account balances began to show: "$0."

59.     FTX Group's customers took to Twitter and other platforms to announce their losses. Many announced that they had lost their life savings. Institutional investors, too, were hit hard. A series of bankruptcies and liquidity crises emerged. The shockwave set off by the FTX Group's collapse continues to reverberate.

60.     Despite the carnage he caused, Bankman-Fried remained unabashed. As customers bemoaned their lost savings, Bankman-Fried playfully tweeted—one letter at a time—"W..H..A..T..H..A..P..P..E..N..E..D." Asked by a journalist about his stance on regulation of the crypto marketplace in light of his empire's demise, Bankman-Fried responded "f*uck regulators … they make everything worse … they don't protect consumers at all." Queried whether his public commitment to "ethics stuff" was "mostly a front," Bankman-Fried responded: "Yeah … I mean that's not *all* of it … but it's a lot." He compared the development of his own public persona to "this dumb game we woke westerners play where we say all the right shibboleths so everyone likes us." He soon put the FTX Group penthouse in The Bahamas up for sale for $40 million.

61.     FTX Group's bankruptcy process began in earnest with the appointment of John J. Ray III as Chief Executive Officer of the debtor entities. In his first-day pleadings before the bankruptcy court, Mr. Ray did not mince words. He wrote: "I have over 40 years of legal and restructuring experience. I have been the Chief Restructuring Officer or Chief Executive Offer in several of the largest corporate failures in history … Never in my career have I seen such a complete lack of corporate controls and such a complete absence of trustworthy financial information as

Class Action Complaint                                          Page 21 of 45

occurred here … this situation is unprecedented." Mr. Ray's pleadings went on to reveal many of the key facts about the FTX Group's malfeasance recounted above. It has become clear that billions of dollars of assets remain missing, and that the FTX Group's liabilities far exceed its assets.

### G.    How the Scheme Worked

62.    Until he put his companies into bankruptcy, Bankman-Fried controlled more than 130 distinct business entities that he and his lieutenants operated as a RICO enterprise referred to herein as the "FTX Group."

63.    The FTX Group's corporate structure can be summarized by reference to four "silos." These silos include (1) a group composed of West Realm Shires, Inc., a Delaware corporation, and its subsidiaries, which include businesses known as FTX US, FTX US Derivatives, FTX US Capital Markets, and others (the "**FTX US Silo**"), (2) a group composed of Alameda Research LLC, a Delaware company, and its subsidiaries (the "**Alameda Silo**"), (3) a group composed of Clifton Bay Investments, LLC, a Delaware company, and its subsidiaries, which included FTX Ventures (the "**FTX Ventures Silo**"), and (4) a group composed of FTX Trading Ltd., an Antiguan company, and its subsidiaries, including the exchange "FTX.com" (the "**FTX Silo**").

64.    Each of these silos was controlled by Bankman-Fried. Defendants Gary Wang and Nishad Singh co-founded many of the entities in the FTX Group with Bankman-Fried, in which they owned minority equity interests. The FTX US and FTX Silos also have third-party equity investors, including investment funds, endowments, sovereign wealth funds, and family funds.

65.    ***The Alameda Silo***. The primary operating company in the Alameda Silo is Alameda Research, LLC, which is organized in the State of Delaware. The Alameda Silo operated quantitative trading funds specializing in crypto assets. Strategies included arbitrage, market making, yield farming, and volatility trading.

The Alameda Silo is owned by Bankman-Fried (90%) and Wang (10%). Bankman-Fried was the initial CEO and head trader within the Alameda Silo companies. Defendant Caroline Ellison was elevated to that position in 2021.

66.     ***The Ventures Silo***. The venture silo contains several entities that made and managed private investments, particularly in cryptocurrency-related startups and ventures. All companies in the Ventures Silo are organized in Delaware or the British Virgin Islands.

67.     ***The FTX Silo***. The primary operating company in the FTX Silo is FTX Trading, Ltd., which is organized in Antigua. This silo includes FTX.com, the trade name for Bankman-Fried's digital asset trading platform and cryptocurrency exchange. FTX.com was co-founded by Bankman-Fried, Wang, and Singh and commenced operations in May 2019. By the end of 2021, approximately $15 billion of assets were held on the platform, which reportedly handled 10% of global crypto trading volume by that time. As of July 2022, FTX.com had millions of registered users.

68.     ***The FTX US Silo***. FTX US was founded in January 2020. FTX US is open to U.S. depositors and had approximately one million users as of August 2022. All companies in the FTX US silo are organized in Delaware or South Dakota.

