# EXHIBIT 9

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
HADIYA K. DESHMUKH (328118)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
hdeshmukh@rgrdlaw.com
      – and –
ERIC I. NIEHAUS (239023)
BRIAN E. COCHRAN (286202)
KENNETH P. DOLITSKY (345400)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
ericn@rgrdlaw.com
bcochran@rgrdlaw.com
kdolitsky@rgrdlaw.com

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICK J. RABBITTE, Individually and on Behalf of All Others Similarly Situated, | Case No. 3:23-cv-655 |
| Plaintiff, | CLASS ACTION |
| vs. | COMPLAINT |
| SEQUOIA CAPITAL OPERATIONS, LLC, THOMA BRAVO, LP, and PARADIGM OPERATIONS LP, | |
| Defendants. | DEMAND FOR JURY TRIAL |

1    Plaintiff Patrick J. Rabbitte ("Plaintiff"), individually and on behalf of all others similarly

2 situated, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts

3 and upon an investigation conducted by and through counsel, which included, among other things, a

4 review of Sequoia Capital Operations, LLC's ("Sequoia"), Thoma Bravo, LP's ("Thoma Bravo"),

5 and Paradigm Operations LP's ("Paradigm") (collectively, "Defendants") financial and investor

6 presentations, financial analysis, media reports and releases (including social media statements) by

7 and about Defendants relating to the FTX Entities (defined herein) and filings in litigation involving

8 Defendants and the FTX Entities.  Plaintiff believes that substantial additional evidentiary support

9 will exist for the allegations set forth herein after a reasonable opportunity for discovery.

10                                    **INTRODUCTION**

11    1.    This is a class action on behalf of a class consisting of all persons and entities other

12 than Defendants that purchased, deposited, and/or transacted in fiat currency or digital assets in

13 accounts with West Realm Shires Services Inc. d/b/a FTX US ("FTX US") or FTX Trading LTD.

14 d/b/a FTX ("FTX or "the Company") (collectively, the "FTX Entities") between July 20, 2021 and

15 November 11, 2022 (the "Class Period"), seeking to recover damages and other equitable and

16 appropriate relief as a result of Defendants' violations of the California Unfair Competition Law, the

17 California False Advertising Law, the California Corporations Code, and various common law

18 causes of action as detailed herein.

19    2.    FTX was a cryptocurrency exchange started in 2019 by Samuel Bankman-Fried

20 ("Bankman-Fried"), who served as its Chief Executive Officer ("CEO") at all relevant times.  FTX's

21 U.S. affiliate, FTX US, was founded in 2020.  The FTX Entities offered a range of trading products

22 to cryptocurrency investors, including derivatives, options, volatility products, and leveraged tokens.

23 The FTX Entities also provided spot markets in more than 300 cryptocurrency trading pairs,

24 including the native token FTT/USDT ("FTT Tokens"), thereby enabling FTX customers to trade

25 with leverage and short certain markets by borrowing from other FTX users.  Importantly, however,

26 each of the FTX Entities' terms of service expressly stated that customer assets belonged solely to

27 the customer and would not be transferred to FTX trading.

28

COMPLAINT -                                                                     - 1

3.     The FTX Entities constituted one half of Bankman-Fried's cryptocurrency empire, the other being a crypto-trading firm called Alameda Research ("Alameda"), which Bankman-Fried founded in 2017 in California.  Bankman-Fried served as CEO of Alameda until 2021, when he was succeeded by Caroline Ellison ("Ellison").  After stepping down as CEO of Alameda and at all relevant times thereafter, Bankman-Fried consistently maintained that the FTX Entities and Alameda were separate and distinct.

4.     From 2019 to 2022, the FTX Entities and Bankman-Fried undertook a major promotional marketing campaign.  The campaign, which included social media posts, interviews, sports partnerships, internet and television advertisements, and naming rights deals, rapidly increased the FTX Entities' valuation, which grew from $1.2 billion to $32 billion in only three years.

5.     FTX's campaign to build trust relied on significant financial support from Defendants.  A key component of the highly lucrative promotional marketing campaign included the air of legitimacy lent by Defendants Sequoia, Thoma Bravo, and Paradigm – U.S.-based venture capital and private equity firms – who claimed to have conducted significant due diligence of the FTX Entities' operations and vouched that the use of the FTX platforms was safe and secure for crypto investors.  These Defendants were part owners of the FTX Entities and had a significant financial interest in promoting the use of the FTX platforms so as to increase the returns on their investments.

6.     On July 20, 2021, Defendants partook in a media campaign to tout the fact that they had invested hundreds of millions of dollars in the FTX Entities.  By the time the FTX Entities declared bankruptcy on November 11, 2022, Sequoia had invested over $200 million, Thoma Bravo had invested more than $100 million, and Paradigm had invested more than $250 million in the FTX Entities.  All told, Defendants invested well over half a billion dollars in the fraudulent FTX scheme. As a result of Defendants' significant investments in the FTX Entities, each was incentivized to leverage their professional reputations and media outreach capabilities to portray FTX as a trustworthy and legitimate crypto exchange, as reflected by each defendant's participation in promotional efforts from the very beginning of their investments in the FTX Entities.  Defendants

COMPLAINT -                                                                                              - 2

1   intended to drive users to the exchange in order to increase the valuation of the FTX Entities, with

2   the goal of increasing the return on Defendants' investments.

3        7.     For example, in a now-deleted self-published piece on its website, Sequoia claimed

4   that FTX had distinguished itself by its trustworthiness and was backed by "credible sources" (most

5   notably Sequoia), stating in pertinent part as follows:[1]

> Alameda was not immune to the exchange-level shenanigans that gave crypto as
> a whole its sleazy reputation. ***But FTX had an ambition to change that. It was built
> to be the exchange traders could count on***. SBF needed to get the word out. ***He
> wanted FTX to be known as the respectable face of crypto***. This required ad
> campaigns, sponsorship deals, a charitable wing – and a war chest to pay for it all.
>
> FTX ***did*** need the money, after all. ***And it needed that money from credible
> sources so it could continue to distinguish itself from the bottom-feeders who came
> to crypto to fleece the suckers***.

(Emphasis added and in original.)

8        8.     Defendants knew that their investments in the FTX Entities would be used to promote

the platforms as credible and trustworthy. Defendants bolstered these marketing campaigns with

their own promotional materials, which sought to gain public trust and distinguish FTX as the most

trusted brand in the crypto industry. Throughout the Class Period and as detailed herein, Defendants

made numerous deceptive and misleading statements about the FTX Entities' business, finances,

operations, and prospects for the purpose of inducing customers to invest, trade, and/or deposit assets

with the FTX Entities. Defendants portrayed FTX as a fast-growing tech startup that had

revolutionized the crypto space through innovation, reliability, and a focus on the greater good.

Defendants claimed that this transformative business could be, and in fact was already, being applied

to a host of interconnected platforms that would forever change cryptocurrency markets.

        9.     Like Sequoia, Thoma Bravo attempted to lure users to the FTX exchange in order to

raise FTX's valuation and make its stake in FTX more valuable. On November 27, 2021, in

response to a tweet warning crypto traders to "[o]nly trade [bitcoin] on a legitimate exchange you

trust," Orlando Bravo, Thoma Bravo's founder and managing partner, portrayed FTX as the most

---
[1]   Emphasis added here and throughout unless otherwise noted.

trustworthy exchange available and urged his Twitter followers to "[o]nly trade [bitcoin] with [FTX]."

10.     Thoma Bravo continued its promotional activities throughout 2022, repeatedly praising Bankman-Fried and FTX.  On January 4, 2022, Mr. Bravo was quoted in a *MarketWatch* article, stating that Bankman-Fried "'combines being visionary with being a phenomenal operator . . . . That is rare.'"

11.     Similarly, following its initial investment in FTX, Paradigm touted the purported promise of the FTX exchange and its "vison[ary]" founder, stating in pertinent part as follows:

> "Sam Bankman-Fried is one of those special founders whose vision is both stunningly ambitious and uniquely adapted to the future of crypto.  ***The team's execution speaks for itself, with FTX growing to become a top global exchange in two years***.  There's a bright future ahead for Sam and FTX, and Paradigm is excited to be a part of it."

12.     Paradigm continued to tout FTX's global platform throughout 2022, for example, on February 23, 2022 by praising FTX's purportedly "'great . . . regulatory engagement,'" stating in pertinent part as follows:

> "Paradigm has been fortunate to be an investor in FTX's global business, and we are thrilled to invest in FTX.US.  ***The team is world class and their focus on great products and regulatory engagement will help ensure access to crypto for millions of Americans*** . . . ."

13.     In October 2021, Sequoia publicly referred to Bankman-Fried as "a special founder who is ambitious and daring enough to build the future of crypto by establishing FTX as the global exchange with the best overall product offering and leveraging the world's crypto rails to build the future of finance."  In the same remarks, Sequoia stated that it was "thrilled to partner with FTX on their next phase of growth."

14.     Alfred Lin, the Sequoia partner who led the firm's investments into FTX, stated in a July 20, 2021 press release published by FTX that the Company was the "high-quality, global crypto exchange the world needs," stating in pertinent part as follows:

> "***FTX is the high-quality, global crypto exchange the world needs***, and it has the potential to become the leading financial exchange for all types of assets.  ***Sam is the perfect founder to build this business, and the team's execution is extraordinary***.  We are honored to be their partners."

15.     On January 18, 2023, Christy Goldsmith Romero, Commissioner of the Commodities Futures Trading Commission ("CFTC"), delivered a speech at The Wharton School and the University of Pennsylvania Carey Law School, entitled "Crypto's Crisis of Trust: Lessons Learned from FTX's Collapse."  Ms. Goldsmith Romero described the way in which Sequoia had knowingly offered its legitimacy to FTX, luring in unsuspecting customers where they were victimized by "one of the most significant breaches of trust in financial history," stating in pertinent part as follows:

> *FTX appears to have used Sequoia as a credibility and trust enhancer, and it used Sequoia's money to embark on a campaign to gain public trust and distinguish itself as the most trusted brand in crypto*.
>
> *It appears that Sequoia at least knew its money would be used in this fashion*.  However, there are serious questions and allegations about whether this public-relations "war chest" was funded not only by venture capital money but also customer property.  If those allegations prove to be true, this could be one of the most significant breaches of trust in financial history.
>
> *The multi-dimensional public relations campaign was meant to build the public's trust in FTX*.  And I have not discussed all elements of that campaign.  There were rumored efforts to influence charities and policy advocacy groups.  There were efforts relating to FTX's extensive legal and political spending; and even an alleged investment in a crypto news site. *All of this appears to be part of a branding campaign designed to make FTX appear trustworthy*.
>
> FTX's violation of the trust it built through this campaign deepened the trust deficit for an unregulated crypto industry already badly damaged by the collapse of TerraUSD, Three Arrows Capital, Celsius and Voyager.  The crypto industry is left with a crisis of trust.

16.     The FTX Entities' rapid success story began to unravel on November 2, 2022.  On that date, the cryptocurrency publication *CoinDesk* published an article entitled "Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet," which questioned the financial health of both Alameda and the FTX Entities and asserted that Alameda's balance sheet was made up primarily of FTT tokens.  According to the article, this indicated that Alameda "rest[ed] on a foundation largely made up of a coin that a sister company invented, not an independent asset like a fiat currency or another crypto."

17.     Shortly after the *CoinDesk* article was published, the FTX Entities experienced significant customer withdrawals, resulting in a liquidity crisis.  Ultimately, Bankman-Fried elected to freeze all withdrawals of customer assets.