69.     ***The FTX Group Hierarchy***. The FTX Group enterprise operated with a distinct structural hierarchy. Bankman-Fried was at all times the unquestioned leader. Bankman-Fried's lieutenants Ellison, Wang, and Singh reported to him and did his bidding. The remainder of this complaint refers to Bankman-Fried, Ellison,

1    Wang, and Singh as the "Inner Circle."[8] FTX Group employees reported to the Inner
2    Circle, as did third parties such as accountants, bankers, lawyers, and the like.[9]

3        70.    Additional information about the backgrounds and roles of the members
4    of the Inner Circle is as follows.

5            a.    *Gary Wang* co-founded Alameda Research and FTX with
6    Bankman-Fried. Wang is a software engineer who formerly worked at
7    Google and graduated from MIT. Wang served as FTX's Chief Technical
8    Officer. Wang built the accounting "backdoor" that allowed the Inner
9    Circle to move and distribute company and customer assets at will. He
10   is known to be extremely private, working closely only with other
11   members of the Inner Circle.[10]

12           b.    *Caroline Ellison* was an early employee at Alameda
13   Research and was eventually appointed by Bankman-Fried and Wang
14   as its CEO. Ellison is an asset trader who formerly worked at the Jane
15   Street trading firm and graduated from Stanford with a degree in
16   mathematics. Ellison admitted to participating in the misappropriation
17   of $10 billion in FTX Group customer funds as the FTX crisis unfurled
18   and implicated Bankman-Fried, Wang, and Singh.

19

20

21       [8] This nomenclature does not imply that persons or entities other than
22   Bankman-Fried, Ellison, Wang, and Singh were not themselves direct participants
     in FTX Group's wrongful conduct. Nor does it imply that others not named as
23   defendants in this complaint are not also liable for their actions in relation to this
     scheme. Discovery in this matter will reveal the full scope and hierarchy of the FTX
24   Group enterprise.

25       [9] Many FTX Group employees appear to have been unaware of the Inner
     Circle's misdeeds.

26       [10] Wang is so private, and so little information about him is available, that
27   commentators have questioned his very existence.

28   **Class Action Complaint**                                    Page 24 of 45

1    c.   ***Nishad Singh*** was an early employee at Alameda
2         Research and co-founded FTX with Bankman-Fried and Wang. Singh is
3         an electrical and software engineer who formerly worked at Facebook
4         and graduated from the University of California, Berkeley. Singh was
5         the Director of Engineering at FTX. Along with Bankman-Fried and
6         Wang, Singh controlled the FTX exchanges' code and corporate funds.

7    71.   At a high level, the Inner Circle's scheme worked as follows. Bankman-
8    Fried and his lieutenants first built a cryptocurrency-focused trading firm (Alameda
9    Research), and then a family of cryptocurrency exchanges (FTX and FTX US). They
10   proceeded to use their technical skills and inside knowledge to systematically
11   advantage Alameda—and thus themselves—over other users of their exchanges. And
12   as the money available to them grew, it appears they treated all the FTX Group's
13   finances as a slush fund—using secret software to misappropriate at least $10 billion
14   of customer assets to cover trading losses, fund venture investments, and spend
15   lavishly on personal boondoggles. The FTX Group did all of this while executing a
16   calculated scheme to defraud the public as to the criminal nature of their enterprise,
17   in particular on television, on podcasts, on social media, and online.

18   72.   The following paragraphs first set out (i) specific allegations about the
19   individual Defendants' misappropriation of customer funds and cheating at the
20   expense of FTX group exchange participants, then (ii) specific allegations about the
21   individual Defendants' scheme to defraud the public about the nature of their
22   enterprise, and finally (iii) specific allegations about the FTX Group's auditors'
23   participation in the FTX Group enterprise.

24   73.   ***Theft & Fraud Allegations.*** The Inner Circle purposefully
25   intermingled the finances and affairs of the FTX Group business entities. They did
26
27

28   Class Action Complaint                                    Page 25 of 45

so in order to benefit themselves at the direct expense of their cryptocurrency exchanges' depositors.

74.     The terms of service of the FTX Group cryptocurrency exchanges made clear that title to customers' digital assets remained at all times with the customer and at no time transferred to the FTX Group. Specifically, the FTX Terms of Service provide:

> a.     "**Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading**."

> b.     "**None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading. FTX Trading does not represent or treat Digital Assets in User's [sic] Accounts as belonging to FTX Trading**."

> c.     "**You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies, you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party**."

75.     The FTX US Terms of Service provide:

> a.     "As part of your FTX.US account, FTX.US provides qualifying users access to accounts for you to store, track, transfer, and manage your balances of cryptocurrency and/or dollars or other supported currency. **All cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX.US for your benefit**."

b. **"Title to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US."**

c. **"FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US."**

76. Nearly every word of these representations to FTX and FTX.US customers was untrue. Rather than maintaining customers' assets for customers' benefit, the Inner Circle misappropriated billions in customer funds for their own causes. This has been confirmed as follows.