COMPLAINT -

18. Then, on November 8, 2022, rival cryptocurrency exchange Binance announced that it had reached a non-binding deal to acquire FTX. However, just one day later, Binance reversed its decision, stating that its review of FTX's finances had uncovered liquidity issues that were "beyond [Binance's] control or ability to help."

19. On November 10, 2022, Bankman-Fried took to Twitter and issued a series of 22 tweets apologizing to customers and attempting to offer an explanation for the crash.

20. Two days later, *The Wall Street Journal* reported that Bankman-Fried, Ellison, and other FTX executives were aware that FTX had used customer assets to cover Alameda's trading losses and repay its outstanding debts.

21. Shortly after the foregoing disclosures, Bankman-Fried resigned as CEO of FTX, and the FTX Entities and Alameda filed for bankruptcy. In a Delaware bankruptcy court filing, FTX's new CEO John J. Ray III stated that he had never seen "such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. . . . [T]his situation is unprecedented."

22. Mr. Ray – known for serving in a similar capacity in connection with the collapse of Enron – testified on December 13, 2022 before the House Financial Services Committee: "'This is really old-fashioned embezzlement . . . . This is just taking money from customers and using it for your own purpose. Not sophisticated at all.'" According to Mr. Ray, the dysfunction at the FTX Entities was longstanding, with no independent board, no coherent recordkeeping, and "'absolutely no internal controls, whatsoever.'" Defendants represented sophisticated investors that had invested hundreds of millions of dollars in the FTX Entities, and Defendants would have known of these glaring deficiencies through their purported due diligence activities. Yet, instead of telling the truth, defendants chose to misrepresent the FTX Entities' operations in order to induce customers to use the FTX platforms.

23. As alleged herein, and as continues to be revealed in the parade of media exposés and government and private actions being pursued against implicated parties, the FTX Entities were operated essentially as a Ponzi scheme, with customer funds entrusted to the FTX Entities being used for self-dealing and to cover over prior investment losses. In the end, billions of dollars' worth

COMPLAINT -                                                                                                    - 6

of customer assets became a casualty of the greed of Bankman-Fried and of his co-conspirators, such as the Defendants, who issued materially false and misleading statements about the credibility, safety, and compliance of the FTX platforms and otherwise aided and abetted the misconduct that led to the collapse of the FTX Entities, as detailed herein.

24. In connection with Bankman-Fried's indictment, the U.S. Attorneys' Office for the Southern District of New York issued a December 13, 2022 press release stating that the collapse of FTX "'was not a case of mismanagement or poor oversight, but of intentional fraud, plain and simple,'" continuing in pertinent part as follows:

> U.S. Attorney Damian Williams said: "One month ago, FTX collapsed, causing billions of dollars in losses to its customers, lenders, and investors. Now, a federal grand jury in New York has indicted the former founder and chief executive officer of FTX and charged him with crimes related to the phenomenal downfall of that one-time cryptocurrency exchange, including fraud on customers, investors, lenders, and our campaign finance system. *As today's charges make clear, this was not a case of mismanagement or poor oversight, but of intentional fraud, plain and simple.*"

> Attorney General Merrick B. Garland said: "The Justice Department has filed charges alleging that *Samuel Bankman-Fried perpetrated a range of offenses in a global scheme to deceive and defraud customers and lenders of FTX and Alameda, the defendant's crypto hedge fund, as well as a conspiracy to defraud the United States government*. We allege that the defendant conspired to defraud customers by misappropriating their deposits; to defraud lenders; to commit securities fraud and money laundering; and to violate campaign finance laws. . . . ."

> FBI Assistant Director Michael J. Driscoll said: "As the indictment today alleges, *Bankman-Fried knowingly defrauded the customers of FTX.com through the misappropriation of the customer deposits to pay expenses and debts of a different company he also owned as well as make other investments*. If you deceive and defraud your customers, the FBI will be persistent in our efforts to bring you to justice."

25. Also on December 13, 2022, CFTC Chair Rostin Benham lambasted the fact that "FTX customer assets were routinely accepted and held by Alameda and commingled with Alameda's funds," after the CFTC filed its own complaint related to the collapse of the FTX Entities, stating in pertinent part as follows:

> *FTX held itself out as "the safest and easiest way to buy and sell crypto" and represented that customers' assets, including both fiat and digital assets including bitcoin and ether, were held in "custody" by FTX and segregated from FTX's own assets. To the contrary, FTX customer assets were routinely accepted and held by Alameda and commingled with Alameda's funds*. Alameda, Bankman-Fried, and others also appropriated customer funds for their own operations and activities, including luxury real estate purchases, political contributions, and high-risk, illiquid

COMPLAINT - - 7

digital asset industry investments. The complaint further alleges that, at Bankman-Fried's direction, FTX employees created features in the FTX code that favored Alameda and allowed it to execute transactions even when it did not have sufficient funds available, including an "allow negative flag" and effectively limitless line of credit that allowed Alameda to withdraw billions of dollars in customer assets from FTX. These features were not disclosed to the public.

26. That same day, SEC Chair Gary Gensler called FTX "'a house of cards'" built "'on a foundation of deception'" following the filing of a related SEC complaint, stating in pertinent part as follows:

> "*We allege that Sam Bankman-Fried built a house of cards on a foundation of deception while telling investors that it was one of the safest buildings in crypto*. . . . The alleged fraud committed by Mr. Bankman-Fried is a clarion call to crypto platforms that they need to come into compliance with our laws. Compliance protects both those who invest on and those who invest in crypto platforms with time-tested safeguards, such as properly protecting customer funds and separating conflicting lines of business."

27. Also on December 13, 2022, SEC's Director of Enforcement Gurbir S. Grewal decried how the FTX Entities' true operations were diametrically opposed to the marketing pitches made to FTX customers (which mirrored the statements made by Defendants), stating in pertinent part as follows:

> "*FTX operated behind a veneer of legitimacy Mr. Bankman-Fried created by, among other things, touting its best- in-class controls, including a proprietary 'risk engine,' and FTX's adherence to specific investor-protection principles and detailed terms of service. But as we allege in our complaint, that veneer wasn't just thin, it was fraudulent* . . . ."

28. As a result of Defendants' active participation in the wrongful acts described herein, Plaintiff and other Class members (defined herein) have been unable to access or withdraw billions of dollars' worth of deposited funds and/or assets in the FTX Entities and have suffered significant losses and damages.

## JURISDICTION AND VENUE

29. The claims asserted herein arise under and pursuant to the California Unfair Competition Law, the California False Advertising Law, the California Corporations Code, as well various common law causes of action.

30. This Court has subject matter jurisdiction over this matter under 28 U.S.C. §1332(d)(2), as this is a class action where at least one of the members of the Class is a citizen of a

1    state different from at least one of the Defendants and also where at least one of the members of the

2    Class is a foreign citizen, and the matter in controversy exceeds the sum or value of $5,000,000.

3        31.    This Court has personal jurisdiction over Defendants because each of the Defendants

4    maintain primary offices in this District, conduct substantial business in this District, and otherwise

5    intentionally availed themselves of the State of California's consumer market through the promotion,

6    marketing, and sale of products and services offered by the FTX Entities in and from this District.

7    Accordingly, Defendants committed tortious acts within the State of California and within this

8    District. Defendants' purposeful availment renders the exercise of jurisdiction by this Court over

9    Defendants permissible under traditional notions of fair play and substantial justice.

10       32.    Venue is proper in this judicial district under 28 U.S.C. §1391(b), because: (i) one or

11   more Defendants reside in this District; and (ii) a substantial part of the events or omissions giving

12   rise to the claims occurred in this District. Bankman-Fried launched his crypto empire from this

13   District, including by founding Alameda in this District. Sequoia maintained its headquarters in

14   Menlo Park, California at all relevant times. Paradigm maintained its headquarters in San Francisco,

15   California at all relevant times. Thoma Bravo maintained primary offices in San Francisco,

16   California at all relevant times. Defendants prepared many of the deceptive statements complained

17   of herein in substantial part in California, the statements relate in substantial part to Defendants'

18   California operations, the statements were used to induce the investment and/or deposit of funds

19   (including cryptocurrency) into the FTX Entities by California residents, and the statements were

20   disseminated in California and to members of the Class who reside in California.

21       33.    In connection with the acts alleged in this complaint, Defendants, directly or

22   indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to,

23   the mails, and interstate telephone and/or wire communications.

24                          **THE PARTIES**

25       34.    During the Class Period, Plaintiff Patrick J. Rabbitte purchased, deposited, and

26   transacted assets with FTX and has been damaged thereby, including because he has been unable to

27   access or withdraw significant assets held in his FTX accounts.

28

COMPLAINT -                                                                                      - 9 -

35.     Defendant Sequoia is a venture capital firm.  The firm is headquartered in Menlo Park, California, and specializes in seed stage, early stage, and growth stage investments in private companies across technology sectors.  As of 2022, Sequoia's total assets under management were approximately $85 billion.  Sequoia was an early investor in FTX and one of the primary promoters of FTX to the financial community and cryptocurrency investors around the world.

36.     Defendant Thoma Bravo is a private equity firm.  The firm is headquartered in Chicago, with primary offices in Miami and San Francisco, and describes itself as one of the largest software investors in the world with over $120 billion in assets under management as of September 30, 2022.  Thoma Bravo was an early investor in FTX and one of the primary promoters of FTX to the financial community and cryptocurrency investors around the world.

37.     Defendant Paradigm is a venture capital firm.  The firm is headquartered in San Francisco, California, and invests in the cryptocurrency, financial services, information technology, media, telecommunication, SaaS, and web3 sectors.  Paradigm was an early investor in FTX and one of the primary promoters of FTX to the financial community and cryptocurrency investors around the world.

38.     Each of the Defendants is liable for making deceptive and/or misleading statements, willfully participating in acts that damaged Class members in violation of the law, and/or aiding and abetting violations of law as described herein.  In committing the wrongful acts alleged herein, each defendant willfully participated in acts and transactions and/or aided and abetted such unlawful acts and transactions, which promoted the purported trustworthiness, favorable risk profile, and financial stability of FTX, thereby deceiving the investing public.

**FACTUAL ALLEGATIONS**

**The Rise of FTX**

39.     In 2017, Bankman-Fried founded Alameda in Berkeley, California.  The crypto-trading firm first rose to prominence by arbitraging the price of bitcoin between different markets before venturing into other types of trades and investments in cryptocurrency projects.

40.     In 2019, Bankman-Fried created FTX, an abbreviation of "futures exchange."  FTX offered investors a range of trading products such as derivatives, options, volatility products, and

leveraged tokens.  FTX also provided spot markets in more than 300 cryptocurrency trading pairs, including its native token FTT/USDT.  One of the attractive features of FTX's digital assets came from its terms of service, which provided that customer assets belonged solely to the customer and would not be transferred or otherwise used in FTX's trading.  Bankman-Fried consistently maintained that the FTX Entities and Alameda were separate and distinct.

41.     Indeed, FTX's terms of service stated, in relevant part, as follows:

8.2.6.  All Digital Assets are held in your Account on the following basis:

   (a)     ***Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading***.  As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets.  FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.

   (b)     ***None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading***; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.

   (c)     ***You control the Digital Assets held in your Account***.  At any time, subject to outages, downtime, and other applicable policies (including the Terms), ***you may withdraw your Digital Assets*** by sending them to a different blockchain address controlled by you or a third party.

42.     The FTX US terms of service contained similarly reassuring language, stating in relevant part as follows:

As part of your FTX.US account, FTX.US provides qualifying users access to accounts for you to store, track, transfer, and manage your balances of cryptocurrency and/or dollars or other supported currency.  ***All cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX.US for your benefit. . . .  Title to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US. . . . FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US***.