77. Ellison admitted that she, Bankman-Fried, Wang, and Singh colluded in the misappropriation of approximately $10 billion in customer funds to a group of Alameda employees on or about November 9, 2022.

78. Bankman-Fried revealed the misappropriation of more than $10 billion in customer funds to employees and investors on or about November 10, 2022. As Reuters reported, Bankman-Fried showed employees and investors spreadsheets that "revealed there was a $10 billion hole in FTX's finances – because customer deposits had been transferred to Alameda and mostly spent on other assets."

79. Bankman-Fried further admitted to the misappropriation of customer funds in a text-based interview with journalist Kelsey Piper on November 15, 2022. There, in response to a query whether he had been "lending out customer funds," Bankman-Fried responded: "it wasn't quite lending them out – it was messier and more organic than that; each step was in isolation rational and reasonable, and then when I finally added it all up last week it wasn't."

80. In the same November 15, 2022 interview, Bankman-Fried further admitted to the years-long intertwinement of the Alameda Silo with the rest of the FTX Group companies. Explaining the kinds of irregularities that led to the FTX

Group collapse, Bankman-Fried gave the example: "like, 'oh FTX doesn't have a bank account, I guess people can wire to Alameda's to get money on FTX … 3 years later … 'oh f*ck it looks like people wired $8b[illion] to Alameda[.]"

81.    As further confirmed in the FTX Group's own bankruptcy filings, the Inner Circle built a "secret exemption of Alameda from certain aspects of FTX.com's auto-liquidation protocol." On information and belief, this "secret exemption" functioned to allow Alameda to make highly leveraged trades on FTX, lose money, and then keep its collateral. Collateral held by any other trader, in contrast, would be "auto-liquidated" to the extent required to cover any losses sustained.

82.    As confirmed by independent blockchain analysis, the Inner Circle used inside knowledge of market-moving events to allow Alameda to "frontrun" on the FTX Group cryptocurrency exchanges. On information and belief, Alameda Research used prior knowledge of cryptocurrencies that were scheduled to be listed on the FTX Entities' platforms to stockpile those cryptocurrencies ahead of the public announcements and then sell them for a profit, often to FTX's own customers. Independent blockchain analysis has confirmed that from January 2021 to March 2022, Alameda held $60 million worth of 18 different cryptocurrencies that were eventually listed on the FTX Entities' platforms. On information and belief, Alameda later sold those positions at inflated prices to the detriment of FTX users.

83.    Bankruptcy filings have revealed the following apparently illicit transactions, which on information and belief were directed by and for the benefit of the Inner Circle: (i) a $1 billion personal loan to Bankman-Fried, (ii) a $2.3 billion loan to Paper Bird, Inc., a Delaware entity controlled by Bankman-Fried, (iii) a $543 million loan to Nishad Singh, and (iv) a $55 million loan to Ryan Salome. At least another $1 billion in assets have vanished.

84.     ***The Scheme to Defraud.*** The Alameda Silo was, from its inception until its bankruptcy, involved in the buying and selling of cryptocurrencies. The FTX US and FTX Silos provided customers with marketplaces for buying, selling, and storing cryptocurrencies and engaging in cryptocurrency-related financial transactions. Because the companies in the Alameda Silo were active participants in that same market served by the FTX US and FTX silos, the Inner Circle knew that their interests would be directly in conflict with that of FTX and FTX US customers. Rather than take steps to ameliorate those conflicts, they intentionally used their asymmetric advantages to profit at those customers' expense.

85.     To create the appearance of separation between the Alameda Silo and the rest of the FTX Group, Bankman-Fried elevated Defendant Caroline Ellison to CEO of Alameda Research, LLC in 2021. Ellison continued to report directly to Bankman-Fried and Wang—co-owners of the Alameda Silo—throughout her tenure. Together, Bankman-Fried, Ellison, Wang, and Singh remained fully in control of all parts of the FTX Group throughout its existence. Bankman-Fried, Ellison, Wang, and Singh remained at all times in ultimate control of the underlying computer code and matching engines that ran the FTX Group's businesses.

86.     Ellison and Bankman-Fried were one-time romantic partners and close personal friends. Ellison, Bankman-Fried, Wang, and Singh were personal friends who lived together in a single penthouse while they controlled the operations of the FTX Group. On information and belief, they routinely discussed and plotted the Alameda and Venture Silos' trading and investment strategies in light of inside information about market conditions and market-moving opportunities created by their ownership of the FTX and FTX US Silos.

87.     Bankman-Fried was repeatedly questioned about the relationship between the FTX Group entities by the financial press and others. In May 2022, in

1 response to questions about Alameda's activities, Bankman-Fried tweeted: "I don't
2 run Alameda anymore, you should ask them."