43.     In addition, FTX.US's website contained a document entitled "FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms," which stated that FTX "segregates customer assets from its own assets across our platforms."  The document also represented that FTX maintained "liquid assets for customer withdrawals . . . [to] ensure a customer without losses can redeem its assets from the platform on demand."

44.     Through, *inter alia*, media reports, bankruptcy proceedings, and in detailed allegations from actions filed by regulators and prosecutors, the statements alleged above about the

manner of holding, and segregation of, customer assets at the FTX Entities have been revealed to be materially false and misleading. In truth, Bankman-Fried and Alameda misappropriated customer assets for their own personal use, proprietary trading purposes, and to cover investment losses, among other misuses.

45. During the Class Period, the FTX Entities experienced a meteoric rise in success due in no small part to an aggressive promotional campaign bankrolled and supported by Defendants. Throughout this period, Bankman-Fried established himself at the forefront of the cryptocurrency space and soon became known and referred to worldwide under the abbreviation "SBF." As Bankman-Fried achieved his celebrity status, he was hailed by some market analysts as the "savior of crypto." Bankman-Fried burnished this reputation through myriad Twitter posts, television and podcast interviews, and political donations. As part of his attempt to appear beyond reproach and selfless, Bankman-Fried described himself as promoting a charitable movement called "Effective Altruism" and promised to donate the wealth he was accruing to a variety of charities.

46. During the same period, FTX became one of the largest crypto-trading companies in the world, with nearly $15 billion in assets being traded on its platforms daily. FTX's marketing efforts involved partnering with popular names in sports and entertainment. Specifically, the FTX Entities secured several celebrity "brand ambassadors" and released a series of internet and television advertisements to promote these partnerships. Further, the FTX Entities entered into various sponsorships and naming rights deals with high-profile sports programs such as UC Berkeley Athletics and the Miami Heat.

47. A key component of these promotional efforts was the legitimacy lent by Defendants as well-known and respected venture capital and private equity firms. Defendants not only invested in FTX knowing that these funds would be spent on the false and misleading promotional activities described above, they often directly touted the purported safety, trustworthiness, and favorable risk profile of the FTX platforms. As intended, these promotional efforts resulted in a rapid increase in the FTX Entities' valuation. By July 2021, FTX had attained a valuation of $18 billion after securing funding from major financial players in the crypto space such as multinational conglomerate Binance and each of the Defendants, among others. By October 2021, after securing

1   another series of investments, FTX had reached a valuation of $25 billion, representing a sizable and

2   speedy return on Defendants' initial investments.  By January 2022, FTX US attained a valuation of

3   $8 billion after securing its own institutional funding.  Combined, the FTX Entities had attained a

4   valuation exceeding $32 billion in only three years – achieved predominantly through Defendants'

5   relentless efforts to promote the FTX exchange as reliable and trustworthy so as to increase the

6   returns on their respective investments.

7   **History of Sequoia**

8        48.    Sequoia is a venture capital firm headquartered in the heart of Silicon Valley.

9   Sequoia was founded by Don Valentine in 1972 and early on made profitable investments in then-

10  nascent computer technology companies like Atari and Apple.  Sequoia earns lucrative investment

11  management fees by pooling capital from its investors, which it then generally invests in pre-IPO

12  companies with a focus on the technology sector.  Sequoia captures the appreciation of its

13  investments between the time of the funding rounds and the time that the company goes public via

14  an IPO.  Because Sequoia invests so early in the life cycle of a company, there is tremendous

15  potential to return many times its initial investment – potential that most average investors do not

16  have.  Investing decisions are made by Sequoia's general partners (called simply "partners" by

17  Sequoia), while limited partners only have a stake in the profits of the Sequoia-managed funds they

18  invest in.

19       49.    Sequoia is one of the largest venture capital firms in the world with over $85 billion

20  in assets under management in 2022.  Sequoia is highly respected among investors with several of its

21  partners being named to *Forbes*' 2022 "The Midas List," which is a list of "The World's Best

22  Venture Capital Investors."[2]  Alfred Lin, the Sequoia partner who led the firm's investments into

23  FTX, came in at 7th out of the 100 venture capitalists named to The Midas List.  In 2021, he was

24  first.

25  _____

26  [2]   Sequoia and Lin also appeared on Valuer's 2021 list of "100 Top Venture Capitalists in the
    USA." https://www.valuer.ai/blog/100-top-venture-capitalists-in-the-usa.  In 2017, Lin was fourth
27  on *The New York Times*' "Top 20 Venture Capitalists Worldwide" list.  https://www.nytimes.com/
    interactive/2017/03/27/technology/Top-20-Venture-Capitalists.html.  In 2021, *dealroom.co* named
28  Sequoia the second-most prominent venture capital firm in the world.  https://dealroom.co/blog/vc-
    investor-prominence-rank-2021.

COMPLAINT -                                                                                    - 13

50.     Mr. Lin has an impressive management track record even outside Sequoia, having been COO and CFO of online footwear retailer Zappos.  Mr. Lin helped lead Zappos to Amazon.com's $1.2 billion acquisition of the shoe retailer in 2009.  After Zappos, Mr. Lin joined the Sequoia team as a partner in 2010.  Mr. Lin has been involved in several highly profitable investments for Sequoia, such as its investments in Airbnb, Uber, DoorDash, and Instacart, among others.  In fact, Mr. Lin is so well respected in the industry that *Forbes* published a piece naming him "The World's Best Venture Capitalist."  The *Forbes* article detailed how Sequoia banked more than $21 billion in a two-day period – thanks to the successful IPOs of Sequoia's investments in DoorDash and Airbnb led by Mr. Lin.  Put simply, Mr. Lin's success at Sequoia is well known to the investing public, and, when Mr. Lin speaks, investors tend to listen to what he has to say.

51.     Mr. Lin's partner and co-lead on Sequoia's FTX investments was Michelle Bailhe. Following Ms. Bailhe's graduation from Brown, she spent time at McKinsey & Co., Google, and private equity firm Hellman & Friedman before being brought on as one of the youngest partners in Sequoia's history.  Ms. Bailhe is heavily involved in Sequoia's crypto and blockchain-related investments and she often appears on television, including *CNBC* and *Bloomberg*, as well as various podcasts to discuss the industry.  Ms. Bailhe heavily promoted Sequoia's FTX investments, hosting interviews with Bankman-Fried, facilitating the publication of articles touting FTX, and making several television and podcast appearances to promote the Company.  For Ms. Bailhe, Sequoia's investment in FTX provided an opportunity to mark her name right next to Mr. Lin's, as the visionary who helped bring FTX to market.

**Sequoia Promotes FTX and Bankman-Fried**

52.     On July 20, 2021, Sequoia participated for the first time in a funding round for FTX. This Series B funding round raised $900 million for FTX, valuing the two-year-old company at $18 billion.  At the time, the funding round was the largest private crypto funding deal ever.  Bankman-Fried explained after the round that "[t]he primary goal of the raise was to [find] strategic allies who can help FTX grow its brand."  Bankman-Fried further touted the fundraising round on Twitter, stating as follows:

53.    Mr. Lin lent his name to a July 20, 2021 FTX promotional press release describing the funding round as the "Largest Raise in Crypto Exchange History."  The release, which also featured defendants Paradigm and Thoma Bravo, contained the following quote from Mr. Lin:

> "***FTX is the high-quality, global crypto exchange the world needs***, and it has the potential to become the leading financial exchange for all types of assets.  ***Sam is the perfect founder to build this business, and the team's execution is extraordinary***.  We are honored to be their partners."

54.    At the time of FTX's Series B funding round, FTX had over one million users and was averaging over $10 billion of daily trading volume.  Following the close of the funding round, crypto traders and investors heeded Mr. Lin's advice and flocked to FTX as a safe haven for what they believed to be high-quality, safe crypto trading.

55.    On October 21, 2021, FTX conducted another fundraising round.  Because of the amount of capital raised, over $420 million, this round would become known as the "Meme Round." Sequoia participated again in this round, which valued FTX at just shy of $25 billion – meaning Sequoia's initial investment in the Series B round had appreciated by almost 40% in just a three-month period.  For context, the S&P 500 Index was up less than 7% during that same period. Sequoia's promotional efforts had worked.   In just the three months since Sequoia's initial investment, the FTX user base increased 48% and its average daily trade volume increased to more than $14 billion.

56.    Recognizing the success of Sequoia's investment, Mr. Lin and Ms. Bailhe engaged in a media blitz to further cement FTX's apparent legitimacy.  For example, on October 21, 2021, Mr.

1    Lin was again quoted by FTX in a Company press release highlighting the close of the most-recent

2    founding round.  In the release, Mr. Lin called Bankman-Fried "a special founder who is ambitious

3    and daring enough to build the future of crypto by establishing FTX as the global exchange with the

4    best overall product offering and leveraging the world's crypto rails to build the future of finance."

5    He concluded that Sequoia was "thrilled to partner with FTX on their next phase of growth."

6         57.    After the Meme Round, Sequoia had committed more than $200 million in capital to

7    FTX and it sought to ensure that this investment continued to appreciate.

8         58.    On November 20, 2021, Ms. Bailhe appeared on FTX's own "The FTX Podcast."

9    She had the following exchange with FTX employee and podcast host, Tristan Yver, in which she

10   represented that Sequoia's confidence in FTX was based on its substantial due diligence:

11        [Yver:]  Did you guys go into FTX because Sam's narrative or because the
          story that FTX told?

12        [Bailhe:]  It's so funny because I actually shared before we ever met Sam in
13        an official Sequoia meeting, I had sent this email to all the people on our side that
          were going to join about like guys like "Don't ask silly questions in the meeting.
14        This is an amazing company.  Please bring your 'A' game. . . .  "Did you guys just
          invest because Sam is so charismatic?"  *And Alfred [Lin] and I were like "No, we*
15        *do our homework."  We did our homework way in advance.  We knew FTX was*
          *this amazing company and we also knew Sam was an amazing founder*.  In the
16        meeting, I think what we loved about Sam is yes, he is an amazing storyteller which I
          think is important to create truly legendary companies.

17
18        59.    During the same podcast, Ms. Bailhe explained that Sequoia takes an active role in

19   the operations of companies that it invests in, like FTX, stating in pertinent part as follows:

20        [Yver:]  So you guys have a lot of communication with these founders that
          you're backing then?  It's not an off-hand process in which you guys invest and then
          let them go off to the races?

21
22        [Bailhe:]  No, no.  *There is a big active conversation throughout.  I think we*
          *take it probably more seriously than any other firm*.  We've been debated actually
23        about whether founders would appreciate that or not.  The founders we work closely
          with seem to appreciate it a lot and we try to be really careful.  Because we're not
24        just passive money.  We want to be really business partners.  Not where it's
          overbearing and we're in your hair but we are partners with you for a decade or
25        however long you want, so it's not okay to back a direct competitor that is going
          after you if you're not okay with that.

26        60.    On December 17, 2021, Ms. Bailhe authored an article entitled "Ask Not Wen Moon

27   – Ask Why Moon" that was published on Sequoia's website.  In the article, Bailhe put forth her

28

bullish case for crypto going forward and promoted Sequoia's close relationship with FTX and Bankman-Fried, stating in pertinent part as follows:

> Like all other waves of technology, ***Sequoia's mission is to partner with the most daring founders in crypto and help them build something legendary. We're proud partners of Sam at FTX***, Jack at Square now Block, Michael at Fireblocks, Uri at Starkware, Elena at Iron Fish, Nader at DeSo, Vlad at Robinhood, and a dozen other seed-stage companies still in stealth. Because we believe crypto will impact every industry, crypto is a firm-wide focus that includes myself (FTX, Fireblocks), Shaun Maguire (DeSo, ParallelFi, Iron Fish, Faraway, Strips, and more seeds in stealth), Alfred Lin (FTX), Mike Vernal (Starkware), Ravi Gupta (Fireblocks), Roelof Botha (Square now Block), Andrew Reed (Robinhood), Stephanie Zhan (stealth seed, Brud acquired by Dapper Labs) and more. Sequoia has been investing in crypto since 2017 and backs founders pre-seed and beyond in equity and tokens.