3       88.    In October 2022, a CNBC interviewer asked Bankman-Fried: "What
4 about the relationship between FTX and Alameda, I think there are some questions
5 about where those lines are ... are there any potential conflicts of interest running as
6 many companies as you do in the same space?" Bankman-Fried responded: "I've put
7 a lot of work over the last few years into trying to eliminate conflicts of interest there
8 ... **one big piece of this is, I don't run Alameda anymore, I don't work for it,**
9 **none of FTX does, separate staffs. The way that we view FTX is as a neutral**
10 **piece of market infrastructure**."

11       89.    On April 3, 2022, in response to allegations that Alameda Research
12 manipulated the price of a particular cryptocurrency, Bankman-Fried tweeted: "Obv
13 bullsh*t conspiracy theory."

14       90.    Bankman-Fried's    statements    concerning    Alameda    Research's
15 separation from the FTX cryptocurrency exchanges were false. Bankman-Fried
16 himself confirmed this when asked about his greatest regrets in his November 15,
17 2022 interview with journalist Kelsey Piper. There, he stated that in retrospect he
18 would have "offboard[ed] Alameda from FTX once FTX could live on its own."
19 Bankman-Fried made the false statements knowing they would be transmitted across
20 the U.S. and the world through electronic-transmissions wires, and with the intention
21 that they would induce or cause customers to begin or continue doing business with
22 the FTX Group.

23       91.    In December 2021, Bankman-Fried went before congress and publicly
24 testified that FTX had a "transparent system where all of the market data is openly
25 available." As has since become clear, FTX's system was not transparent—it
26 contained secret "backdoors" that allowed Bankman-Fried and his co-Defendants to

27

28 Class Action Complaint                             Page 30 of 45

1   move billions amongst their entities at will. It also contained secret exemptions for

2   Bankman-Fried's own proprietary trading firm. Bankman-Fried made this false

3   public statement knowing that it would be transmitted across the United States and

4   around the world using electronic-transmissions wires, with the intention that it

5   would cause customers to begin or continue doing business with FTX Group.

6         92.     In August 2022, then-President of FTX Brett Harrison tweeted that

7   "direct deposits from employers to FTX US are stored in individually FDIC-insured

8   bank accounts in the users' names." On information and belief, Harrison made this

9   statement at Bankman-Fried's direction and with his prior consent. This statement

10   was patently false—FTX US customers are not, and at no time have been, FDIC-

11   insured. Harrison made this statement, at Bankman-Fried's behest, knowing that it

12   would be transmitted across the United States and around the world using electronic-

13   transmissions wires, with the intention to cause customers to begin or continue doing

14   business with FTX Group.

15         93.     Bankman-Fried and his lieutenants' false statements accelerated as the

16   FTX crisis began to roil in November 2022. Bankman-Fried issued a series of tweets

17   including the following false statements on November 7, 2022:

18               a.     "FTX is fine. Assets are fine. FTX has enough to cover all

19            client holdings. We don't invest client assets (even in treasuries). We

20            have ben processing all withdrawals and will continue to be."

21               b.     "FTX International currently has a total market value of

22            assets/collateral higher than client deposits (moves with prices!)."

23

24               c.     "We have GAAP audits, with > $1b excess cash. We have a

25            long history of safeguarding client assets, and that remains true today."

26               d.     "This [tweet thread discussing FTX financial problems]

27            was about FTX International. FTX US, the US based exchange that

28   Class Action Complaint                               Page 31 of 45

accepts Americans, was not financially impacted by this sh*tshow … It's 100 % liquid. Every user could fully withdraw."

94.     Each of these statements was later proven false. FTX did invest client assets in trading and venture-capital schemes controlled by FTX's owners through the Alameda Entities. FTX International did not have a total market value of assets and collateral higher than client deposits. And FTX US *was* financially impacted by the Defendants' conduct, as became clear when Bankman-Fried put that entity into bankruptcy and customer withdrawals were frozen. Bankman-Fried made these false statements knowing they would be transmitted across the U.S. and the world through electronic-transmissions wires, and with the intention that they would cause customers to begin or continue doing business with the FTX entities.

95.     Shortly after Alameda Research's balance sheet was revealed in the press, Defendant Ellison attempted to calm the market by tweeting, on November 6, 2022: "a few notes on the balance sheet info that has been circulating recently: that specific balance sheet is for a subset of our corporate entities, we have > $10b of assets that aren't reflected there … the balance sheet breaks out a few of our biggest long positions; we obviously have hedges that aren't listed … given the tightening in the crypto credit space this year we've returned most of our loans by now."