61.     On the same day, Sequoia sent the following tweets from its official Twitter account promoting FTX, including a quote by Bankman-Fried that FTX did not "do scammy things . . . [e]ven if it is technically legal":



62.     On January 31, 2022, FTX completed its Series C fundraising round. Sequoia did not participate. The Series C round valued FTX at nearly $32 billion, marking a nearly 90% appreciation in Sequoia's Series B investment in just over six months. In the three months since the Meme Round, and following Sequoia's widespread promotional efforts, FTX's user base had grown another 60%.

63.     Sequoia's investment in FTX was so successful that it opened a first-of-its-kind crypto-focused fund. Ms. Bailhe continued her media blitz to promote the new fund, appearing on *CNBC* and *Bloomberg*. In connection with the campaign, Sequoia penned a blog post on *Medium*

where it promoted its relationship with FTX and Bankman-Fried, which stated in pertinent part as follows:

> *We have partnered with an ever-growing group of some of the best founders in crypto. From Sam Bankman-Fried at FTX*, Jack Dorsey at Block, Uri Kolodny and Eli Ben-Sasson at StarkWare, and Michael Shaulov at Fireblocks, to Elena Nadolinski at Iron Fish, Yubo Ruan at Parallel, Ming Wu at Strips and more in stealth, these founders have expanded both our thinking and how we support their unique needs.

64.    On April 13, 2022, Ms. Bailhe hosted an interview with Bankman-Fried for *Startup Grind*, a conference that bills itself as a "Global Community for Entrepreneurs." The interview segment was entitled "The Rise of FTX." Ms. Bailhe portrayed Bankman-Fried as a brilliant and savvy trader, prudent risk taker, and visionary founder, stating in pertinent part as follows:

> *I am thrilled to be here today with a founder that Sequoia is honored to back and that is Sam himself. Sam is the co-founder and CEO of FTX and an exceptional founder and human in so many ways. And so I am excited that you all will get to know the man behind the myth in this session*.

> \*       \*       \*

> Sam, to many people, you are an enigma. You grew up in Northern California, the son of two Stanford law professors. You graduated from MIT which is sort of an alt thing to do these days. You actually went all four years and got a degree and were a top trader on Wall Street at Jane Street. And somehow you blink and years later you are the CEO of a crypto exchange in the Bahamas. *So, your trajectory is striking and I think a lot of that has to do with how well you calculate risk and upside. So talk about the risk that you've taken in your journey as a founder and how smart risk taking has shaped you and helped get FTX to where it is today*.

> \*       \*       \*

> *Hopefully, the audience can hear the level of quantitative thinking that shapes your choices*. I want to double click on that. A lot of people who know you really well, Sam, call you a trader's trader. People used to watch you trade like they watch gamers on Twitch. FTX's original motto is by trader, for traders. And I think your background as a trader has always given you a deep connection with your users, whether they are individual or institutional and incredible founder fit. *But what I don't think a lot of people realize is how much it impacts your skill in taking risk*. Is that where you first honed this thinking that you have about risk or was it something else in your life? And how has the trading background that you have shaped you as a founder?

> \*       \*       \*

> You have done what experts will tell you not to do and *you have been right many times*. So how do you decide when to listen to advice and from whom?

65.     Ms. Bailhe continued by highlighting Bankman-Fried's purported altruism and the values-centric culture of FTX, stating in pertinent part as follows:

> Hearing you talk about the deep sense of accountability that I think you know you had hardened through all these experiences *reminds me of a lot of the culture at FTX and it also reminds me about your subscription to the Effective Altruism movement. So you are earning to give. You plan to give away the majority of what you earn. And you have already started. You have a $100 million FTX future fund to that effect*. How do these values guide you as a founder and how do they also impact the culture at FTX?

> *                    *                    *

> *FTX is famously lean because you care a lot about culture and you are one of the companies that spends the most time thinking about each additional person you add to the organization*. People are always shocked to hear these stats, but I think the exact stats are that you had three developers to your first $100 million in revenue, and seven to your first billion. And I will never forget when we were at dinner with other great founders and their jaws like hit the floor when you said that. What drives your strong conviction that leaner teams are better?

66.     Ms. Bailhe also highlighted the astounding growth of FTX, stating in pertinent part as follows:

> *What's interesting to me is one of the hallmarks of FTX – both culture and product – is speed*. And you just move faster than your competition and it shows on tons of dimensions. How do you set pace as a leader? Aside from keeping the team lean, hiring the right people. *How do you set the cadence of work and how do you maintain that as you grow?*

> *                    *                    *

> *One of your superpowers is your unbridled ambition. This past year alone, FTX has launched several new products and I would argue made the transition from a product company to a platform company*. So you have the international exchange, you have the US exchange, you have US retail app, you have a proposal in front of the CFTC to change the way that derivatives could work in the US for crypto. And you also have a white label product so that any app that wants to add crypto trading can do that now via an API. And yet, this is a fraction of what we know you have planned. Could you talk about your long-term vision for FTX?

> *                    *                    *

> I remember in our first meeting when you talked about this vision, you had a way of describing it that I thought was very visceral and fun, which was: *we want to build something so that whatever you want to do with your next dollar, whether its trade crypto or send a dollar to a friend or buy a banana, that you can do it with FTX*. And it was just a great way to phrase it.

67.     On September 22, 2022, just weeks before the collapse of FTX, Sequoia published a now-deleted glowing profile of Bankman-Fried and FTX on its website. The self-published piece

was entitled "Sam Bankman-Fried Has a Savior Complex – And Maybe You Should Too." The piece detailed Bankman-Fried's supposed adherence to "Effective Altruism" – the idea that one should earn as much as possible for benefit of humankind, as FTX and Bankman-Fried were purportedly working to do. . The piece described Bankman-Fried in almost superhuman terms, as an investing genius who would first revolutionize crypto trading and then the world. The piece stated in pertinent part as follows:

> SBF's purpose in life was set: He was going to get filthy rich, for charity's sake. All the rest was merely execution risk.

> \*       \*       \*

> SBF's mind had been trained almost from birth to calculate. As a schoolboy the hedonic calculous of utilitarianism has him trying to maximize the utility function (measured in "utils," of course) for abortion. During his teenage gaming years, his mathematical abilities allowed him to sharpen his tactics – and win. And, of course, every trade SBF ever made at Jane [Street] was the subject of a risk/reward calculation.

> \*       \*       \*

> He had to find a risk-neutral career path – which, if we strip away the trader-jargon, actually means he felt he needed to take on a lot more risk in the hopes of becoming part of the global elite. The math couldn't be clearer. Very high risk multiplied by dynastic wealth trumps low risk multiplied by mere rich-guy wealth. To do the most good for the world, SBF needed to find a path on which he'd be a coin toss away from going totally bust.

> \*       \*       \*

> At this point, mid-2019, SBF decided to double down again – and scratch his own itch. He would bet Alameda's multimillion-dollar trading profits on a new venture: a trading exchange called FTX. **It would combine Coinbase's stolid, regulation-loving approach** with the kinds of derivatives being offered by Binance and others.

> \*       \*       \*

> "Of the exchanges that we had met and looked at, some of them had regulatory issues, some of them were already public," Bailhe says. "And then there was Sam." **The exchange that SBF had started to build, FTX, was Goldilocks-perfect. There was no concerted effort to skirt the law, no Zuckerbergian diktat demanding that things be broken**. And, yet, FTX wasn't waiting to get permission to innovate. The company had based itself offshore precisely because it aspired to build an advanced risk engine that would support all sorts of hedging strategies. SBF himself seemed to be bred for the role of crypto exchange founder and CEO. Not only had he been a top trader at a top firm – and, thus, the ideal customer – but both his parents were lawyers. "**And, so, he is committed to making the right chess moves for FTX to eventually be able to legally do everything they want to do in the U.S.,"** Bailhe says – "**not by asking forgiveness, but by asking permission**."

. . . *Alameda was not immune to the exchange-level shenanigans that gave crypto as a whole its sleazy reputation. But FTX had an ambition to change that. It was built to be the exchange traders could count on*. SBF needed to get the word out. He wanted FTX to be known as the respectable face of crypto. This required ad campaigns, sponsorship deals, a charitable wing – and a war chest to pay for it all.

FTX did *need* the money, after all. *And it needed that money from credible sources so it could continue to distinguish itself from the bottom-feeders who came to crypto to fleece the suckers. So, in the summer of 2021, when FTX started to raise its Series B from a who's who of Silicon Valley VCs, Bailhe and Lin hit the "Don't Panic" button. "Embarrassingly, we had never tried to reach out to Sam, because we figured he didn't need us," Bailhe admits. "I thought they were just minting money and had absolutely no need for investors." Learning otherwise, they quickly contacted SBF and organized a last-minute Zoom call between him and the partners at Sequoia – at four California time on a hot July Friday afternoon. Bailhe was adamant, putting her reputation with the other partners on the line: "I'm line, 'No, it's worth it. Cancel your afternoon*.'"

The Zoom went well for all concerned. SBF looked relaxed as he answered questions, talking, as he usually does, in complete paragraphs about topics of extreme complexity. Ramnik Arora, FTX's head of product and another ex-Facebook engineer, remembers the meeting clearly: "We're getting all these questions from Sequoia toward the end. *He's absolutely fantastic*." Arora locks eyes with me, and I am mesmerized. Arora is intense – calling to mind a Bollywood version of Adrian Brody. "*Unbelievably fantastic*," he says, shaking his head.

Bailhe remembers it the same way: "We had a great meeting with Sam, but the last question, which I remember Alfred asking, was, 'So, everything you're building is great, but what is your long-term vision for FTX?'"

That's when SBF told Sequoia about the so-called super-app: "I want FTX to be a place where you can do anything you want with your next dollar. You can buy bitcoin. You can send money in whatever currency to any friend anywhere in the world. You can buy a banana. You can do anything you want with your money from inside FTX."

Suddenly, the chat window on Sequoia's side of the Zoom lights up with partners freaking out.

"*I LOVE THIS FOUNDER,*" typed one partner.

"*I am a 10 out of 10,*" pinged another.

"*YES!!!*" exclaimed a third.

What Sequoia was reacting to was the scale of SBF's vision. It wasn't a story about how we might use fintech in the future, or crypto, or a new kind of bank. It was a vision about the future of money itself – with a total addressable market of every person on the entire planet.

"I sit ten feet from him, and I walked over, thinking, *Oh, shit, that was really good*," remembers Arora. "And it turns out that that fucker was playing *League of Legends* through the entire meeting."

"*We were incredibly impressed,*" Bailhe says. "*It was one of those your-hair-is-blown-back type of meetings*."

Not only that, Arora says, but *League of Legends* is the kind of multiplayer online battle arena video game where every four minutes or so of tactical maneuvering is punctuated by ten seconds of action known as a gank – gamer slang for "gang killing" – where you and your team gang up on an enemy. "There's a fight that happens, basically," says Arora, who was watching over SBF's shoulder as he answered that final question from Sequoia, "and I'm like, *This guy is fucking in a gank*!"

The B round raised a billion dollars. Soon afterward came the "meme round": $420.69 million from 69 investors.