96.     Ellison's statement was false. Alameda Research did not have > $10 billion of assets that weren't reflected in the leaked spreadsheet and had not returned its loans. Ellison knew that Alameda was insolvent and had already been the recipient of $10 billion in funds misappropriated from the FTX Group's customers. Ellison made this false statement knowing it would be transmitted across the U.S. and the world through electronic-transmissions wires, and with the intention that they would cause customers to begin or continue doing business with the Alameda Entities and the FTX Entities.

97.     Ellison's personal blog reveals that she knew she was part of an ongoing scheme to defraud the public as to the true nature of the FTX Group's business. There, she wrote: "How do I signal my genuinely sweet and feminine nature on my dating profile? **Should it go before or after the section on wire fraud**[?]"

98.     ***The FTX Group's Auditors.*** The FTX Group, through Bankman-Fried, used audit results to deceive customers. In July 2021, Bankman-Fried tweeted that "yesterday, FTX became the first (?) crypto derivatives exchange to complete a GAAP audit!" The following month, he tweeted that he was "[e]xcited to announce that @ftx_us [i.e., FTX US] has officially passed its US GAAP audit!" Bankman-Fried went on to note that "both @FTX_official [i.e., FTX] and @ftx_us [i.e., FTX US] have [now] passed US GAAP audits," and pledged that his exchanges "plan to continue getting audits going forward."

99.     Soon, FTX's "Security Policy"—set out on its website—noted that "FTX has successfully undergone a US GAAP financial audit for 2021 and plans to continue undergoing regular audits." Similarly, FTX US's "Regulation and Licensure Information"—published on the FTX.US website—stated that "FTX US has successfully received a US GAAP financial audit."

100.     It remains unclear which firms completed these 2021 audits. Nevertheless, Bankman-Fried's were widely shared. In August 2021, Blockworks—a crypto-industry news service—reported that "Both FTX and FTX.US have completed requirements to pass the US Generally Accepted Accounting Principles (GAAP) audit, which checks for a set of accounting principles, standards, and procedures in accordance with the Financial Accounting Standards Board (FASB)." Bankman-Fried's audit-related tweets were liked and reshared thousands of times.

101.     The FTX Group appears to have retained Armanino and Prager Metis to audit FTX US and FTX, respectively, at some time during 2021. In light of

Class Action Complaint                                             Page 33 of 45

1  Bankman-Fried's previous public announcements and public attention to the FTX
2  Group's prior audit results, Armanino and Prager Metis personnel knew or should
3  have known that their work would be used to entice third parties to entrust FTX
4  Group with their assets.

5      102.    For both firms, the opportunity to work with the FTX Group was likely
6  perceived as a major coup. Both Armanino and Prager Metis market themselves
7  aggressively in the cryptocurrency space. Armanino's website touts its "industry-
8  focused practice serv[ing] digital asset financial service firms, miners & stakers,
9  funds, token projects, and 'crypto-curious companies," including "on-demand audit
10  opinions issued under the most stringent examination standards." Prager Metis
11  advertises that it "works with different companies in the digital assets space from an
12  audit, tax, and advisory perspective, including a top-three global cryptocurrency
13  exchange"—presumably FTX—and is a "leader in the digital assets industry."

14     103.    As reported in the Wall Street Journal, both Armanino and Prager Metis
15  have doubled as both auditors and "crypto industry cheerleaders" in recent years.
16  Each firm has issued public statements in support of crypto-industry companies and,
17  on information and belief, has made focused efforts to grow its revenue by riding the
18  cryptocurrency wave and expanding its book of digital-asset-related business.

19     104.    Both firms' facilitation of the FTX Group's activities is part of a pattern
20  of failures to meet professional obligations. In 2019, a PCAOB review of one
21  Armanino audit found that Armanino had "issued an opinion without satisfying its
22  fundamental obligation to obtain reasonable assurance about whether the financial
23  statements were free of material misstatement." In part by failing to maintain
24  "professional skepticism" and "obtain[] sufficient appropriate audit evidence to
25  support its opinion that the financial statements were presented fairly," Armanino
26  "fail[ed] to accomplish the essential purpose of the audit." In 2020, the PCAOB

27

28  Class Action Complaint                                          Page 34 of 45

1    reviewed four audits in which Prager Metis was the primary auditor. It found that

2    **all four** were deficient, setting out a litany of problems with Prager Metis's work.

3         105.    In March 2022, Armanino and Prager Metis issued certified audit

4    reports giving FTX US and FTX clean bills of health. FTX's bankruptcy administrator

5    has since publicly declared these reports unreliable, writing that he had "substantial

6    concerns as to the information presented" and did "not believe it appropriate for

7    stakeholders or the [bankruptcy] Court to rely on the audited financial statements as

8    a reliable indication of the financial circumstances" of the entities examined.