(Emphasis added and in original.)

68.    The Sequoia article described Bankman-Fried in hyperbolic terms, calling him "obviously a genius," "as good at explaining the principles of macroeconomics as anyone out there in the world today," a "future trillionaire," and someone who was "not talking about maximizing the total value of FTX," but rather "the total value of the universe." The article similarly described Bankman-Fried as a "risk-neutral" market player who strove to "be fully rational about maximizing his income on behalf of the poor" and "apply his trading principles across the board." The article spoke of FTX with similarly effusive praise, stating: "FTX has a remarkable corporate culture . . . that comes right from the top" with a "guilelessness, an openness." The article described FTX's extremely "[e]thical behavior" as its primary "competitive advantage" and informed readers that "the success of FTX seems like a foregone conclusion."

69.    Sequoia's official Twitter account promoted the article on September 22, 2022 and September 30, 2022, stating in pertinent part as follows:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19



20      70.     On January 18, 2023, CFTC Commissioner Goldsmith Romero delivered a speech at

21 The Wharton School and the University of Pennsylvania Carey Law School entitled "Crypto's Crisis

22 of Trust: Lessons Learned from FTX's Collapse."  Ms. Goldsmith Romero described the central

23 importance of Sequoia's support for FTX in luring customers onto the FTX platforms, stating in

24 pertinent part as follows:

25          *FTX appears to have used Sequoia as a credibility and trust enhancer, and
            it used Sequoia's money to embark on a campaign to gain public trust and
26          distinguish itself as the most trusted brand in crypto*.

27          *It appears that Sequoia at least knew its money would be used in this
            fashion*.  However, there are serious questions and allegations about whether this
28          public-relations "war chest" was funded not only by venture capital money but also

COMPLAINT -                                                                          - 23

customer property. If those allegations prove to be true, this could be one of the most significant breaches of trust in financial history.

      ***The multi-dimensional public relations campaign was meant to build the public's trust in FTX***. And I have not discussed all elements of that campaign. There were rumored efforts to influence charities and policy advocacy groups. There were efforts relating to FTX's extensive legal and political spending; and even an alleged investment in a crypto news site. ***All of this appears to be part of a branding campaign designed to make FTX appear trustworthy***.

      FTX's violation of the trust it built through this campaign deepened the trust deficit for an unregulated crypto industry already badly damaged by the collapse of TerraUSD, Three Arrows Capital, Celsius and Voyager. The crypto industry is left with a crisis of trust.

## History of Thoma Bravo

71.    Thoma Bravo is a private equity firm headquartered in Chicago, with primary offices in Miami and San Francisco. The predecessor firm to Thoma Bravo, Golder Thoma & Co. ("Golder Thoma"), was founded in 1980 by Stanley Golder and Carl Thoma. Golder Thoma pioneered the "buy-and-build" investment strategy in which the firm would use primarily debt to take a controlling stake in an existing company (also called a "leveraged buyout" or "LBO"). The firm then works with the acquired company's management to transform into a larger and more profitable business through internal growth and a series of strategic, industry consolidating acquisitions. Through several iterations, Golder Thoma came to be known as Thoma Bravo.

72.    Orlando Bravo, Thoma Bravo's founder and managing partner, was born in Puerto Rico and moved to Florida in his early teens. He attended college at Brown University before earning his law degree from Stanford Law School and his Master of Business Administration degree from Stanford's Graduate School of Business. While attending law school at Stanford, one of his professors was Bankman-Fried's father, Joseph Bankman.

73.    Following graduate school, Mr. Bravo began working on mergers and acquisitions for Morgan Stanley. After Morgan Stanley, Mr. Bravo joined Thoma Bravo's predecessor firm, Thoma Cressey Equity Partners. After leading several successful deals, Mr. Bravo eventually became a named partner at the firm, leading it to become in 2008 what is now known as Thoma Bravo.

74.    Mr. Bravo is a well-known, successful private equity professional, being dubbed "Wall Street's best dealmaker" by *Forbes* in 2019, and "private equity's king of Saas" by the

*Financial Times* in 2021. As of September 30, 2022, Thoma Bravo had more than $120 billion in assets under management.

**Thoma Bravo Promotes FTX and Bankman-Fried**

75.     Thoma Bravo invested for the first time in FTX during the same July 2021 Series B funding round that Sequoia also made its first investment in, investing $125 million. Following the $900 million funding round, Mr. Bravo sounded his praises for Bankman-Fried and FTX in a press release issued by FTX, which was also posted on the Thoma Bravo website, stating in pertinent part as follows:

> "We have watched with excitement as ***Sam and the FTX team have successfully built the most cutting-edge, sophisticated cryptocurrency exchange in the world***. While this has been an incredible accomplishment in itself, their commitment to making a positive impact on the world through their business is what sets the company apart. We are thrilled to partner with FTX on their next phase of growth as they create a new ecosystem for crypto."

76.     Also in July 2021, Mr. Bravo took to Twitter to endorse FTX and Bankman-Fried:



77.     However, at the time, Thoma Bravo failed to disclose that its investment in FTX had arisen from Mr. Bravo's personal relationship with Bankman-Fried's father. As the *Financial Times* would later reveal in a November 11, 2022 article: "It was a surprise phone call from an old

1  university professor that launched private equity investor Orlando Bravo into becoming one of the

2  most prominent and vocal supporters of Sam Bankman-Fried and his crypto trading firm FTX." The

3  article continued in pertinent part as follows:

4          The call was from Joseph Bankman, a professor of law and business at
        Stanford University who had taught Bravo in the late 1990s. At the time, in mid-
5        2021, Bravo's $122bn private equity firm Thoma Bravo was opening an office in
        Miami, the city where Bankman's son Sam had just paid $135mn for a 19-year
6        naming rights contract with the local NBA team.

7          Bankman told Bravo his son was looking for guidance on philanthropic
        projects in Miami to further his "effective altruism" mission. Only after they spoke
8        did Bravo learn that Bankman-Fried was also in the process of raising a $900mn
        Series B funding round at a $18bn valuation, with a who's who of investors
9        including Sequoia Capital, BlackRock and SoftBank. He quickly called Bankman
        back seeking an introduction and a way into the deal, which was progressing quickly
10       and would be the largest capital raising in crypto exchange history.

11         When Bravo and a partner Tre Sayle began due diligence for the funding
        round, they were taken aback by FTX's numbers. The two-year-old start-up led by a
12       relatively small staff of young traders was on course to earn over $200mn in
        operating profit for the year, unprecedented margins for an early-stage growth
13       company that would normally be losing money. Bravo was blown away. Thoma
        Bravo invested more than $125mn in the round in June 2021, becoming one of
14       FTX's largest backers.

15         78.     Thoma Bravo continued to laud FTX during the Class Period, attempting to lure users

16  to the FTX exchange which, in turn, make Thoma Bravo's stake in FTX more valuable. On

17  November 27, 2021, in response to a tweet warning crypto traders to "[o]nly trade [bitcoin] on a

18  legitimate exchange you trust," Mr. Bravo emphasized the purported trustworthiness of FTX. Mr.

19  Bravo urged his Twitter followers to "[o]nly trade [bitcoin] with [FTX]," stating in pertinent part as

20  follows:

21

22

23

24

25

26

27

28



79.     Mr. Bravo continued making the media rounds in order to promote Bankman-Fried and FTX.  For example, on January 4, 2022, Mr. Bravo was quoted in a *MarketWatch* article describing Bankman-Fried's "incredible" execution and stating: "'He combines being visionary with being a phenomenal operator . . . .  That is rare.'"

80.     On April 8, 2022, Mr. Bravo appeared on *The Scoop* podcast with financial journalist Frank Chaparro.  Mr. Bravo heaped praise on Bankman-Fried and FTX, stating in pertinent part as follows:

> [Chaparro:] What advice do you give to an FTX to really stampede the competition and stand out?
>
> [Bravo:] Well FTX is already doing that.  FTX doesn't need a lot of advice.  That's the great thing.  It is so unusual to find a leader like Sam that combines an incredible strategic mindset with at the same time an exceptional operational and execution rhythm to the business.  You usually find greatness in one or the other and you have to adjust to the culture of the company and their strengths.  In the case of FTX, you have both plus a pioneer plus a company that has such a big cultural mission that is beyond any individual.  Companies like that you don't just run across very often – even in a decade.

81.     On June 7, 2022, Mr. Bravo endorsed a tweet by Bankman-Fried where he claimed that FTX would keep growing even as other businesses cut jobs.  As reflected below, Mr. Bravo responded, "This is exactly right":



82.     On June 23, 2022, Mr. Bravo highlighted the "rigorous operations" of FTX as other crypto firms struggled during a crypto downturn, stating in pertinent part as follows:



83.     On September 21, 2022, Mr. Bravo spoke at the 2022 IPEM conference in Cannes, France.  IPEM is an international conference for professionals in the private equity and venture capital community.  More than 5,000 industry professionals attended the conference.  While speaking at IPEM, Mr. Bravo announced to other professional investors that FTX was going to be "a big winner," and he described Bankman-Fried as "one of the best entrepreneurs" he had come across in his entire career.

84.     Just three days later, on September 25, 2022, the *Financial Times* published an article chronicling an interview with Mr. Bravo where he singled out FTX and Bankman-Fried as worthy

investment opportunities which stood out from the overall crypto sector, stating in pertinent part as follows:

> "I've gotten to know that world a little bit more, and some of the business practices don't rise to the level of ethics that we're all used to in private equity with your investors and your customers and your community, and that has been a bit disappointing," [Bravo] said.

> Bravo, who has said he personally owns bitcoin, criticised the crypto market for what he called a "disturbing" lack of transparency. But he stressed that he was still bullish about bitcoin and believed the industry was "just young" and ethical problems would "get fixed over time".

*      *      *

> However, he said, *the firm would "certainly look at" putting more money into FTX if it held another funding round*. The Bahamas-based crypto company was going to be "a big winner", he said, describing 30-year-old Bankman-Fried as "one of the best entrepreneurs" he had come across.

> Bravo's comments came as he and other dealmakers from around the world gathered for the IPEM private equity conference in Cannes and as the economic conditions that propelled a decade-long boom in the industry go into reverse.

85.     Just weeks later, on November 11, 2022, FTX filed for bankruptcy. Billions of dollars in depositor funds remain misappropriated. Many lost their life savings because they had done exactly what Mr. Bravo had urged: only trading bitcoin on FTX.

**History of Paradigm**

86.     Paradigm is a venture capital firm focused "on supporting the crypto/Web3 companies and protocols of tomorrow." The firm was founded in 2018 by ex-Sequoia partner, Matt Huang, and Coinbase founder, Fred Ehrsam.

87.     After graduating with a degree in mathematics from the Massachusetts Institute of Technology, Mr. Huang founded Hotspots, Inc. – an analytics company. Hotspots was eventually acquired by Twitter and Mr. Huang joined the Twitter Ads team. Following his time at Twitter, Mr. Huang found success as a venture capitalist at Sequoia, where he gained experience investing in pre-IPO companies. After four years at Sequoia, Mr. Huang partnered with Mr. Ehrsam to found Paradigm – a venture capital firm focused on funding blockchain and web3 companies. In just a few years, Mr. Huang and Mr. Ehrsam grew Paradigm into a venture capital powerhouse with billions of dollars in assets under management. From December 2020 through April 2022, Paradigm grew its

1   assets under management by more than 300%.  Mr. Huang has ample experience in successful

2   venture capital raises, having participated as an investor in ByteDance (TikTok's parent company)

3   and Instacart, among others.