9         106.    By agreeing to prepare and certify the audit reports at the behest of the

10   FTX Group, Armanino and Prager Metis agreed to conspire with the FTX Group in

11   its conduct of a RICO enterprise. On information and belief, both Armanino and

12   Prager Metis—through their personnel—knew about or were willfully blind to the

13   nature of the FTX Group enterprise and pattern of racketeering in which the Inner

14   Circle was engaged. As expert accountants have publicly noted following the FTX

15   Group's demise, Armanino and Prager Metis certified the FTX US and FTX financials

16   in the face of at least four obvious red flags.

17        107.    First, neither Armanino nor Prager Metis was given access to the full

18   scope of the FTX Group financials or gained an understanding of the interrelationship

19   of the financial health of the FTX Group entities.

20        108.    Second, neither Armanino nor Prager Metis provided an opinion

21   concerning FTX Group's internal controls over accounting and financial reporting.

22        109.    Third, neither Armanino nor Prager Metis questioned why the FTX

23   Group had not paid any U.S. federal income taxes despite being—on paper—

24   enormously profitable and subject to U.S. jurisdiction.

25        110.    Fourth, Prager Metis did not question the innumerable related-party

26   transactions on display in FTX's financials, including but not limited to transactions

27

in which (i) Bankman-Fried and other insiders were trading on their own exchange for their own accounts, (ii) an enormous "software royalty" paid by FTX Group to Alameda Research without any satisfactory explanation, (iii) the use of related parties to manage FTX currency and treasury activities on an "outsourced" basis, and (iv) extensive use of the in-house FTT token for variety of purposes, including acquisitions and other related-party transactions.

111.     In addition to issuing their certified audit results, both Armanino and Prager Metis showed public support for the FTX Group. Armanino did so when it tweeted: "Let's go buddy!," tagging Bankman-Fried in advance of his testimony before Congress. Prager Metis did so when it posted on its website that it was "Proud to support FTX US," and included a photo of Prager Metis and FTX representatives at a baseball game. Auditors are required by regulators to maintain a "professional skepticism" of their clients, including alertness to errors and fraud when assessing a company's finances. Neither Armanino nor Prager Metis did so here.

112.     Because Armanino and Prager Metis personnel knew that their audit results would be used and in fact were used to entice third parties to entrust property to FTX Group and cover up the FTX Group's ongoing malfeasance, each of these firms facilitated and conspired with the FTX Group in its RICO enterprise. In light of the glaring nature of the defects in the FTX Group's financial documentation and internal controls, as confirmed by Mr. Ray, Armanino and Prager Metis are believed to have either been at least reckless or willfully blind with regard to the FTX Group's true nature and the RICO enterprise devised and managed by the Inner Circle.

## VI.   Causes of Action & Class Allegations

113.    In light of the foregoing allegations, Plaintiff brings the following causes of action on behalf of himself and all others similarly situated.

**Count One**
**Conduct of RICO Enterprise (18 U.S.C. § 1962(c))**
**(Against Bankman-Fried, Ellison, Wang, and Singh)**

114.    All preceding allegations are incorporated as if fully set forth herein.

115.    Bankman-Fried, Ellison, Wang, and Singh (collectively, the "Count One Defendants") are culpable persons under 18 U.S.C. § 1961(3).

116.    The FTX Group is an enterprise engaged in and whose activities affect interstate commerce. Each of the Count One Defendants was associated with or employed by this enterprise and directed and managed its affairs.

117.    The Count One Defendants' enterprise shared a common purpose, which was to: (i) convince and assuage potential and existing customers to entrust FTX Group with their assets, (ii) conceal their misappropriation of customers' funds and conflict-of-interest activities, and (iii) make their ill-gotten gains available to them for use in interstate and foreign commerce.

118.    The Count One Defendants' enterprise had a continuity of structure and personnel. Bankman-Fried was at all times the leader. Ellison, Wang, and Singh reported to Bankman-Fried as his top lieutenants, co-owners (in the case of Wang and Singh), and part of his inner circle.

119.    The Count One Defendants agreed to and did conduct and participate in the enterprise's affairs through a pattern of racketeering activity for the unlawful purpose of intentionally defrauding depositors and customers of the FTX Group entities. Specifically, the Count One Defendants committed multiple related acts of racketeering activity as follows.

120.    The Count One Defendants committed multiple acts of wire fraud under 18 U.S.C. § 1343. Specifically, as set out in the preceding paragraphs, the Count One

Class Action Complaint                                        Page 37 of 45

Defendants devised and perpetrated a scheme to defraud customers and potential customers of the FTX US and FTX cryptocurrency exchanges for the purpose of obtaining money or property by means of false or fraudulent pretenses, representations, or promises, and transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce various writings, signals, pictures, and sounds for the purpose of executing their scheme.