4          88.     Since founding Paradigm, Mr. Huang has gained an immense following and is highly

5   respected in the blockchain/crypto industry.  Currently, Mr. Huang boasts well over 100,000

6   followers on Twitter and has the attention of tens of thousands within the crypto community.

7   **Paradigm Promotes FTX and Bankman-Fried**

8          89.     Paradigm's first investment in FTX came in the July 20, 2021 Series B funding

9   round.  Following the funding round, Mr. Huang described Bankman-Fried as a visionary founder

10  and emphasized the excellent "execution" of FTX in a press release issued by FTX to promote its

11  platforms, stating in pertinent part as follows:

12              "***Sam Bankman-Fried is one of those special founders whose vision is both
                stunningly ambitious and uniquely adapted to the future of crypto.  The team's
13              execution speaks for itself***, with FTX growing to become a top global exchange in
                two years.  There's a bright future ahead for Sam and FTX, and Paradigm is excited
14              to be a part of it."

15         90.     After witnessing its initial investment in FTX's Series B round quickly appreciate, in

16  November 2021, Paradigm set out to raise $2.5 billion from investors for a crypto-centric venture

17  fund, called "Paradigm One."  The *Financial Times* later reported that one of the investors in the

18  Paradigm One fund was FTX's sister trading company, Alameda.  In November 2021, Alameda

19  reportedly invested $20 million in the Paradigm One fund.  The *Financial Times* article questioned

20  the "circular" nature of these transactions, quoting Charles Whitehead, a professor at Cornell Law

21  School, who described the investments as "'weird . . . it raises your eyebrows.'"

22         91.     Just two months later, in January 2022, the Paradigm One fund invested in FTX's

23  Series C funding round, which valued FTX at nearly $32 billion.  Aside from a general disclosure

24  that Paradigm may invest in companies that are owned or operated by its limited partners, Paradigm

25  did not reveal Alameda's stake in the Paradigm fund.[3]

26

27

28  ---
    [3]    Alameda would later expand its stake in Paradigm One by an additional $5 million investment.

92.     In a February 23, 2022 press release, Mr. Huang praised FTX's "great products and regulatory engagement," stating in pertinent part as follows:

> "Paradigm has been fortunate to be an investor in FTX's global business, and we are thrilled to invest in FTX.US. ***The team is world class and their focus on great products and regulatory engagement will help ensure access to crypto for millions of Americans*** . . . ."

93.     On September 9, 2022, Mr. Huang retweeted a response by Bankman-Fried to one of Mr. Huang's tweets which stated: "[I]t's really important that the gateways to the financial world take their duty extremely seriously to prevent financial crimes."  By promoting and distributing the tweet, Mr. Huang signaled his agreement that Mr. Bankman-Fried had in fact taken significant measures to prevent financial crimes in the crypto space as illustrated in the following exchange:



94.     By November 2022, FTX's and Defendants' deceit had come unraveled, costing investors billions of dollars in losses.  Mr. Huang wrote an apologetic tweet to his followers in which he revealed that Paradigm itself had never used any of FTX's platforms, even as he had encouraged others to do so:



**Defendants' Fraudulent Scheme and Deceptive Course of Conduct**

95.     As detailed above, Defendants represented to Plaintiff and the Class that they had performed adequate due diligence supporting their substantial FTX investments; that FTX's products and services were safe, trustworthy, and reliable; that Bankman-Fried was a visionary crypto founder whose sole focus was on the greater good rather than profiting at the expense of others; that FTX was being competently run with extraordinary execution; and that the FTX Entities and Bankman-Fried had strictly complied with all legal and regulatory requirements to safeguard their customers' assets, which included ensuring that funds deposited by FTX platform users would be segregated for safekeeping.

96.     Defendants knew, or should have known, that these representations were materially false and misleading when made.  If Defendants performed the due diligence activities that they

claimed to have performed with respect to FTX, they would have been apprised through such activities of the wanton fraud and self-dealing and the complete lack of internal controls and competency present at FTX.  Defendants had knowledge that the FTX Entities were not operating in the manner that Defendants had represented to consumers and the market as a result of their experience and relationship with the FTX Entities, and their statements to the contrary during the Class Period did not have a reasonable factual basis.

97.     Defendants' unfair and deceptive statements described herein are likely to mislead – and clearly have misled – consumers and investors acting reasonably in the circumstances into depositing funds and/or cryptocurrency into the FTX Entities.

98.     Defendants' unfair and deceptive statements described herein were likely to have misled – and indeed did mislead – consumers acting reasonably under the circumstances in purchasing, transacting, or depositing fiat current or crypto assets in accounts with the FTX Entities during the Class Period.

99.     Defendants' conduct has caused Class members to suffer billions of dollars in losses, as the FTX Entities ultimately collapsed and fell into bankruptcy.

**The Truth Emerges**

100.     The FTX Entities' rapid growth story began to unravel on November 2, 2022, when an article published by the cryptocurrency publication *CoinDesk* questioned the financial health of Alameda and the FTX Entities and revealed that Alameda held billions of dollars' worth of FTT, the native FTX token.  Specifically, the article, entitled "Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet," stated in pertinent part as follows:

> Billionaire Sam Bankman-Fried's cryptocurrency empire is officially broken into two main parts: FTX (his exchange) and Alameda Research (his trading firm), both giants in their respective industries.

> But even though they are two separate businesses, the division breaks down in a key place: on Alameda's balance sheet, according to a private financial document reviewed by CoinDesk.  (It is conceivable the document represents just part of Alameda.)

> That balance sheet is full of FTX – specifically, the FTT token issued by the exchange that grants holders a discount on trading fees on its marketplace.  While there is nothing per se untoward or wrong about that, it shows Bankman-Fried's trading giant Alameda rests on a foundation largely made up of a coin that a sister

company invented, not an independent asset like a fiat currency or another crypto. The situation adds to evidence that the ties between FTX and Alameda are unusually close.

The financials make concrete what industry-watchers already suspect: Alameda is big. As of June 30, the company's assets amounted to $14.6 billion. Its single biggest asset: $3.66 billion of "unlocked FTT." The third-largest entry on the assets side of the accounting ledger? A $2.16 billion pile of "FTT collateral."

There are more FTX tokens among its $8 billion of liabilities: $292 million of "locked FTT." The liabilities are dominated by $7.4 billion of loans.

"It's fascinating to see that the majority of the net equity in the Alameda business is actually FTX's own centrally controlled and printed-out-of-thin-air token," said Cory Klippsten, CEO of investment platform Swan Bitcoin, who is known for his critical views of altcoins, which refer to cryptocurrencies other than bitcoin (BTC).

\*　　　\*　　　\*

Other significant assets on the balance sheet include $3.37 billion of "crypto held" and large amounts of the Solana blockchain's native token: $292 million of "unlocked SOL," $863 million of "locked SOL" and $41 million of "SOL collateral." Bankman-Fried was an early investor in Solana. Other tokens mentioned by name are SRM (the token from the Serum decentralized exchange Bankman-Fried co-founded), MAPS, OXY and FIDA. There is also $134 million of cash and equivalents and a $2 billion "investment in equity securities."

Also, token values may be low. In a footnote, Alameda says "locked tokens conservatively treated at 50% of fair value marked to FTX/USD order book."

Owners of the FTT token get discounts on FTX trading fees, increased commissions on referrals and earn rewards. The value of FTT is maintained by FTX's rolling program of buying back and burning tokens, a process that eats up a third of the exchange's trading commissions, which will continue until half of all tokens are burned, according to FTX.

101.    Shortly after the *CoinDesk* article was published, the FTX Entities suffered massive customer withdrawals, resulting in a liquidity crisis.

102.    On November 6, 2022, Binance, a competing crypto asset trading platform, commented that "[d]ue to recent revelations that have came [sic] to light," Binance would be liquidating its FTT holdings, which had been valued at the time at over $500 million. This announcement caused a collapse in the price of FTT tokens and accelerated the pace of customer withdrawals from the FTX platforms.

103.    Then, on November 8, 2022, Binance announced that it had reached a non-binding deal to acquire FTX. However, only one day later, Binance stated that "as a result of [its] corporate

COMPLAINT -                                                                                           - 34 -

due diligence . . . [Binance had] decided that [it would] not pursue the potential acquisition of FTX[]" and that "the issues [were] beyond [Binance's] control or ability to help."

104. Ultimately, by November 8, 2022, Bankman-Fried had elected to freeze all withdrawals of customer assets. As a result, the price of FTT declined by 80%, and Alameda's collateral on deposit had a value lower than the amount Alameda had borrowed from FTX. This resulted in FTX having billions dollars' worth of unrecoverable loans outstanding to Alameda.

105. On November 9, 2022, Sequoia sent the following letter to its limited partners:

> We are in the business of taking risk. Some investments will surprise to the upside, and some will surprise to the downside. We do not take this responsibility lightly and do extensive research and thorough diligence on every investment we make. At the time of our investment in FTX, we ran a rigorous diligence process. In 2021, the year of our investment, FTX generated approximately $1B in revenue and more than $250M in operating income, as was made public in August 2022.

106. In contrast to Sequoia's claim that it does "extensive research and thorough diligence on every investment we make," *The Wall Street Journal* reported that on a subsequent call with investors, Sequoia stated that "the firm would improve its due-diligence process on future investments" and "the firm in the future will be in a position to have even early-stage startups' financial statements audited by one of the Big Four accounting firms."

107. On November 10, 2022, Bankman-Fried took to Twitter and issued a series of 22 tweets apologizing to customers and attempting to offer an explanation for the crash, as detailed below:



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SBF** ✔
@SBF_FTX

9) Anyway: right now, my #1 priority--by far--is doing right by users.

And I'm going to do everything I can to do that. To take responsibility, and do what I can.

9:13 AM · Nov 10, 2022

**SBF** ✔
@SBF_FTX

11) There are a number of players who we are in talks with, LOIs, term sheets, etc.

We'll see how that ends up.

9:13 AM · Nov 10, 2022

**SBF** ✔
@SBF_FTX

13) Because at the end of the day, I was CEO, which means that "I" was responsible for making sure that things went well. "I", ultimately, should have been on top of everything.

I clearly failed in that. I'm sorry.

9:13 AM · Nov 10, 2022



**SBF** ✔
@SBF_FTX

10) So, right now, we're spending the week doing everything we can to raise liquidity.

I can't make any promises about that. But I'm going to try. And give anything I have to if that will make it work.

9:13 AM · Nov 10, 2022



**SBF** ✔
@SBF_FTX

12) Every penny of that--and of the existing collateral-- will go straight to users, unless or until we've done right by them.

After that, investors--old and new--and employees who have fought for what's right for their career, and who weren't responsible for any of the fuck ups.

9:13 AM · Nov 10, 2022

**SBF** ✔
@SBF_FTX

14) So, what does this mean going forward?

I'm not sure--that depends on what happens over the next week.

But here are some things I know.

9:13 AM · Nov 10, 2022



108.     Then, on November 12, 2022, *The Wall Street Journal* published an article entitled "Alameda, FTX Executives Are Said to Have Known FTX Was Using Customer Funds," which revealed that FTX customer funds had been used to prop up Alameda.  The article stated in pertinent part as follows:

Alameda Research's chief executive and senior FTX officials knew that FTX had lent its customers' money to Alameda to help it meet its liabilities, according to people familiar with the matter.

Alameda's troubles helped lead to the bankruptcy of FTX, the crypto exchange founded by Sam Bankman-Fried. Alameda is a trading firm also founded and owned by Mr. Bankman-Fried.

Alameda faced a barrage of demands from lenders after crypto hedge fund Three Arrows Capital collapsed in June, creating losses for crypto brokers such as Voyager Digital Ltd., the people said.