121. The Count One Defendants committed multiple violations of 18 U.S.C. § 1952, prohibiting interstate or foreign travel or transportation in aid of a racketeering enterprise. Specifically, as set out in the preceding paragraphs, the Count One Defendants traveled in interstate or foreign commerce with intent to distribute the proceeds of their unlawful activity and otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of their unlawful activity. The Count One Defendants' unlawful activity for purposes of this violation includes money laundering in violation of 18 U.S.C. § 1956 and indictable violations of U.S. Code, Chapter 31, Subchapter II, prohibiting false reporting of monetary transactions.

122. The Count One Defendants committed numerous acts of money laundering in violation of 18 U.S.C. § 1956. Specifically the Count One Defendants, with the knowledge that the property involved in financial transactions to which they were party represented the proceeds of unlawful activity, did in fact conduct and attempt to conduct financial transactions that involved the proceeds of their unlawful activity and were intended to promote the carrying on of that unlawful activity.

123. The Count One Defendants engaged in numerous transactions in property derived from unlawful activity in violation of 18 U.S.C. § 1957. Specifically, the Count One Defendants repeatedly deposited funds derived from their unlawful

1  RICO enterprise by and through financial institutions in the United States and
2  abroad, and thereby affected interstate and foreign commerce.

3  124.  The Count One Defendants operated an unlicensed money-transmitting
4  business in violation of 18 U.S.C. § 1960. Specifically, Defendants operated Alameda
5  Research Ltd. as a money-transmitting business by directing FTX customers
6  worldwide to direct wire transfers to that entity and proceeding to distribute those
7  funds at their discretion. On information and belief, Alameda Research Ltd. is not a
8  licensed money transmitting business in any jurisdiction and its activities involved
9  the transportation of funds that were intended to be used to promote or support
10 unlawful activity.

11 125.  The Count One Defendants committed numerous violations of the
12 National Stolen Property Act, codified at 18 U.S.C. §§ 2314-15. Specifically, the Count
13 One Defendants transported, transmitted, or transferred in interstate and foreign
14 commerce money of the value of $5000 or more, knowing the same to have been stolen,
15 converted, or taken by fraud.

16 126.  The acts set forth in the preceding paragraphs constitute a pattern of
17 racketeering activity pursuant to 18 U.S.C. § 1961(5).

18 127.  Each of the Count One Defendants directly and indirectly conducted and
19 participated in the conduct of the enterprise's affairs through the pattern of
20 racketeering activity described above, in violation of 18 U.S.C. § 1962(c).

21 128.  As a direct and proximate result and by reason of the Count One
22 Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), the named
23 Plaintiff and the members of the plaintiff class have been injured in their business
24 and property. The named Plaintiff and the members of the plaintiff class have
25 suffered concrete financial losses consisting of the loss of the fiat currency and digital
26 assets entrusted to FTX US. Even if these assets are eventually returned to the

28 Class Action Complaint                                    Page 39 of 45

members of the plaintiff class by virtue of the bankruptcy process, the class members will have been concretely injured by the loss of use of their assets during the intervening period.

129.     WHEREFORE, Plaintiff requests that this Court enter judgment against the Count One Defendants for violation of RICO § 1962(c).

**Count Two**
**RICO Conspiracy (18 U.S.C. § 1962(d))**
**(Against All Defendants)**

130.     All preceding allegations are incorporated as if fully set forth herein.

131.     Bankman-Fried, Ellison, Wang, Singh, Armanino, and Prager Metis (collectively, the "Count Two Defendants") are each culpable persons under 18 U.S.C. § 1961(3).

132.     The Count Two Defendants agreed and conspired to violate 18 U.S.C. § 1962(c). The individual Defendants Bankman-Fried, Ellison, Wang, and Singh directed and controlled a RICO enterprise through a pattern of racketeering activity as set out in the preceding paragraphs. Armanino and Prager Metis facilitated this scheme by agreeing to provide and providing auditing and consulting services to the FTX Group. They did so knowingly, or recklessly, or with willful blindness to the nature of the RICO enterprise.

133.     As a direct and proximate result and by reason of the Count Two Defendants' racketeering activities and violations of 18 U.S.C. § 1962(d), the named Plaintiff and the members of the plaintiff class have been injured in their business and property. The named Plaintiff and the members of the plaintiff class have suffered concrete financial losses consisting of the loss of the fiat currency and digital assets entrusted to FTX US. Even if these assets are eventually returned to the members of the plaintiff class by virtue of the bankruptcy process, the class members will have been concretely injured by the loss of use of their assets during the intervening period.

Class Action Complaint                                             Page 40 of 45

134. WHEREFORE, Plaintiff requests that this Court enter judgment against the Count Two Defendants for violations of 18 U.S.C. § 1962(d).

### Class Allegations
### (Applicable to All Counts)

**A. Class Type & Definition**

135. Plaintiff brings this action individually and on behalf of a nationwide class, pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3).