In a video meeting with Alameda employees late Wednesday Hong Kong time, Alameda CEO Caroline Ellison said that she, Mr. Bankman-Fried and two other FTX executives, Nishad Singh and Gary Wang, were aware of the decision to send customer funds to Alameda, according to people familiar with the video. Mr. Singh was FTX's director of engineering and a former Facebook employee. Mr. Wang, who previously worked at Google, was the chief technology officer of FTX and cofounded the exchange with Mr. Bankman-Fried.

Ms. Ellison said on the call that FTX used customer money to help Alameda meet its liabilities, the people said.

Alameda had taken out loans to fund illiquid venture investments, the people said.

On Friday, FTX, Alameda, FTX US and other FTX affiliates filed for bankruptcy protection.

Bankruptcy means that it could be a long time before individual investors and others owed their funds are able to potentially recover any of them, if ever.

109.    *The Wall Street Journal* article's revelation that customer assets were being used to cover Alameda's trading losses and repay its outstanding debts demonstrated that FTX had been operating in direct contradiction of the FTX Entities' terms of service, which explicitly stated that customer assets would not be transferred to FTX trading.

110.    Shortly after the foregoing disclosures, Bankman-Fried resigned as CEO of FTX and the FTX Entities and Alameda filed for bankruptcy. In a Delaware bankruptcy court filing, FTX's new CEO John J. Ray III stated that he had never seen "such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. . . . [T]his situation is unprecedented."

111.    Thereafter, on November 30, 2022, Bankman-Fried granted an interview to *New York Times* reporter Andrew Ross Sorkin, during which Bankman-Fried accepted responsibility for FTX and Alameda's failures. Among other statements, Bankman-Fried acknowledged: "'I was

1  responsible ultimately for doing the right things and I mean, we didn't. Like, we messed up big."'

2  According to *Forbes*, Bankman-Fried intended to make a similar *mea culpa* to Congress before he

3  lost his job, planning to state, "I f****d up."

4        112. On December 12, 2022, Bankman-Fried was arrested in the Bahamas on the eve of

5  what would have been roughly his fourth time providing testimony to a congressional committee in a

6  one-year period. Accordingly, the scheduled congressional testimony for December 13, 2022 was

7  provided by Mr. Ray, wherein Mr. Ray confirmed a host of adverse facts about what his

8  investigation to date into the FTX Entities had uncovered or confirmed. During his prepared

9  remarks to Congress, Mr. Ray stated, in pertinent part, the following:

10        While many things are unknown at this stage, and many questions remain, we
   know the following:

11
12        ***First***, customer assets from FTX.com were commingled with assets from the
   Alameda trading platform.

13        ***Second***, Alameda used client funds to engage in margin trading which
   exposed customer funds to massive losses.

14
15        ***Third***, the FTX Group went on a spending binge in late 2021 through 2022,
   during which approximately $5 billion was spent buying a myriad of businesses and
   investments, many of which may be worth only a fraction of what was paid for them.

16
17        ***Fourth***, loans and other payments were made to insiders in excess of $1
   billion.

18        ***Fifth***, Alameda's business model as a market maker required deploying funds
   to various third party exchanges which were inherently unsafe, and further

19  exacerbated by the limited protections offered in certain foreign jurisdictions.

20  (Emphasis in original.)

21        113. The FTX Entities remain embroiled in bankruptcy proceedings, where their assets

22  continue to be consumed by a variety of costs. Billions of dollars' worth of assets have yet to be

23  returned to FTX customers, while each of the Defendants has escaped the collapse of FTX relatively

24  unscathed and continue to operate without any major disruptions to their respective investment

25  portfolios.

26  **CLASS ACTION ALLEGATIONS**

27        114. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil

28  Procedure 23(a), (b)(2), and (b)(3) on behalf of a Class consisting of all persons and entities that

1   purchased, deposited, and/or transacted in fiat currency or digital assets in accounts with the FTX

2   Entities during the Class Period and who were damaged thereby (the "Class"). Excluded from the

3   Class are Defendants herein, the officers and directors of Defendants, at all relevant times, members

4   of their immediate families, and their legal representatives, heirs, successors, or assigns, and any

5   entity in which Defendants have or had a controlling interest.

6        115.   The members of the Class are so numerous that joinder of all members is

7   impracticable. Plaintiff and members of the Class are presently unable to withdraw their assets from

8   FTX accounts. While Plaintiff, at this time, does not possess information on the exact number of

9   Class members, and the number of such persons may only be ascertained through appropriate

10  discovery, Plaintiff believes that there are more than one million members in the proposed Class.

11  For example, the FTX website currently posts a prepared statement for the May 12, 2022 testimony

12  Bankman-Fried provided to the U.S. House Committee on Agriculture, in which it is stated: "At the

13  time of this writing, the FTX platforms have millions of registered users, and the FTX US platform

14  has around one million users." Class members may be identified from records maintained by the

15  FTX Entities or their transfer agents and may be notified of the pendency of this action by mail,

16  using the form of notice similar to that customarily used in class actions. Alternatively, since one or

17  more of the FTX Entities required customers to consent to receive communications electronically

18  and to provide them with the customers' email addresses, email notice to Class members may also be

19  a suitable alternative to mail notice in this action.

20       116.   Plaintiff's claims are typical of the claims of the members of the Class as all members

21  of the Class are similarly affected by Defendants' wrongful conduct in violation of laws that are

22  complained of herein.

23       117.   Plaintiff will fairly and adequately protect the interests of the members of the Class

24  and has retained counsel competent and experienced in complex class litigation. Plaintiff has no

25  interests antagonistic to or in conflict with those of the Class.

26       118.   Common questions of law and fact exist as to all members of the Class and

27  predominate over any questions solely affecting individual members of the Class. Among the

28  questions of law and fact common to the Class are:

1         (a)    whether Defendants violated Cal. Bus. & Prof. Code §§17200 *et seq*. and

2    17500 *et seq*.;

3         (b)    whether Defendants violated Cal. Corp. Code §25504.1;

4         (c)    whether Defendants violated the common law as alleged herein;

5         (d)    whether Defendants engaged in a conspiracy as alleged herein;

6         (e)    whether Defendants aided and abetted the violations of law of each of the

7    other Defendants and/or the FTX Entities and their affiliates as alleged herein;

8         (f)    whether Plaintiff and Class members are entitled to compensatory damages,

9    restitution, punitive damages, statutory damages, declaratory relief, disgorgement, and/or other legal

10   or equitable remedies as a result of Defendants' conduct; and

11        (g)    the extent of damage sustained by Class members.

12       119.    A class action is superior to all other available methods for the fair and efficient

13   adjudication of this controversy since joining all Class members is impracticable, and this action will

14   be manageable as a class action.

### COUNT I

#### Violation of California's Unfair Competition Law
#### (Cal. Bus. & Prof. Code §17200 *et seq*.)

    120.    Plaintiff repeats and realleges each and every allegation contained above as if fully set

forth herein.

    121.    This Count is asserted against Defendants and is based upon the California Unfair

Competition Law ("UCL"), which prohibits any "unlawful, unfair or fraudulent business act or

practice." Cal. Bus. & Prof. Code §17200.

    122.    Defendants' unfair and deceptive practices described herein were likely to mislead –

and in fact did mislead – consumers acting reasonably in the circumstances into purchasing,

depositing, and/or transacting in fiat currency and digital assets with accounts with the FTX Entities.

    123.    **Unlawful**: During the Class Period, Defendants advertised and otherwise promoted

the FTX Entities using false and/or misleading claims, such that Defendants' actions as alleged

herein violate at least the following laws:

(a)     The False Advertising Law, Cal. Bus. & Prof. Code §17500 *et seq*.; and

(b)     Cal. Corp. Code §25504.1.

124.    **Fraudulent**: A practice is "fraudulent" under the UCL if members of the general public were or are likely to be deceived.  As detailed herein, Defendants' statements regarding, *inter alia*, the safety and viability of the FTX Entities and their own due diligence activities were deceptive to the public.

125.    **Unfair**: The UCL gives courts maximum discretion to address improper business practices that are "unfair."  Defendants' collective conduct with respect to the marketing and promotion of the FTX Entities is unfair because Defendants' conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers in inducing them to purchase, transact, and/or deposit fiat currency and digital assets with accounts with the FTX Entities and the utility of Defendants' conduct, if any, does not remotely outweigh the gravity of the harm to their victims. Plaintiff and the Class would not have purchased, transacted, and/or deposited fiat currency and digital assets with accounts with the FTX Entities at the prices paid or at all had they known that the statements were misrepresentations and deceptive.

126.    Defendants' conduct with respect to the promotion of the FTX Entities is also unfair because the consumer injury is substantial, not outweighed by benefits to consumers or competition, and not one that consumers can reasonably avoid.

127.    The harm suffered by Plaintiff and the Class was directly and proximately caused by the deceptive and unfair practices of Defendants related to the promotion and marketing of the FTX Entities, as described herein.

128.    In accordance with California Business & Professions Code §17203, Plaintiff seeks an order enjoining the Defendants from continuing to conduct business through fraudulent or unlawful acts and practices and to commence a corrective advertising campaign.  On behalf of the Class, Plaintiff also seeks an order for the restitution of all monies made from Defendants' investments in or other business dealings with the FTX Entities, which were made resulting from acts of fraudulent, unfair, or unlawful competition as detailed herein.

COMPLAINT -                                                                                          - 43

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT II

### Violation of California's False Advertising Law
### (Cal. Bus. & Prof. Code §17500 *et seq.*)

129.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

130.    This Count is asserted against Defendants and is based upon California's False Advertising Law ("FAL"), which prohibits any statement in connection with the sale of goods or services "which is untrue or misleading."  Cal. Bus. & Prof. Code §17500.

131.    As set forth herein, Defendants made statements regarding the FTX Entities and their own due diligence activities that were untrue or misleading.  They publicly represented, *inter alia*, that the FTX Entities were a viable and safe way to invest in crypto and that they had vetted these representations through their own due diligence efforts, statements designed to deceive consumers into investing with the FTX Entities.

132.    Defendants' claims that the FTX Entities were, *inter alia*, viable and safe for investing in crypto and that they had verified these representations through robust due diligence activities were untrue and manifestly false and misleading for the reasons detailed herein.  For example, when the FTX Entities imploded in late 2022, it was revealed that the FTX Entities had failed to employ the most basic safeguards and siphoned billions of dollars' worth of customer assets for their own nefarious purposes during the Class Period.

133.    Defendants knew, or reasonably should have known, that their claims relating to, *inter alia*, the viability and safety of the FTX Entities and their own due diligence activities were untrue or misleading.  Defendants failed to adequately inform Plaintiff and the Class of the true nature of the FTX Entities.

134.    When the true nature of the FTX Entities became publicly known at the end of the Class Period, the immediate public outrage, bankruptcy proceedings, and government investigation reflected the degree to which consumers and the public at large felt they were deceived by Defendants and the FTX Entities' business practices.

1    135.   By reason of the above conduct, Defendants are liable pursuant to Cal. Bus. & Prof.

2    Code §17500.

### COUNT III

### Violation of Cal. Corp. Code §25504.1

5    136.   Plaintiff repeats and realleges each and every allegation contained above as if fully set

6    forth herein.

7    137.   California Corporations Code §25504.1 imposes joint and several liability for "[a]ny

8    person who materially assists in any violation of Section 25110 . . . or 25401 . . . with intent to

9    deceive or defraud."

10   138.   "Materially assisting" in an alleged securities law violation, as defined under

11   California law, may take the form of communicating misrepresentations directly to investors, or

12   otherwise playing a material, facilitating role in the alleged securities law violation.