136. The class is defined as all persons who, during the Class Period, entrusted fiat and/or digital currency to FTX US and were damaged thereby (the "Class").

137. The Class Period is defined as the period between January 1, 2020 to the present.

138. The Defendants are excluded from the Class.

139. Plaintiff reserves the right to modify, change, or expand any aspect of these class definitions based on discovery and further investigation.

**B. Rule 23 Requisites**

140. For the reasons that follow, each of the requirements for maintenance of a class action under Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) are met.

141. The Class is so numerous that the joinder of all members is impracticable. On information and belief, at least tens of thousands of depositors are presently unable to access assets they entrusted to FTX US. The Class members' identities can be ascertained and notice of this action provided to them by reference to FTX Group records or, if necessary, the records of third-party entities that worked with FTX Group such as Silvergate Bank.

142. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting individual members of the Class. Among the questions of law and fact common to the Class are:

Class Action Complaint                                              Page 41 of 45

a. Whether the Defendants formed an enterprise that engaged in interstate commerce;

b. Whether the individual Defendants violated federal laws regarding wire fraud, transportation of stolen property, unlawful monetary transactions, operating an unlicensed money-transmission business, money laundering, and/or the National Stolen Property Act;

c. Whether the Defendants falsely promoted the FTX Group enterprise;

d. Whether the individual Defendants conspired to and in fact did misappropriate customer assets;

e. The amount of customer assets misappropriated by the individual Defendants;

f. Whether Armanino and Prager Metis conspired with, facilitated, and/or participated in the individual Defendants' RICO enterprise;

g. Whether Armanino and Prager Metis knew of, or were reckless or wilfully blind with regard to, the nature of the RICO enterprise;

h. Whether the Class members have suffered damages, and if so the nature and extent of those damages.

143. Plaintiff's claims against Defendants are typical of the claims of the members of the Class because all members sustained damages arising out of the Defendants' wrongful conduct as detailed herein. Plaintiff's and the Class members' claims all arise out of the Defendants' uniform misrepresentations, omissions, and unlawful acts and practices related to the FTX Group's activities.

144. Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent in class-action lawsuits. Plaintiff has no interests

1   antagonistic to or in conflict with those of the Class and is an adequate representative

2   for the Class.

3   145.    A class action is superior to other available methods for the fair and

4   efficient adjudication of this controversy since the joinder of all members of the Class

5   is impracticable. In addition, because the damages suffered by individual members of

6   the Class may in some instances be relatively small, the expense and burden of

7   individual litigation make it impossible for such Class members individually to

8   redress the wrongs done to them. Also, the adjudication of this controversy through

9   a class action will avoid the possibility of inconsistent and possibly conflicting

10  adjudications of the claims asserted herein. There will be no difficulty in the

11  management of this action as a class action.

12  146.    Defendants have acted or refused to act on grounds generally applicable

13  to the Class, thereby making appropriate final injunctive relief and corresponding

14  declaratory relief with respect to the Class as a whole.

15  **VII.    Prayer for Relief**

16  WHEREFORE, Plaintiff, individually and on behalf of all others similarly

17  situated, respectfully requests that this Court grant the following relief.

18          a.      Determine that the claims alleged herein may be maintained as

19                  a class action under Federal Rule of Civil Procedure 23 and issue an

20                  order certifying the class as defined above.

21          b.      Award all actual, general, special, incidental, statutory, recission,

22                  punitive, and consequential damages and restitution to which Plaintiff

23                  and the Class members are entitled, including triple damages to which

24                  Plaintiff and the Class members are entitled under the RICO Act.

25          c.      Award post-judgment interest on such monetary relief.

26          d.      Grant appropriate injunctive and/or declaratory relief.

27

28  Class Action Complaint                                        Page 43 of 45

| 1 | | e. | Award reasonable attorneys' fees and costs. |

e. Award reasonable attorneys' fees and costs.

f. Grant such further relief that the Court deems appropriate.

**VIII.   Jury Demand**

Plaintiff, individually and on behalf of the putative Class, demands a trial by jury on all matters so triable.

Dated:  November 23, 2022                    Respectfully submitted,

Marshal J. Hoda, Esq.
Texas Bar No. 2411009
(*Pro hac vice* application forthcoming)
12333 Sowden Road, Suite B
Houston, TX 77080
o. (832) 848-0036
marshal@thehodalawfirm.com
THE HODA LAW FIRM, PLLC

/s/  Steven C. Vondran Esq,
Steven C. Vondran, Esq.
California Bar No. 232337
One Sansome Street, Suite 3500
San Francisco, CA 94104
o. (877) 276-5084
steve@vondranlegal.com
THE LAW OFFICES OF STEVEN C. VONDRAN, PC

Class Action Complaint                                    Page 45 of 45