13   139.   As alleged herein, Defendants made material misrepresentations and omissions to

14   Plaintiff and Class members regarding, *inter alia*, the viability and safety of the FTX Entities and

15   their own due diligence activities with the intent to deceive and/or defraud investors in order to

16   induce them to open accounts and purchase, transact in, and/or deposit securities on the FTX

17   platforms, including securities such as yield-bearing accounts ("YBAs") that were issued by the FTX

18   Entities.

19   140.   The YBAs constituted unregistered securities sold in violation of Cal. Corp. Code

20   §25110.  The FTX Entities, with Defendants' material assistance, offered and sold the unregistered

21   YBAs to members of the Class.

22   141.   In addition, Cal. Corp. Code §25401 makes it "unlawful for any person to offer or sell

23   a security in this state, or to buy or offer to buy a security in this state, by means of any written or

24   oral communication that includes an untrue statement of a material fact or omits to state a material

25   fact necessary to make the statements made, in the light of the circumstances under which the

26   statements were made, not misleading."  The FTX Entities, together with the material assistance of

27   Defendants, sold the YBAs by means of materially false and misleading written and oral

28   communications.

COMPLAINT -                                                                                    - 45

142.     As a result of this assistance, Defendants violated Cal. Corp. Code §25504.1 and Plaintiff and members of the Class sustained damages as herein described.

**COUNT IV**

**Negligent Misrepresentation**

143.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

144.     Plaintiff brings this claim against Defendants for negligent misrepresentation.

145.     As detailed herein, Defendants negligently misrepresented certain material facts, including, *inter alia*, regarding the safety and viability of the FTX Entities and their own due diligence activities in order to induce confidence in the FTX platforms and convince consumers to commit fiat currency and digital assets to the FTX platforms, thereby increasing the value of Defendants' investments in the FTX Entities.

146.     Defendants made these material misrepresentations without reasonable grounds for believing the misrepresented facts to be true.

147.     The representations made by Defendants in connection with the FTX Entities were material and would have been considered by a reasonable consumer in making decisions to engage in any transactions with the FTX Entities.

148.     Plaintiff and the Class justifiably relied on Defendants' statements in that they purchased, deposited, and/or transacted in fiat currency and digital assets with accounts with the FTX Entities, which they would not have done at the prices paid or at all had they known the true nature of the FTX platforms.  Plaintiff and the members of the Class opened accounts and purchased, transacted, and/or deposited fiat currency and digital assets into accounts with the FTX entities believing that the FTX platforms would be operated in accordance with the representations made by Defendants.

149.     As a result, Plaintiff and members of the Class were directly and proximately injured by Defendants' negligence in failing to inform Plaintiff and members of the Class of the true nature of the operations of the FTX platforms.

150.     As a result of Defendants' negligent misrepresentation during the Class Period, Plaintiff and the Class suffered damages, including because they cannot retrieve their fiat currency or digital assets currently in accounts with the FTX platforms as a result of the insolvency of the FTX Entities.

**COUNT V**

**Intentional Misrepresentation**

151.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

152.     Plaintiff brings this claim against Defendants for intentional misrepresentation.

153.     As detailed herein, Defendants knowingly misrepresented certain material facts, including, *inter alia*, regarding the safety and viability of the FTX Entities and their own due diligence activities in order to induce confidence in the FTX platforms and convince consumers to commit fiat currency and digital assets to the FTX platforms, thereby increasing the value of Defendants' investments in the FTX Entities.

154.     Defendants made these misrepresentations with knowledge that their statements were materially misleading.

155.     The representations made by Defendants in connection with the FTX Entities were material and would have been considered by a reasonable consumer in making decisions to engage in any transactions with the FTX Entities.

156.     Plaintiff and the Class actually and justifiably relied on Defendants' statements in that they purchased, deposited, and/or transacted in fiat currency and digital assets with accounts with the FTX Entities, which they would not have done at the prices paid or at all had they known the true nature of the FTX platforms.  Plaintiff and the members of the Class opened accounts and purchased, transacted, and/or deposited fiat currency and digital assets into accounts with the FTX entities believing that the FTX platforms would be operated in accordance with the representations made by Defendants.

157.     As a result, Plaintiff and members of the Class were directly and proximately injured by Defendants' intentional misrepresentations in failing to inform Plaintiff and members of the Class of the true nature of the operations of the FTX platforms.

158.     As a result of Defendants' intentional misrepresentations during the Class Period, Plaintiff and the Class suffered damages, including because they cannot retrieve their fiat currency or digital assets currently in accounts with the FTX platforms as a result of the insolvency of the FTX Entities.

**COUNT VI**

**Fraudulent Inducement**

159.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

160.     This Count is asserted against Defendants and is based upon the claim of fraudulent inducement.

161.     As detailed herein, Defendants materially misrepresented and omitted existing facts about the FTX Entities when they failed to disclose information regarding the true nature of the FTX Entities and their own due diligence efforts that was known to them.

162.     The omission is material because Plaintiff and the Class would not have transacted with the FTX Entities had they known true nature of the FTX Entities.

163.     Defendants marketed and promoted the FTX Entities to Plaintiff and the Class despite having knowledge of the true nature of the FTX Entities that were contrary to their public misrepresentations.

164.     Defendants intended that consumers and purchasers would rely on Defendants' statements regarding, *inter alia*, the safety and viability of the FTX Entities and their own due diligence activities so as to increase the user base for the FTX platforms and thereby increase the value of their investments in the FTX Entities.

165.     Plaintiff and the Class were not aware of the true nature and safety of the FTX Entities' platform and could not reasonably have discovered those true characteristics.

COMPLAINT -                                                                                          - 48

166.     Plaintiff and the Class justifiably relied on Defendants' statements in that they purchased, deposited, and/or transacted in fiat currency and digital assets with accounts with the FTX Entities, which they would not have done at the prices paid or at all had they known the true nature of the FTX platforms.

167.     As a result of Defendants' fraudulent inducement of Plaintiff and the Class onto the FTX platforms, Plaintiff and the Class suffered damages, including because they cannot retrieve their fiat currency or digital assets currently in accounts with the FTX platforms as a result of the insolvency of the FTX Entities.

## COUNT VII

## Civil Conspiracy

168.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

169.     This Count is asserted against Defendants and is based upon the claim of civil conspiracy under common law.

170.     Defendants made misrepresentations and omissions to Plaintiff and Class members regarding, *inter alia*, the viability and safety of the FTX Entities and their own due diligence activities in order to induce confidence in the FTX platforms and convince consumers to commit fiat currency and digital assets to the FTX platforms, thereby increasing the value of Defendants' investments in the FTX Entities.

171.     As detailed herein, Defendants engaged in concerted tortious acts, particularly in the form of misrepresentations and omissions made to Plaintiff and the Class for the purposes of inducing them to commit fiat currency and digital assets to the FTX platforms, thereby increasing the value of Defendants' investments in the FTX Entities.  These acts were made in concert and pursuant to an agreement among the FTX Entities, Bankman-Fried, and Defendants to promote the FTX platforms.

172.     In addition to benefitting Defendants by increasing the value of their investments in the FTX Entities, the conspiracy substantially aided the wrongdoing conducted by the FTX Entities and Bankman-Fried.

173.     As a result of Defendants' civil conspiracy, Plaintiff and the Class suffered damages, including because they cannot retrieve their fiat currency or digital assets currently in accounts with the FTX platforms as a result of the insolvency of the FTX Entities.

## COUNT VIII

### Aiding and Abetting

174.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

175.     This Count is asserted against Defendants for aiding and abetting the violations of law undertaken by each other and the FTX Entities and their affiliates as alleged herein.

176.     Defendants made misrepresentations and omissions to Plaintiff and Class members regarding, *inter alia*, the viability and safety of the FTX Entities and their own due diligence activities in order to induce confidence in the FTX platforms and convince consumers to commit fiat currency and digital assets to the FTX platforms, thereby increasing the value of Defendants' investments in the FTX Entities.  As a result, Defendants provided substantial assistance to the FTX Entities in connection with the tortious activities alleged herein.

177.     Defendants had knowledge of the wrongdoing by the FTX Entities as a result of their experience and relationship with the FTX Entities, including through the due diligence that each provided in connection with their substantial investments in the FTX Entities.

178.     As a result of Defendants' aiding and abetting of the violations of law by each other and the FTX Entities and their affiliates as detailed herein, Plaintiff and the Class suffered damages, including because they cannot retrieve their fiat currency or digital assets currently in accounts with the FTX platforms as a result of the insolvency of the FTX Entities.

## COUNT IX

### Declaratory Judgment
### (Cal. Civ. Proc. Code §1060)

179.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

COMPLAINT -

- 50 -

180.     This Count is asserted against Defendants and is based upon the violations of the California Unfair Competition Law and the California Unfair Advertising Law as alleged herein.

181.     There is a bona fide, actual, and present need for the declaratory relief requested herein; the declaratory relief prayed for herein deals with a present, ascertained, or ascertainable state of facts and a present controversy as to the state of facts; contractual and statutory duties and rights are dependent on those facts and law applicable to the facts; the parties have an actual, present, adverse, and directly antagonistic interest in the subject matter; and the antagonistic and adverse interests are all before this Court by proper process for final resolution.

182.     Plaintiff and the Class have an obvious and significant interest in the outcome of this lawsuit.

183.     Plaintiff and the Class purchased, transacted, and/or deposited fiat currency and digital assets with accounts with the FTX Entities in reliance on Defendants' false and misleading statements.

184.     If Plaintiff and the Class knew the true facts surrounding the FTX Entities, Plaintiff and the Class would not have purchased, transacted, or deposited fiat currency and digital assets with the FTX Entities at the prices paid or at all.

185.     Thus, there is a justiciable controversy over whether the Defendants illegally solicited their purchases, deposits, and other transactions from Plaintiff and the Class.

186.     Plaintiff and the Class seek an order declaring that Defendants committed the violations of law alleged herein; enjoining Defendants from continuing such legal violations; ordering that Defendants engage in appropriate and equitable remedial measures, such as issuing public announcements to correct their misrepresentations of material fact regarding the FTX Entities and their own due diligence activities; and ordering that each of the Defendants that received financial benefits from their wrongful acts detailed herein provide appropriate and equitable restitution to Plaintiff and members of the Class.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Class counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding rescission or a rescissory measure of damages;

D.     Disgorgement of Defendants' ill-gotten gains;

E.     Providing the declaratory relief requested;

F.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

G.     Awarding such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: February 14 , 2023                    ROBBINS GELLER RUDMAN
                                                              & DOWD LLP
                                             SHAWN A. WILLIAMS
                                             HADIYA K. DESHMUKH


                                                    s/ Shawn A. Williams
                                             SHAWN A. WILLIAMS

                                             Post Montgomery Center
                                             One Montgomery Street, Suite 1800
                                             San Francisco, CA  94104
                                             Telephone:  415/288-4545
                                             415/288-4534 (fax)

COMPLAINT -                                                                    - 52

1
2  ROBBINS GELLER RUDMAN
      & DOWD LLP
3  ERIC I. NIEHAUS
   BRIAN E. COCHRAN
4  KENNETH P. DOLITSKY
   655 West Broadway, Suite 1900
5  San Diego, CA  92101-8498
   Telephone:  619/231-1058
6  619/231-7423 (fax)

7  ROBBINS GELLER RUDMAN
      & DOWD LLP
8  STUART A. DAVIDSON
   ANNY M. MARTIN
9  225 NE Mizner Boulevard, Suite 720
   Boca Raton, FL  33432
10 Telephone:  561/750-3000
   561/750-3364 (fax)

11 Attorneys for Plaintiff

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT -