# EXHIBIT 10

AZRA MEHDI (SBN 220406)
azram@themehdifirm.com
THE MEHDI FIRM, PC
95 Third Street
2nd Floor No. 9122
San Francisco, CA 94103
Ph/Fax: 415.905.8880
Attorney for Plaintiff

[additional counsel appears on signature page]

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| MARK GIRSHOVICH, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>SEQUOIA CAPITAL OPERATIONS, LLC, PARADIGM OPERATIONS LP, and THOMA BRAVO, LP,<br><br>Defendants. | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Mark Girshovich ("Girshovich" or "Plaintiff"), by his attorneys and on behalf of himself and all others similarly situated, submits this Class Action Complaint against Sequoia Capital Operations, LLC ("Sequoia"), Paradigm Operations LP ("Paradigm") and Thoma Bravo, LP ("Thoma Bravo") (Sequoia, Paradigm and Thoma Bravo are collectively referred to herein as "Defendants"), alleging statutory violations of California's Unfair Competition Law (Cal. Bus. & Prof. Code §17200 *et seq.*), False Advertising Law (Cal. Bus. & Prof. Code §17500 *et seq.*), and Corporations Code §25504.1, in addition to common law claims of Negligent Misrepresentation,

Intentional Misrepresentation, Fraudulent Inducement, Civil Conspiracy, Aiding and Abetting, and claims for Declaratory Judgement (Cal. Civ. Proc. Code §1060). Plaintiff's allegations are based upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including the review of publicly available information, including but not limited to financial and investor presentations, financial analysis, news reports, public filings, public statements (including on social media platforms) and other matters of public record, except as to the allegations specifically pertaining to each of the Plaintiffs, which are based on each's personal knowledge.

## I.    INTRODUCTION

1.    This is a class action brought on behalf of a class consisting of all persons and entities that purchased, deposited and/or transacted in fiat currency and/or digital assets in accounts with West Realm Shires Service Inc. d/b/a/ FTX US ("FTX US") or FTX Trading LTD d/b/a FTX ("FTX Trading" or the "Company") (FTX US and FTX Trading are collectively referenced herein as "FTX" or the "FTX Entities") between July 20, 2021 and November 11, 2022 (the "Class Period") seeking to recover damages and equitable relief against Defendants for their violations of law described below.

## II.    THE PARTIES

2.    Plaintiff Mark Girshovich is a resident of the State of New Jersey. During the Class Period, Plaintiff Girshovich purchased, deposited, and transacted assets with FTX and has been damaged thereby, including because he has been unable to access or withdraw significant assets held in his FTX accounts.

3.    Defendant Sequoia is a venture capital firm. Sequoia is headquartered in Menlo Park, California. Sequoia was an early investor in FTX and one of the primary promoters of FTX to the financial community and cryptocurrency investors around the world.

4.     Sequoia specializes in seed stage, early stage, and growth stage investments in private companies across technology sectors.   As of 2022, Sequoia's total assets under management were approximately $85 billion.  Sequoia considers itself "***actively engaged partners who roll up our sleeves and dedicate decades of collective company-building experience*** to help founders achieve their potential."[1]

5.     Defendant Paradigm is a venture capital firm.  The firm is headquartered in San Francisco, California.  Paradigm was an early investor in FTX and one of the primary promoters of FTX to the financial community and cryptocurrency investors around the world.

6.     Paradigm focuses its investments on supporting the cryptocurrency, Web3 companies and "protocols of tomorrow."[2]  Paradigm administers over $13 billion in total assets, "placing it among the biggest financial advisory firms in the country by assets under management (AUM)."[3]  According to Paradigm, it takes a "***deeply hands-on approach*** to help projects reach their full potential, from the technical … to the operational."[4]

7.     Defendant Thoma Bravo is a private equity firm.  The firm is headquartered in Chicago, Illinois and has other U.S. offices in Miami and San Francisco.  Thoma Bravo was an early investor in FTX and one of the primary promoters of FTX to the financial community and cryptocurrency investors around the world.

8.     Thoma Bravo is one of the largest software investors in the world with an over 40 year history and over $120 billion in assets under management as of September 30, 2022.

---

[1] *FAQ*, Sequoia Capital, https://www.sequoiacap.com/faq/ (accessed Mar. 1, 2023) (emphasis added).

[2] *About*, Paradigm, https://www.paradigm.xyz/ (accessed February 28, 2023).

[3] *Paradigm*, Smartadvisor Match by Smart Asset, https://smartadvisormatch.com/advisor-firm-network/california/paradigm-operations-lp-299210#:~:text=Paradigm%20Operations%20Lp%20is%20a%20financial%20advisory%20company,in%20the%20country%20by%20assets%20under%20management%20%28AUM%29 (accessed February 28, 2023).

[4] *About*, Paradigm, https://www.paradigm.xyz/ (accessed February 28, 2023) (emphasis added).

According to Thoma Bravo, the firm has acquired or invested in more than 420 software and technology companies representing over $235 billion of value. The company says its investment philosophy "is centered around working collaboratively with existing management teams…. Leveraging our deep sector expertise and strategic and operational capabilities, we execute through a partnership-driven approach supported by a set of management principles, ***operating metrics and business processes***."[5]

9. Each of the Defendants is liable for making deceptive and/or misleading statements, willfully participating in acts that damaged Class members in violation of the law, and/or aiding and abetting violations of law as described herein. In committing the wrongful acts alleged herein, each defendant willfully participated in acts and transactions and/or aided and abetted such unlawful acts and transactions, which promoted the purported trustworthiness, favorable risk profile, and financial stability of FTX, thereby deceiving the digital asset trading investing public.

## III. JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction under 28 U.S.C. § 1332, as this is a class action where at least one of the members of the Class is a citizen of a state different from at least one of the Defendants and also where at least one of the members of the Class is a foreign citizen, and the matter in controversy exceeds the sum or value of $5,000,000.

11. Additionally, this Court has specific jurisdiction over each named Defendant herein because each Defendant is a corporation which conducts business in and maintains operations in this District and otherwise intentionally availed themselves of the State of California's consumer market through the promotion, marketing, and sale of products and services offered by the FTX Entities in and from this District. Moreover, Defendants committed tortious acts within the State of California and within this District. Defendants' purposeful availment of the State of California

---

[5] *Id.* (emphasis added).

and this District renders the exercise of jurisdiction by this Court over Defendants permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because: (i) one or more Defendants reside in this District; and (ii) a substantial part of the events or omissions giving rise to the claims occurred in this District.  As detailed below, non-party Sam Bankman-Fried launched his cryptocurrency business relevant to the allegations in this complaint from this District, including by founding the company Alameda Research in this District.  At all relevant times hereto, Sequoia maintained its headquarters in Menlo Park, California.  Paradigm maintained its headquarters in San Francisco, California at all relevant times.  In addition, Thoma Bravo maintains primary offices in San Francisco, California at all relevant times.  Defendants prepared and/or disseminated many of the deceptive statements complained of herein in substantial part in California, the statements relate in substantial part to Defendants' California operations, the statements were used to induce the investment and/or deposit of assets (including cryptocurrency) into the FTX Entities by California residents, and the statements were disseminated in California and to members of the Class who reside in California.

13.     The claims asserted herein arise pursuant to the California Unfair Competition Law, the California False Advertising Law, the California Corporations Code, as well as various common law causes of action.

14.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, and interstate telephone and/or wire communications.

## IV. FACTUAL ALLEGATIONS

### A. The Alameda and the FTX Entities Are Founded

15.     Sam Bankman-Fried ("Bankman-Fried"), who is also known by the initialism "SBF," graduated from the Massachusetts Institute of Technology in 2014.  He then worked at a proprietary trading firm, Jane Street Capital, for approximately three years, until September 2017.  After a short stint at the Center for Effective Altruism, Bankman-Fried then founded Alameda Research ("Alameda") in or around the fall of 2017.  Tara Mac Aulay ("Mac Aulay") was his co-founder.  Mac Aulay left Alameda in or around April 2018.[6]

16.     Caroline Ellison ("Ellison") joined Alameda in 2018.  She described Alameda in an interview with *Forbes* magazine as follows:  "After Bankman-Fried convinced her to jump ship for Alameda in 2018, Ellison realized she'd arrived at a haphazard startup.  'This was very much like, oh, yeah, we don't really know what we're doing.'"[7]

17.     In or around late 2018, Alameda's headquarters were relocated from California to Hong Kong.  At that time, the leadership team included Bankman-Fried's close friend Nishad Singh ("Singh") and his college roommate Zixiao "Gary" Wang ("Wang").  Ellison and Sam Trabucco ("Trabucco") were also part of the group, and upon moving to Hong Kong, the group lived like college students in an apartment together.

18.     Alameda was a quantitative trading firm, similar to Wall Street hedge funds which use mathematical models and data to inform trading decisions.  It used leverage – or borrowed

---

[6] Mac Aulay contends that she "and a group of others all quit, in part due to concerns over risk management and business ethics." Tara Mac Aulay (@Tara_MacAulay), Twitter, (Nov. 16, 2022, 3:57 PM EST) https://twitter.com/Tara_MacAulay/status/1592985303262072834 (accessed Mar. 2, 2023).

[7] David Jeans, Sarah Emerson, Richard Nieva and Michael del Castillo. *Meet Caroline Ellison, The 'Fake Charity Nerd Girl' Behind The FTX Collapse* (Nov 18, 2022), https://www.forbes.com/sites/davidjeans/2022/11/18/queen-caroline-the-risk-loving-29-year-old-embroiled-in-the-ftx-collapse/?sh=777dd74791f0 (accessed Mar. 1, 2023).

money – to fuel its cryptocurrency trades in the expectation of bigger returns. Alameda initially engaged in making high-speed, market-neutral – and relatively low profit – trades, matching buyers and sellers, which did not depend on predicting if cryptocurrencies would rise or fall. For example, in January 2018, Bankman-Fried organized an arbitrage trade of bitcoin to take advantage of the higher price of the cryptocurrency in Japan compared to the price in America. In 2018, Alameda earned between $10 million and $30 million before that price gap closed.

19.     As more sophisticated investors, such as hedge funds, entered into the cryptocurrency arbitrage trading business, trading became much less lucrative for Alameda, which earned $10 million and $30 million before the narrowing of the Bitcoin spread. Further, obtaining financing was a time-consuming enterprise, particularly because banks and traditional Wall Street firms were avoiding cryptocurrency firms due to the lack of regulation and oversight. And borrowing terms were not necessarily favorable to Alameda when it was able to secure loans. Bankman-Fried needed ever-larger sums to keep Alameda afloat, especially as he was promising potential lenders annual returns of up to twenty percent.[8]

20.     Bankman-Fried determined that the solution to the aforementioned challenges was to build a cryptocurrency exchange of his own which could generate revenue to fund Alameda's activities. FTX was born.

21.     FTX Trading was founded by Bankman-Fried and Wang. Bankman-Fried served as FTX Trading's Chief Executive Officer ("CEO") at all times relevant to the facts and events described herein. Singh was the company's head of engineering. The Company began doing business in May 2019, from its offices in Hong Kong.

---

[8] Patricia Kowsmann, Vicky Ge Huang, Caitlin Ostroff, and Gregory Zuckerman, *Troubles at Sam Bankman-Fried's Alameda Began Well Before Crypto Crash*, The Wall Street Journal, (Dec. 31, 2022) https://www.wsj.com/articles/alameda-sam-bankman-fried-ftx-crypto-crash-11672434101 (accessed Mar. 1, 2023).

22.     FTX Trading moved from Hong Kong to the Bahamas, where Mr. Bankman-Fried built his base of operations.

23.     FTX US was the U.S.-based subsidiary of FTX Trading and began doing business as a cryptocurrency trading platform in or around May 2020.

### B.     The FTX Entities and the PR Campaign

24.     In order to grow the FTX, and in light of other issues occurring in the cryptocurrency arena, including the failure of other cryptocurrency exchanges, Bankman-Fried engaged in a campaign to further public confidence in FTX.  He presented himself as an ethical leader, testifying before Congress, stating that he wanted to ensure that there were "sufficient customers protections against systemic risk" and to "inform people as best as I can and be a resource."[9]

25.     FTX also worked to gain widespread support and trust from the public through promotions in media and through high profile celebrities.  FTX spent heavily on sports partnerships, including ads with celebrities, elite athletes, and sports sponsorships.  Bankman-Fried worked to ensure that FTX was "painting, hopefully, a healthy image of ourselves and the industry."[10]

26.     A critical pillar of the strategy to bring legitimacy, and correspondingly success, to FTX was Bankman-Fried's reliance upon both the financial support and stamp of approval from Defendants, U.S. based venture capital and private equity firms with stellar reputations and

---

[9] Steven Ehrlich, *Exclusive Transcript: The Full Testimony Bankman-Fried Planned to Give To Congress*, Forbes, (Dec. 13, 2022) https://www.forbes.com/sites/stevenehrlich/2022/12/13/exclusive-transcript-the-full-testimony-sbf-planned-to-give-to-congress/?sh=315336833c47 (accessed Mar. 1, 2023).

[10] A Natasha Tiku, *29-Year-Old CEO Is Pushing Crypto During the Super Bowl By Giving Away Millions in Bitcoin*, The Washington Post, (February 8, 2022), https://www.washingtonpost.com/technology/2022/02/08/29-year-old-ceo-pushes-crypto-company-during-super-bowl-by-giving-away-millions-bitcoin/ (accessed Mar. 1, 2023).

experience. These trusted companies would serve two purposes: they would both fund FTX's public relations campaign and they would be key voices in that campaign.

> **(1) Paradigm, Sequoia, and Thoma Bravo – the renown, knowledgeable and respected Venture Capital firms – Invest and Promote FTX and Sam Bankman-Fried**

> **(a) Sequoia**

27. Sequoia is a venture capital firm specializing in early investments in private companies across technology sectors. Sequoia was founded by Don Valentine in 1972, and early on made profitable investments in computer technology companies like Atari and Apple. Sequoia earns lucrative investment management fees by pooling capital from its investors, which it then generally invests in pre-initial public offering companies with a focus on the technology sector. Sequoia captures the appreciation of its investments between the time of the funding rounds and the time that the company goes public via an IPO. Because Sequoia invests so early in the life cycle of a company, there is tremendous potential to return many times its initial investment – potential that most average investors do not have. The company has "long been seen as the gold standard in the venture industry for its high investment bar."[11]

28. Sequoia is one of the largest venture capital firms in the world with over $85 billion in assets under management in 2022. Sequoia is highly respected among investors with several of its partners being named to *Forbes*' 2022 "The Midas List," which is a list of "The World's Best Venture Capital Investors."[12]

---

[11] Berber Jin, *Sequoia Capital Apologizes to Its Fund Investors for FTX Loss*, The Wall Street Journal, (Nov. 22, 2022) https://www.wsj.com/articles/sequoia-capital-apologizes-to-limited-partners-for-ftx-investment-11669144914#_= (accessed Mar. 2, 2023).

[12] Sequoia and Lin also appeared on Valuer's 2021 list of "100 Top Venture Capitalists in the USA." In 2017, Lin was fourth on *The New York Times*' "Top 20 Venture Capitalists Worldwide" list. In 2021, *dealroom.co* named Sequoia the second-most prominent venture capital firm in the world.

29. Sequoia is possibly best known for its letters to both shareholders and the general public regarding the state of the economy, and thus is a known influencer of investment and business decisions. For example, just before the Great Recession in 2008, Sequoia sent to the general public a warning of the eventual economic downturn and advice on how to weather it with a presentation entitled "R.I.P. Good Times."[13]

30. Sequoia frequently posts articles like "R.I.P. Good Times" on their site providing advice for its clients, as well as CEOs and the general public for how to proceed with tumultuous current events—such as the COVID-19 Pandemic. "Presumably when Sequoia issues a pronouncement, executives at the companies it's funded pay at least some attention."[14]

31. Alfred Lin ("Lin") is a partner at Sequoia and has been with the firm since 2010. Before then, he was the Chairman, Chief Operating Officer, and Chief Financial Officer of Zappos. Prior to joining Zappos, Lin held the Vice President of Finance and Business Development position for Tellme Networks and co-founded his own incubator and investment firm, Venture Frogs. In addition to his resume demonstrating expertise and experience in both business and finance, Lin also holds a bachelor's degree in applied mathematics from Harvard and a master's degree in statistics from Stanford.

32. Lin is known as an impressive businessman and financier and led the firm's investment into FTX. Indeed, in 2021 Lin was number one on the *Forbes* "Midas" list, due his involvement with the IPOs of Airbnb and DoorDash. Lin also joined Apple's Tim Cook, Twitter's Jack Dorsey, and Amazon's Jeff Bezos in a ranking of the 30 Most Influential People in Tech. His

---

[13] Minda Zetlin, *In 2008, a Legendary VC Firm Warned of an Economic Crisis. It Just Sent the Same Alert about the Coronavirus*, Inc, (Mar. 7, 2020) https://www.inc.com/minda-zetlin/sequoia-capital-coronavirus-covid-19-economic-effect-warning-roelof-botha.html (accessed Mar. 2, 2023).
[14] *Id.*

profile states, in short, that "every company he has worked for has been acquired," and "[e]verything he touches turns to gold."[15]

33.     Lin's partner and co-lead on Sequoia's FTX investments was Michelle Bailhe ("Bailhe").  Following Bailhe's graduation from Brown, she spent time at McKinsey & Co., Google, and private equity firm Hellman & Friedman before being brought on as one of the youngest partners in Sequoia's history.  Bailhe, who is heavily involved in Sequoia's cryptocurrency and blockchain-related investments, is a regular guest on financial and investment news outlets, often appearing on television, including on *CNBC* and *Bloomberg*, as well as on various podcasts to discuss the industry.

34.     Bailhe played a key role in the promotion of Sequoia's FTX investments, hosting interviews with Bankman-Fried, facilitating the publication of articles touting FTX, and making several television and podcast appearances to promote the FTX.  In addition to furthering her firm's success, the success of FTX provided Bailhe and opportunity to demonstrate that, like Lin and others at Sequoia, she was a visionary leader, similarly with a "Midas touch."

**(b) Paradigm**

35.     Formed in 2018, the Paradigm firm has quickly gained prominence by forming the largest cryptocurrency fund ever at $2.5B.  In the years since its launch in 2018, Paradigm "has since amassed as much as $10 billion in assets, with investments in about 40 crypto firms."[16]

36.     Matt Huang ("Huang") is Paradigm's co-founder.  After graduating with a degree in mathematics from MIT, Huang was founder and CEO of Hotspots, Inc., a Y Combinator

---

[15] Tanya Prive, *The 30 Most Influential People in Tech*, Forbes, (Jan. 7, 2013) https://www.forbes.com/sites/tanyaprive/2013/01/07/the-30-most-influential-people-in-tech/?sh=14b00b6a4bbe (accessed Mar. 2, 2023).

[16] Jonathan Ponciano, *Billionaire Coinbase Cofounder Nabs $2.5 Billion For Crypto's Biggest Venture Fund Ever*, Forbes, (Nov. 15, 2021) https://www.forbes.com/sites/jonathanponciano/2021/11/15/billionaire-coinbase-cofounder-nabs-25-billion-for-cryptos-biggest-venture-fund-ever/?sh=4ccad449159e (accessed Mar. 1, 2023).

company eventually acquired by Twitter. Following his time at Twitter, Huang found success as a venture capitalist at Sequoia, where he gained experience investing in pre-IPO companies. After four years at Sequoia, Huang partnered with Fred Ehrsam ("Ehrsam") to found Paradigm, a venture capital firm focused on funding blockchain and web3 companies.

37.     Huang and his co-founder Ehrsam grew Paradigm into a venture capital powerhouse with billions of dollars in assets under management. From December 2020 through April 2022, Paradigm grew its assets under management by more than 300%. Huang was also an angel investor in companies like ByteDance, which developed TikTok and Instacart.

38.     Since founding Paradigm, Huang has become a highly respected voice in the blockchain and cryptocurrency industries. Huang has a Twitter following of over 115,000.

**(c) Thoma Bravo**

39.     Thoma Bravo is one of the largest private equity firms in the world, with more than $120B in assets under management. The predecessor firm to Thoma Bravo, Golder Thoma & Co. ("Golder Thoma"), was founded in 1980 by Stanley Golder and Carl Thoma. Golder Thoma pioneered the "buy-and-build" investment strategy in which the firm would use primarily debt to take a controlling stake in an existing company (i.e., a leveraged buyout or "LBO") and then work to transform the acquired company into a larger and more profitable business. Through several iterations, Golder Thoma came to be known as Thoma Bravo, now led by Carl Thoma and Orlando Bravo ("Bravo"). In February of 2019, Thoma Bravo was named the best-performing buyout investor in the world by French business school HEC Paris in conjunction with DOW Jones. In 2021, Thoma Bravo was the highest growing major buyout firm in the world. Thoma Bravo has risen "from a niche investor with barely a few billion dollars in assets" to an industry powerhouse

with assets greater than certain other private equity giants.[17]  According to public data analyzed by Forbes, "[s]ince the beginning of 2015, Bravo has sold or listed 25 investments worth a total of $20 billion, [for] four times their cost."[18]

40.     Orlando Bravo, Thoma Bravo's founder and managing partner, was born in Puerto Rico and moved to Florida in his early teens.  He attended college at Brown University before earning dual degrees at Stanford, a law degree from Stanford Law School and his Master of Business Administration degree from Stanford's Graduate School of Business.  While attending law school at Stanford, one of his professors was Bankman-Fried's father, Joseph Bankman.

41.     Following graduate school, Bravo worked on mergers and acquisitions for Morgan Stanley.  Bravo then joined Thoma Bravo's predecessor firm, Thoma Cressey Equity Partners.  After leading several successful deals, Bravo eventually became a named partner at the firm, leading it to become in 2008 what is now known as Thoma Bravo.

42.     Bravo was dubbed "Wall Street's best dealmaker" by *Forbes* in 2019, and "private equity's king of SaaS" by the *Financial Times* in 2021.  As of September 30, 2022, Thoma Bravo had more than $120 billion in assets under management.

43.     In short, Defendants each were highly successful firms, with stellar reputations, and knew that their representations and pronouncements concerning the soundness – or lack thereof – of FTX and Bankman-Fried would be trusted and relied upon by the public.  Moreover, they knew that if they were to promote FTX and Bankman-Fried, they would be instrumental in helping further their financial investments in FTX.

---

[17] Antoine Gara, *Buyout firm Thoma Bravo goes from niche to big league*, Financial Times, (Dec. 6, 2021) https://www.ft.com/content/456f2fd7-f868-4ea6-abd7-fce34e783333 (accessed Mar. 1, 2023).

[18] Antoine Gara, *Meet Wall Street's Best Dealmaker: New Billionaire Orlando Bravo*, Forbes, (Oct. 2, 2019) https://www.forbes.com/sites/antoinegara/2019/10/02/meet-wall-streets-best-dealmaker-new-billionaire-orlando-bravo/?sh=778ee41842ec (accessed Mar. 1, 2023).

**(2) The Rise of FTX**

44.     FTX, Bankman-Fried's abbreviation of "futures exchange," offered a wide variety of trading and financial products.  FTX users could buy and sell NFTs, fiat currency and cryptocurrencies, including FTX's own native cryptocurrency token FFT/USDT.  FTX targeted both retail and institutional traders and investors, as well as individuals, and its platform was accessible through its desktop and mobile applications.  FTX also provided a vehicle for derivatives trading, futures, options, long and short sales.  FTX customers also could engage in peer to peer margined and leveraged offerings to one another. In addition, FTX offered variable rate interest rewards on cryptocurrency as sets held in yield bearing accounts ("YBAs"), which rates were determined by FTX in its sole discretion.

45.     One of the attractive features of FTX came from its promises in its terms of service, which *inter alia* guaranteed that, at all times, customers' assets belonged solely to them and never would be transferred to, borrowed by or otherwise used to trade for itself by FTX.

46.     Indeed, FTX Trading's terms of service offered this guarantee:

8.2.6.  All Digital Assets are held in your Account on the following basis:

(a)     ***Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading***.  As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets.  FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.
(b)     ***None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading***; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.
(c)     ***You control the Digital Assets held in your Account***.  At any time, subject to outages, downtime, and other applicable policies (including the Terms), ***you may withdraw your Digital Assets*** by sending them to a different blockchain address controlled by you or a third party.[19]

47.     Similarly, the FTX US terms of service promised:

---

[19]  FTX Trading Terms of Service (emphasis added).

As part of your FTX.US account, FTX.US provides qualifying users access to accounts for you to store, track, transfer, and manage your balances of cryptocurrency and/or dollars or other supported currency. ***All cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX.US for your benefit.… Title to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US.… FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US.***[20]

48.     In addition, FTX US's website contained a document entitled "FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms," which stated that FTX "segregates customer assets from its own assets across our platforms."  The document also represented that FTX maintained "liquid assets for customer withdrawals… [to] ensure a customer without losses can redeem its assets from the platform ***on demand***."[21]  These promises were known and understood by Defendants.

49.     Notwithstanding FTX's millions of customers and extensive array of product offerings, Bankman-Fried was dependent upon Alameda to fuel FTX.  Alameda, which had become one of the biggest trading firms in the cryptocurrency arena, was FTX's primary market maker.  This enabled Alameda to use its buying power to artificially inflate the value of a cryptocurrency it was borrowing against or take the losing side of trades in order to attract customers to the exchange.[22]

---

[20]     FTX.US     User     Agreement,     ftx.us,     (Sept.     16,     2022) https://web.archive.org/web/20221111173046/https://ftx.us/TermsOfService.pdf (accessed Mar. 1, 2023) (emphasis added).

[21] *FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms*, FTX: policy (Mar.     10,     2022)     https://www.ftxpolicy.com/posts/investor-protections#:~:text=These%20include%20(1)%20maintaining%20adequate,of%20assets%20and%20disclosures%20to (accessed Mar. 2, 2023) (emphasis added).

[22] Patricia Kowsmann, Vicky Ge Huang, Caitlin Ostroff, and Gregory Zuckerman, *Troubles at Sam Bankman-Fried's Alameda Began Well Before Crypto Crash*, The Wall Street Journal, (Dec. 31, 2022)  https://www.wsj.com/articles/alameda-sam-bankman-fried-ftx-crypto-crash-11672434101 (accessed Mar. 3, 2023).

50.     According to the Securities and Exchange, record-keeping at Alameda was deficient.  Moreover, that did not change significantly after FTX launched.  Assets and debts were "generally treated as interchangeable."[23]

51.     Unlike other customers, whose collateral would be sold if they carried negative balances, pursuant to code directed by Bankman-Fried and written by Wang, Alameda was allowed to carry negative balances that would not trigger the sale of Alameda's collateral, even if the collateral's value fell below a certain level.[24]  In doing this, FTX, in effect, gave Alameda a virtually unlimited line of credit, one that ultimately would create a multi-billion hole in FTX's balance sheet.

52.     In addition and according to media reports, bankruptcy proceedings and detailed allegations from actions filed by, among others, regulators, and prosecutors, the FTX's statements concerning the manner of holding and segregating customer assets at the FTX Entities were materially false and misleading.  Despite its guarantees not to do so,  FTX, Bankman-Fried and Alameda misused and misappropriated billions of dollars of FTX customers' assets.

53.     During the Class Period, the FTX Entities experienced a meteoric rise in success due in no small part to the aggressive promotional campaign bankrolled and led by Defendants. Throughout this period, Bankman-Fried, with the help of Defendants, was able to position himself as being at the forefront of  the cryptocurrency space.  Bankman-Fried established this reputation through, among other mechanisms, television and podcast interviews, political donations and social media posts.

---

[23] *Securities and Exchange Commission v. Samuel Bankman-Fried*, Civil Action No. 22-cv-10501, at 16 (S.D.N.Y. Dec. 13, 2022).
[24] *Securities and Exchange Commission v. Samuel Bankman-Fried*, Civil Action No. 22-cv-10501, at 12 (S.D.N.Y. Dec. 13, 2022).

54. As part of his attempt to appear beyond reproach, and in light of other issues occurring in the cryptocurrency arena, including the failure of other cryptocurrency exchanges, Bankman-Fried engaged in a campaign to further his personal brand and public confidence in FTX. Bankman-Fried described himself as promoting a charitable movement called "Effective Altruism" and promised to donate much of the wealth that he was accruing to a variety of charities, and he spoke often about the need for above board behavior in the cryptocurrency space. Bankman-Fried presented himself as an ethical leader, testifying before Congress, stating that he wanted to ensure that there were "sufficient customers protections against systemic risk" and to "inform people as best as I can and be a resource." Bankman-Fried eventually achieved celebrity status and notoriety and was even known and referred to simply by his initials, "SBF."

55. FTX ultimately became one of the largest crypto-trading companies in the world, with nearly $15 billion in assets being traded on its platforms daily. Through its marketing efforts, FTX worked to gain widespread support and trust from the public through promotion in media and through high profile celebrities. FTX spent heavily on sports partnerships, including ads featuring elite athletes such as Tom Brady, Naomi Osaka and Steph Curry. FTX's marketing efforts involved partnering with popular celebrities in entertainment such as Larry David. Specifically, the FTX Entities secured several celebrity "brand ambassadors" and released a series of internet and television advertisements to promote these partnerships. In addition, the FTX Entities entered into various sponsorships and naming rights deals with high-profile sports programs such as UC Berkeley Athletics, the Miami Heat and Major League Baseball.

56. A critical pillar of the strategy to promote an air of legitimacy to FTX was Bankman-Fried's reliance upon both the financial support and stamp of approval from Defendants, U.S. based venture capital and private equity firms with stellar reputations and experience. These

trusted companies would serve two purposes: they would both fund FTX's public relations campaign and they would be key voices in that campaign.

57.     Defendants not only invested in FTX, knowing that these funds would be spent on the false and misleading promotional activities described above, but they also often directly touted the purported safety, trustworthiness, and favorable risk profile of the FTX platforms and of Bankman-Fried himself.  These promotional efforts worked as intended, as they helped to fuel the rapid increase in the FTX Entities' valuation.

58.     By July 2021, FTX had attained a valuation of $18 billion after securing funding from each of the Defendants, among others.  By October 2021, after securing another series of funding, FTX had reached a valuation of $25 billion, representing a significant return on Defendants' initial investments in mere months.  Combined, the FTX Entities had attained a valuation exceeding $32 billion in only three years – achieved predominantly through Defendants' relentless and effusive efforts to promote the FTX exchange as reliable and trustworthy, in order to better ensure substantial returns on their respective investments.

**(3) Defendants Invest in FTX and Promote FTX and Bankman-Fried**

**(a) Sequoia**

59.     Sequoia first participated in a funding round for FTX on or about July 2021.  This Series B funding round raised $900 million for FTX, valuing the two-year-old company at $18 billion.  At the time, the funding round was the largest private cryptocurrency funding deal ever.

60.     Bankman-Fried explained the reason for this funding round:  "*[t]he primary goal of the raise was to [find] strategic allies who can help FTX grow its brand*."[25]

---

[25] Nina Bambysheva, *Bitcoin Alert: Biggest Private Crypto Deal Ever Is Closed*, Forbes, (Jul. 20, 2021)        https://www.forbes.com/sites/ninabambysheva/2021/07/20/bitcoin-exchange-led-by-worlds-richest-crypto-billionaire-raises-record-900-million/?sh=16e51eed4e33   (Mar. 2, 2023) (emphasis added).

61. Lin of Sequoia lent his name to a July 20, 2021 FTX promotional press release describing the funding round as the "Largest Raise in Crypto Exchange History." The release, which also featured defendants Paradigm and Thoma Bravo, contained the following quote from Lin:

> *FTX is the high-quality, global crypto exchange the world needs*, … *Sam is the perfect founder to build this business, and the team's execution is extraordinary*. We are *honored* to be their partners."[26]

62. At the time of FTX's Series B funding round, FTX had over one million users and was averaging over $10 billion of daily trading volume. After the funding round and these glowing words, FTX prospects grew, as cryptocurrency traders and investors heeded Lin's advice and flocked to FTX as a safe haven for what they believed to be high-quality, safe digital asset trading.

63. On October 21, 2021, FTX conducted another fundraising round. Because of the amount of capital raised, $420.69 million and the number of funders (69), this round would become known as the "Meme Round," with the numbers 420 and 69 being obvious nods to meme culture. Sequoia participated again in this funding round, which valued FTX at just shy of $25 billion – meaning Sequoia's initial investment in the Series B round had appreciated by almost 40% in a three-month period. By contrast, the S&P 500 Index was increased by less than 7% during that same period.

64. Sequoia's promotional efforts had worked. Since Sequoia's initial investment only three months earlier, the FTX user base increased 48% and its average daily trade volume increased to more than $14 billion.

---

[26] *FTX Trading Ltd. Closes $900M Series B Round – Largest Raise in Crypto Exchange History*, PRNewswire, (Jul. 20, 2021) https://www.prnewswire.com/news-releases/ftx-trading-ltd-closes-900m-series-b-round----largest-raise-in-crypto-exchange-history-301337709.html (accessed Mar. 2, 2023) (emphasis added).

65.     Given the success of Sequoia's investment and the additional funding it provided to FTX in the Meme Round, $200 million, Lin and Bailhe engaged in a media blitz to further cement FTX's apparent legitimacy.

66.     On October 21, 2021, Lin was quoted in an FTX press release highlighting the close of the most-recent founding round.  In that release, Lin called Bankman-Fried "a special founder who is ambitious and daring enough to build the future of cryptocurrency by establishing FTX as the global exchange with the best overall product offering and leveraging the world's crypto rails to build the future of finance."[27]  He crowed that Sequoia was "***thrilled*** to partner with FTX on their next phase of growth."[28]

67.     On November 20, 2021, Bailhe appeared on FTX's "The FTX Podcast."  She had the following exchange with FTX employee and podcast host, Tristan Yver, in which she represented that Sequoia's confidence in FTX was based on its substantial due diligence:

> [Yver:]  Did you guys go into FTX because Sam's narrative or because the story that FTX told?
>
> [Bailhe:]  It's so funny because I actually shared before we ever met Sam in an official Sequoia meeting, I had sent this email to all the people on our side that were going to join about like guys like "Don't ask silly questions in the meeting.  This is an amazing company.  Please bring your 'A' game…. "Did you guys just invest because Sam is so charismatic?"  ***And Alfred [Lin] and I were like "No, we do our homework."  We did our homework way in advance.  We knew FTX was this amazing company and we also knew Sam was an amazing founder….***[29]

68.     During the same podcast, Ms. Bailhe explained that Sequoia takes an active role in the operations of companies that it invests in, like FTX, stating in pertinent part as follows:

---

[27] *FTX Trading Ltd. Closes $420 Million Series B-1 Funding Round*, PRNewswire, (Oct. 21, 2021) https://www.prnewswire.com/news-releases/ftx-trading-ltd-closes-420-million-series-b-1-funding-round-301405473.html (accessed Mar. 2, 2023).
[28] *Id.* (emphasis added).
[29] Tristan Yver, *The FTX Podcast*, FTX, (Nov. 21, 2021) https://open.spotify.com/episode/2c4a2r1WtJfSE5xBQNglKB?si=PBgOo4laQROcDVd-z_Ncjg (accessed Mar. 2, 2023) (emphasis added).

[Yver:] So you guys have a lot of communication with these founders that you're backing then? It's not an off-hand process in which you guys invest and then let them go off to the races?

[Bailhe:] No, no. **There is a big active conversation throughout. I think we take it probably more seriously than any other firm**. We've been debated actually about whether founders would appreciate that or not. The founders we work closely with seem to appreciate it a lot and **we try to be really careful.** Because we're not just passive money. We want to be really business partners. Not where it's overbearing and we're in your hair but we are partners with you for a decade or however long you want, so it's not okay to back a direct competitor that is going after you if you're not okay with that.[30]

69. On December 17, 2021, Bailhe authored an article entitled "Ask Not Wen Moon – Ask Why Moon" that was published on Sequoia's website. In the article, Bailhe touted Sequoia's close relationship with FTX and Bankman-Fried, stating in pertinent part as follows:

Like all other waves of technology, **Sequoia's mission is to partner with the most daring founders in crypto and help them build something legendary. We're proud partners of Sam at FTX**….[31]

70. On the same day, Sequoia sent the following tweets from its official Twitter account promoting FTX, including a quote by Bankman-Fried admonishing the cryptocurrency industry and intimating that FTX did not "do scammy things . . . [e]ven if it is technically legal":



71. On January 31, 2022, FTX completed its Series C fundraising round. While Sequoia did not participate, the Series C round valued FTX at nearly $32 billion. This resulted in a dramatic,

---

[30] *Id*. (emphasis added).
[31] Michelle Bailhe, *Ask Not Wen Moon-Ask Why Moon*, Sequoia, (Dec. 17, 2021) https://www.sequoiacap.com/article/ask-not-wen-moon-ask-why-moon/ (accessed Mar. 2, 2023) (emphasis added).

nearly 90%, appreciation in Sequoia's Series B investment in just over six months.  In the three months since the Meme Round, and following Sequoia's substantial efforts to promote FTX, FTX's user base had grown another 60%.

72.     Sequoia's investment in FTX was so successful that it opened a first-of-its-kind cryptocurrency-focused fund.  Bailhe promote the new fund by appearing on various television programs on *CNBC* and *Bloomberg*.  In connection with the campaign, Sequoia authored a *Medium* blog post touting its relationship with FTX and Bankman-Fried, which stated in pertinent part as follows:

> ***We have partnered with an ever-growing group of some of the best founders in crypto.  From Sam Bankman-Fried at FTX***, Jack Dorsey at Block, Uri Kolodny and Eli Ben-Sasson at StarkWare, and Michael Shaulov at Fireblocks, to Elena Nadolinski at Iron Fish, Yubo Ruan at Parallel, Ming Wu at Strips and more in stealth, these founders have expanded both our thinking and how we support their unique needs.[32]

73.     On April 13, 2022, Bailhe hosted an interview with Bankman-Fried for *Startup Grind*, a conference that bills itself as a "Global Community for Entrepreneurs."  The interview segment was entitled "The Rise of FTX."  Bailhe portrayed Bankman-Fried as a brilliant founder and a savvy but prudent risk taker, stating in pertinent part as follows:

> *I am thrilled to be here today with a founder that Sequoia is honored to back and that is Sam himself.  Sam is the co-founder and CEO of FTX and an exceptional founder and human in so many ways.  And so I am excited that you all will get to know the man behind the myth in this session*.

> …Sam, to many people, you are an enigma.  You grew up in Northern California, the son of two Stanford law professors.  You graduated from MIT which is sort of an alt thing to do these days.  You actually went all four years and got a degree and were a top trader on Wall Street at Jane Street.  And somehow you blink and years later you are the CEO of a crypto exchange in the Bahamas.  *So, your trajectory is striking and I think a lot of that has to do with how well you calculate risk and upside.  So talk about the risk that you've taken in your journey as a founder and how smart risk taking has shaped you and helped get FTX to where it is today*.

---

[32] Michelle Bailhe, Shaun Maguire, and Alfred Lin, *A Block Step Forward*, Medium: Sequoia, (Feb. 17, 2022)  https://sequoia.medium.com/a-block-step-forward-14274f4a0e65 (accessed Mar. 2, 2023) (emphasis added).

*… Hopefully, the audience can hear the level of quantitative thinking that shapes your choices*. I want to double click on that. *A lot of people who know you really well, Sam, call you a trader's trader.* People used to watch you trade like they watch gamers on Twitch. FTX's original motto is by trader, for traders.

…You have done what experts will tell you not to do and *you have been right many times*….[33]

74. Ms. Bailhe also highlighted the astronomical growth of FTX, without analysis or critique, stating:

*What's interesting to me is one of the hallmarks of FTX – both culture and product – is speed*. And you just move faster than your competition and it shows on tons of dimensions. How do you set pace as a leader? Aside from keeping the team lean, hiring the right people. *How do you set the cadence of work and how do you maintain that as you grow?*

*One of your superpowers is your unbridled ambition. This past year alone, FTX has launched several new products and I would argue made the transition from a product company to a platform company.* So you have the international exchange, you have the US exchange, you have US retail app, you have a proposal in front of the CFTC to change the way that derivatives could work in the US for crypto. And you also have a white label product so that any app that wants to add crypto trading can do that now via an API. And yet, this is a fraction of what we know you have planned. Could you talk about your long-term vision for FTX?

I remember in our first meeting when you talked about this vision, you had a way of describing it that I thought was very visceral and fun, which was: *we want to build something so that whatever you want to do with your next dollar, whether its trade crypto or send a dollar to a friend or buy a banana, that you can do it with FTX.* And it was just a great way to phrase it.

75. On September 22, 2022, just weeks before the collapse of FTX, Sequoia published a now-deleted article on Bankman-Fried and FTX on its website. The self-published piece was entitled "Sam Bankman-Fried Has a Savior Complex – And Maybe You Should Too."[34] The piece detailed Bankman-Fried's supposed adherence to "Effective Altruism" – the idea that one should earn as much as possible for benefit of humankind, as Bankman-Fried claimed that FTX and

---

[33] Michelle Bailhe and Sam Bankman-Fried, *The Extraordinary Rise of FTX*, Startup Grind, (Apr. 13, 2021) available at https://m.codedfilm.com.ng/download/the-extraordinary-rise-of-ftx-startup-grind-global-2022/LS1rTk0zWTJ5UlFrWQ (accessed Mar. 2, 2023) (emphasis added.)

[34] A. Fisher, *Sam Bankman-Fried Has a Savior Complex—And Maybe You Should Too*, Sequoia Capital Spotlight (Sept. 22, 2022), available at https://web.archive.org/web/20221027181005/https://www.sequoiacap.com/article/sam-bankman-fried-spotlight/ (accessed Mar. 2, 2023).

himself were working to do.  The piece was gushing, describing Bankman-Fried in near mythic

terms, as an investing genius who would first revolutionize cryptocurrency trading and then the

world.  The piece stated:

> SBF's purpose in life was set: He was going to get filthy rich, for charity's sake.  All the
> rest was merely execution risk.

> SBF's mind had been trained almost from birth to calculate.… During his teenage
> gaming years, his mathematical abilities allowed him to sharpen his tactics – and
> win.  And, of course, every trade SBF ever made at Jane [Street] was the subject of
> a risk/reward calculation.

> He had to find a risk-neutral career path – which, if we strip away the trader-jargon,
> actually means he felt he needed to take on a lot more risk in the hopes of becoming
> part of the global elite.  The math couldn't be clearer.  Very high risk multiplied by
> dynastic wealth trumps low risk multiplied by mere rich-guy wealth.  To do the most
> good for the world, SBF needed to find a path on which he'd be a coin toss away
> from going totally bust.

> At this point, mid-2019, SBF decided to double down again – and scratch his own
> itch.  He would bet Alameda's multimillion-dollar trading profits on a new venture:
> a trading exchange called FTX.  **It would combine Coinbase's stolid, regulation-
> loving approach** with the kinds of derivatives being offered by Binance and others.

> "Of the exchanges that we had met and looked at, some of them had regulatory
> issues, some of them were already public," Bailhe says.  "And then there was Sam."
> **The exchange that SBF had started to build, FTX, was <u>Goldilocks-perfect</u>.  There
> was no concerted effort to skirt the law, no Zuckerbergian diktat demanding that
> things be broken**.  And, yet, FTX wasn't waiting to get permission to innovate.  The
> company had based itself offshore precisely because it aspired to build an advanced
> risk engine that would support all sorts of hedging strategies.  SBF himself seemed
> to be bred for the role of crypto exchange founder and CEO.  Not only had he been
> a top trader at a top firm – and, thus, the ideal customer – but both his parents were
> lawyers.  "**And, so, he is committed to making the right chess moves for FTX to
> eventually be able to legally do everything they want to do in the U.S.,**" Bailhe
> says – "**not by asking forgiveness, but by asking permission**."

> Alameda was not immune to the exchange-level shenanigans that gave crypto as a
> whole its sleazy reputation.  But FTX had an ambition to change that.  It was built
> to be the exchange traders could count on.  **SBF needed to get the word out.  He
> wanted FTX to be known as the respectable face of crypto.  This required ad
> campaigns, sponsorship deals, a charitable wing – and a war chest to pay for it
> all.**

> FTX … **it needed that money from credible sources so it could continue to
> distinguish itself from the bottom-feeders who came to crypto to fleece the suckers.**
> So, in the summer of 2021, when FTX started to raise its Series B from a who's who
> of Silicon Valley VCs, Bailhe and Lin hit the "Don't Panic" button.
> "Embarrassingly, we had never tried to reach out to Sam, because we figured he
> didn't need us," Bailhe admits.  "I thought they were just minting money and had
> absolutely no need for investors."  Learning otherwise, they quickly contacted SBF
> and organized a last-minute Zoom call between him and the partners at Sequoia – at

four California time on a hot July Friday afternoon.  ***Bailhe was adamant, putting her reputation with the other partners on the line:  "I'm line, 'No, it's worth it.  Cancel your afternoon.'"***

The Zoom went well for all concerned.  SBF looked relaxed as he answered questions, talking, as he usually does, in complete paragraphs about topics of extreme complexity.  Ramnik Arora, FTX's head of product and another ex-Facebook engineer, remembers the meeting clearly: "We're getting all these questions from Sequoia toward the end.  ***He's absolutely fantastic***."  Arora locks eyes with me, and I am mesmerized.  Arora is intense – calling to mind a Bollywood version of Adrian Brody.  "***Unbelievably fantastic***," he says, shaking his head.

Bailhe remembers it the same way: "We had a great meeting with Sam, but the last question, which I remember Alfred asking, was, 'So, everything you're building is great, but what is your long-term vision for FTX?'"

That's when SBF told Sequoia about the so-called super-app: "I want FTX to be a place where you can do anything you want with your next dollar.  You can buy bitcoin.  You can send money in whatever currency to any friend anywhere in the world.  You can buy a banana.  You can do anything you want with your money from inside FTX."

Suddenly, the chat window on Sequoia's side of the Zoom lights up with partners freaking out.

>    ***I LOVE THIS FOUNDER," typed one partner***.

>    "***I am a 10 out of 10," pinged another***.

>    "***YES!!!" exclaimed a third***.

What Sequoia was reacting to was the scale of SBF's vision.  It wasn't a story about how we might use fintech in the future, or crypto, or a new kind of bank.  It was a vision about the future of money itself – with a total addressable market of every person on the entire planet.

"I sit ten feet from him, and I walked over, thinking, ***Oh, shit, that was really good***," remembers Arora.  "And it turns out that that fucker was playing *League of Legends* through the entire meeting."

***"We were incredibly impressed," Bailhe says.  "It was one of those your-hair-is-blown-back type of meetings***."

Not only that, Arora says, but *League of Legends* is the kind of multiplayer online battle arena video game where every four minutes or so of tactical maneuvering is punctuated by ten seconds of action known as a gank – gamer slang for "gang killing" – where you and your team gang up on an enemy.  "There's a fight that happens, basically," says Arora, who was watching over SBF's shoulder as he answered that final question from Sequoia, "and I'm like, ***This guy is fucking in a gank***!"

The B round raised a billion dollars.  Soon afterward came the "meme round": $420.69 million from 69 investors.[35]

76.     Sequoia further described Bankman-Fried in hyperbolic terms, calling him "obviously a genius," a "future trillionaire," and someone who was "not talking about maximizing the total value of FTX," but rather "the total value of the universe."[36]  Sequoia, through the article, described Bankman-Fried as a risk-neutral market player who strove to "be fully rational about maximizing his income on behalf of the poor" and "apply his trading principles across the board."  Sequoia spoke of FTX with similarly effusive praise, stating: "FTX has a remarkable corporate culture…that comes right from the top" with a "guilelessness, an openness."  The article described that its primary "competitive advantage" was its extremely ethical behavior and informed readers that "the success of FTX seems like a foregone conclusion."

77.     Sequoia's official Twitter account promoted the article on September 22, 2022 and September 30, 2022 as follows:



---

[35] *Id.* (emphasis added and in original).
[36] *Id.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14



15      78.     On January 18, 2023, in a speech at The Wharton School and the University of

16  Pennsylvania Carey Law School The Wharton School and the University of Pennsylvania Carey

17  Law School entitled "Crypto's Crisis of Trust: Lessons Learned from FTX's Collapse," CFTC

18  Commissioner Goldsmith Romero described the how Sequoia's support for FTX was central to

19  luring customers onto the FTX platforms:

20          ***FTX appears to have used Sequoia as a credibility and trust enhancer, and it used***
21          ***Sequoia's money to embark on a campaign to gain public trust and distinguish***
            ***itself as the most trusted brand in crypto***.

22
            ***It appears that Sequoia at least knew its money would be used in this fashion***.
23          However, there are serious questions and allegations about whether this public-
            relations "war chest" was funded not only by venture capital money but also
24          customer property.  If those allegations prove to be true, this could be one of the
            most significant breaches of trust in financial history.

25
            ***The multi-dimensional public relations campaign was meant to build the public's***
26          ***trust in FTX***.  And I have not discussed all elements of that campaign.  There were
            rumored efforts to influence charities and policy advocacy groups.  There were
27          efforts relating to FTX's extensive legal and political spending; and even an alleged
            investment in a crypto news site.  ***All of this appears to be part of a branding***
28          ***campaign designed to make FTX appear trustworthy***.

FTX's violation of the trust it built through this campaign deepened the trust deficit for an unregulated crypto industry already badly damaged by the collapse of TerraUSD, Three Arrows Capital, Celsius and Voyager. The crypto industry is left with a crisis of trust.[37]

### (b) Thoma Bravo

79.     Thoma Bravo first invested in FTX during the same July 2021 Series B funding round in which Sequoia made its first investment, investing $125 million. Following the $900 million funding round, Orlando Bravo sounded his praises for Bankman-Fried and FTX in a press release issued by FTX, which was also posted on the Thoma Bravo website:

> We have watched with excitement as ***Sam and the FTX team have successfully built the most cutting-edge, sophisticated cryptocurrency exchange in the world***. While this has been an incredible accomplishment in itself, ***their commitment to making a positive impact on the world through their business is what sets the company apart.*** We are thrilled to partner with FTX on their next phase of growth as they create a new ecosystem for crypto.[38]

---

[37] Cristy Goldsmith Romero, *Crypto's Crisis of Trust: Lessons Learned from FTX's Collapse*, The Wharton School and the University of Pennsylvania Carey Law School Keynote Address, (Jan. 18, 2023) available at https://buckleyfirm.com/sites/default/files/Buckley%20InfoBytes%20-%20CFTC%20Goldsmith%20Romero%20Speech%20Crypto%E2%80%99s%20Crisis%20of%20Trust%20Lessons%20Learned%20from%20FTX%E2%80%99s%20Collapse.pdf (accessed Mar. 2, 2023) (emphasis added).

[38] *FTX Trading Ltd. Closes $900M Series B Round – Largest Raise in Crypto Exchange History*, PRNewswire, (Jul. 20, 2021) https://www.prnewswire.com/news-releases/ftx-trading-ltd-closes-900m-series-b-round----largest-raise-in-crypto-exchange-history-301337709.html (accessed Mar. 2, 2023) (emphasis added).

80.     Also in July 2021, Orlando Bravo endorsed FTX and Bankman-Fried to his

thousands of Twitter followers:



81.     At the time that Thoma Bravo, and Orlando Bravo specifically, were promoting

FTX, they failed to disclose that the company's investment in FTX had arisen from Orlando

Bravo's personal relationship with Bankman-Fried's father:  "It was a surprise phone call from an

old university professor that launched private equity investor Orlando Bravo into becoming one of

the most prominent and vocal supporters of Sam Bankman-Fried and his crypto trading firm

FTX."[39]  A *Financial Times* article explained:

> The call was from Joseph Bankman, a professor of law and business at Stanford
> University who had taught Bravo in the late 1990s.  At the time, in mid-2021,
> Bravo's $122bn private equity firm Thoma Bravo was opening an office in Miami,
> the city where Bankman's son Sam had just paid $135mn for a 19-year naming
> rights contract with the local NBA team.
>
> Bankman told Bravo his son was looking for guidance on philanthropic projects in
> Miami to further his "effective altruism" mission.  Only after they spoke did Bravo
> learn that Bankman-Fried was also in the process of raising a $900mn Series B

---

[39] Antoine Gara, Harriet Agnew, Tabby Kinder, and Richard Waters, *How Sam Bankman-Fried Seduced Blue-Chip Investors*, Financial Times, (Nov. 11, 2022) https://www.ft.com/content/67b1899f-4b1f-4676-b264-0d19e205d64e (accessed Mar. 2, 2023).

funding round at a $18bn valuation, with a who's who of investors including Sequoia Capital, BlackRock and SoftBank. He quickly called Bankman back seeking an introduction and a way into the deal, which was progressing quickly and would be the largest capital raising in crypto exchange history.

When Bravo and a partner Tre Sayle began due diligence for the funding round, they were taken aback by FTX's numbers. The two-year-old start-up led by a relatively small staff of young traders was on course to earn over $200mn in operating profit for the year, **unprecedented margins for an early-stage growth company that would normally be losing money.** Bravo was blown away. Thoma Bravo invested more than $125mn in the round in June 2021, becoming one of FTX's largest backers.[40]

82.     During the Class Period, Thoma Bravo continued to tout FTX, attempting to lure users to the FTX exchange which, in turn, make Thoma Bravo's stake in FTX more valuable.

83.     On November 27, 2021, in response to a tweet warning cryptocurrency traders: "[o]nly trade [bitcoin] on a legitimate exchange you trust," Bravo emphasized the purported trustworthiness of FTX. Bravo told his Twitter followers: "[o]nly trade [bitcoin] with @FTX_Official [FTX]."[41]

84.     Bravo continued promote Bankman-Fried and FTX through media appearances. For example, on January 4, 2022, Bravo was quoted in a *MarketWatch* article describing Bankman-Fried.

Bravo describes Bankman Fried as incredible at execution. "He combines being visionary with being a phenomenal operator," Bravo says. "That is rare."[42]

85.     On April 8, 2022, Bravo appeared on *The Scoop* podcast with financial journalist Frank Chaparro. Bravo described Bankman-Fried and FTX in glowing terms:

[Chaparro:] What advice do you give to an FTX to really stampede the competition and stand out?

---

[40] *Id.* (emphasis added).
[41] Orlando Bravo (@OrlandoBravoTB), Twitter, (Nov. 27, 2021, 9:28 PM), https://twitter.com/OrlandoBravoTB/status/1464783337428426756 (accessed Mar. 2, 2023).
[42] Steve Gelsi, *How Young, Everyday Investors Convinced a Top Billionare Dealmaker to Join Them as a Crypto Bull*, MarketWatch, (Jan. 4, 2022) https://www.marketwatch.com/story/how-wall-streets-top-billionaire-dealmaker-learned-to-love-cryptocurrencies-11641301240 (accessed Mar. 2, 2023) (emphasis added).

[Bravo:] Well FTX is already doing that. ***FTX doesn't need a lot of advice.*** That's the great thing. ***It is so unusual to find a leader like Sam that combines an incredible strategic mindset with at the same time an exceptional operational and execution rhythm to the business.*** You usually find greatness in one or the other and you have to adjust to the culture of the company and their strengths. In the case of FTX, you have both plus a pioneer plus a company that has such a big cultural mission that is beyond any individual. ***Companies like that you don't just run across very often – even in a decade***.

86.     On June 7, 2022, Mr. Bravo endorsed a tweet by Bankman-Fried where he claimed that FTX would keep growing, even as other businesses cut jobs. Bravo, retweeting Bankman-Fried, who had approximately one million followers on Twitter, responded, "This is exactly right."[43]

87.     On June 23, 2022 Bravo, again while retweeting Bankman-Fried, tweeted that Bankman-Fried was "so unique in combining innovation with operations" and stated that rigor and innovation are what enabled FTX to "generate internal resources (cash flow) that are then deployed to help the [cryptocurrency] ecosystem in these challenging times."[44]

88.     On September 21, 2022, Bravo spoke at IPEM Cannes 2022. IPEM is an international conference for professionals in the private equity and venture capital community. More than 5,000 industry professionals attended the conference. While speaking at IPEM, Bravo declared to other professional investors that FTX was going to be "a big winner," and he described Bankman-Fried as "one of the best entrepreneurs" he had come across in his entire career.[45]

89.     Three days later, on September 25, 2022, the *Financial Times* published an article chronicling an interview with Bravo where Bravo singled out FTX and Bankman-Fried as worthy

---

[43]     Orlando Bravo (@OrlandoBravoTB), Twitter, (Jun. 7, 2022, 8:09 AM) https://twitter.com/OrlandoBravoTB/status/1534145547363225601 (accessed Mar. 2, 2023).
[44]     Orlando Bravo (@OrlandoBravoTB), Twitter, (Jun. 23, 2022, 10:06 PM) https://twitter.com/OrlandoBravoTB/status/1540154451209506816 (accessed Mar. 2, 2023).
[45]     Kaye Wiggins, *Crypto Industry Is Not As Ethical As Private Equity, Says Buyout Billionaire*, Financial Times, (Sept. 26, 2022) https://www.ft.com/content/c5dd6c35-d3e2-4602-a8e4-54266990cfd3 (accessed Mar. 2, 2023).

investment opportunities which stood out from the overall cryptocurrency sector. Bravo criticized the cryptocurrency market for what he characterized as a "'disturbing' lack of transparency" and "business practices [that] don't rise to the level of ethics we're all used to in private equity."[46]

> However, he said, [Thoma Bravo] would "certainly look at" putting more money into FTX if it held another funding round. The Bahamas-based crypto company was going to be "a big winner," he said, describing 30-year-old Bankman-Fried as "one of the best entrepreneurs" he had come across.

90. Weeks after Bravo lauded FTX and Bankman-Fried, FTX and Alameda principals admitted to misappropriating FTX customers' funds, were arrested, and FTX filed for bankruptcy. Billions of dollars in depositor funds remain misappropriated. Many lost their life savings because they had done exactly what Bravo had urged: only trading bitcoin on FTX.

**(c) Paradigm**

91. After witnessing its initial investment in FTX's Series B round quickly appreciate, in November 2021, Paradigm set out to raise $2.5 billion from investors for a cryptocurrency focused venture fund, called "Paradigm One." The *Financial Times* recently reported that one of the investors in the Paradigm One fund was FTX's sister trading company, Alameda. In November 2021, Alameda reportedly invested $20 million in the Paradigm One fund. The *Financial Times* article questioned the "circular" nature of these transactions, noting, "as a result of the transactions, Bankman-Fried invested in and received financing from a single pot of money."[47] The *Financial Times* quoted Charles Whitehead, a professor at Cornell Law School, who described the investments as "'weird… it raises your eyebrows.'"[48]

---

[46] *Id.*

[47] Kadhim Shubber and Joshua Oliver, *FTX Boss Invested in Paradigm Fund That Backed His Crypto Exchange*, Financial Times, (Jan. 10, 2023) https://www.ft.com/content/756f4268-5d9b-42e5-8fdd-d007e60b8d00 (accessed Mar. 2, 2023).

[48] *Id.*

92.     Two months later, in January 2022, the Paradigm One fund invested in FTX's Series C funding round, which valued FTX at nearly $32 billion.  Aside from a general disclosure that Paradigm may invest in companies that are owned or operated by its limited partners, Paradigm did not reveal Alameda's stake in the Paradigm fund.

93.     In a February 23, 2022 press release, Paradigm's Huang praised FTX's "great products and regulatory engagement," stating:

> Paradigm has been fortunate to be an investor in FTX's global business, and we are thrilled to invest in FTX.US.  ***The team is world class and their focus on great products and regulatory engagement will help ensure access to crypto for millions of Americans....***[49]

94.     On September 9, 2022, Huang retweeted to his over one hundred thousand Twitter followers a response by Bankman-Fried to one of Huang's tweets, which stated: "[I]t's really important that the gateways to the financial world take their duty extremely seriously to prevent financial crimes."[50]  By promoting and distributing the tweet, Huang gave the false signal that Bankman-Fried had in fact taken his duty to prevent financial crimes "extremely seriously."

95.     By November 2022, after the truth about FTX and Alameda had been revealed, and Defendants deceit had come unraveled, costing investors billions of dollars in losses, Huang wrote an apologetic string of tweets to his followers in which he revealed that Paradigm itself had never used any of FTX's platforms, even as he had encouraged others to do so, and contended that Paradigm was "shocked by the revelations about FTX, Alameda, and FTX."[51]  In an effort to cover his tracks, Huang also appears to have deleted some, if not all, of his tweets praising FTX.

---

[49]   *FTX US Closes $400M Series A Round*, PRNewswire, (Jan 26, 2022) https://www.prnewswire.com/news-releases/ftx-us-closes-400m-series-a-round-301468435.html (accessed Mar. 2, 2023) (emphasis added).

[50]   Matt   Huang   (@matthuang),   Twitter   (Sept.   9,   2022,   12:22   PM) https://twitter.com/SBF_FTX/status/1568273553056743426 (accessed Mar. 2, 2023).

[51]   Matt   Huang   (@matthuang),   Twitter   (Nov.   15,   2022,   2:07PM), https://twitter.com/matthuang/status/1592595241453776896 (accessed Mar. 2, 2023).

**(4) FTX and Alameda's Interdependence and FTX's Fall**

96.     FTX offered a wide variety of trading and financial products.  Notwithstanding FTX's growing customer base and extensive array of offerings, Bankman-Fried was dependent upon Alameda to fuel FTX's growth.  Alameda, which had become one of the biggest trading firms in the cryptocurrency arena, made its transactions on FTX.  As a result, Alameda was FTX's primary market maker.  This enabled Alameda to use its buying power to artificially inflate the value of a cryptocurrency it was borrowing against or take the losing side of trades in order to attract customers to the exchange.[52]

97.     Given their substantial investment, over $500 million, and the significant returns they were receiving thereon due to the meteoric rise of FTX, Defendants were incentivized to use their influence and public platforms to depict FTX and Bankman-Fried as trustworthy, legitimate, and sound, notwithstanding these and other problematic business practices.  Defendants' efforts to bolster the reputations of FTX and Bankman-Fried were wildly successful.  Before FTX's collapse, approximately three and a half years after commencing operations, FTX grew into one of the world's leading cryptocurrency exchanges, with customers from retail investors and institutional traders to individuals with no prior financial trading experience, with a valuation of $32 billion.  Defendants' public campaign designed to increase the valuation of the FTX Entities, and in turn, increase the return on their investments in FTX, worked.

---

[52] Patricia Kowsmann, Vicky Ge Huang, Caitlin Ostroff, and Gregory Zuckerman, *Troubles at Sam Bankman-Fried's Alameda Began Well Before Crypto Crash*, The Wall Street Journal, (Dec. 31, 2022)   https://www.wsj.com/articles/alameda-sam-bankman-fried-ftx-crypto-crash-11672434101 (accessed Mar. 2, 2023).

CLASS ACTION COMPLAINT

-34-

## (5) Defendants' Fraudulent Scheme and Deceptive Course of Conduct

98.     As set forth above, Defendants made multiple false representations to Plaintiff and the Class, including, but not limited to, that:  (a) they had performed sufficient due diligence supporting their investments in FTX; (b) FTX's products and services were safe and reliable; (c) Bankman-Fried was a visionary leader, trustworthy and with sound judgment; (d) Bankman-Fried and his team at FTX were customer centered and focused on the greater good rather than profiting at the expense of others; (e) FTX was being run competently, if not exceptionally, and with extraordinary prudence; and (f) the FTX Entities and Bankman-Fried had strictly complied with all legal and regulatory requirements to safeguard their customers' assets, which included ensuring that funds deposited by FTX platform users would be segregated for safekeeping and not used in any manner for the benefit of FTX, Bankman-Fried or Alameda.

99.     Defendants knew, or should have known, that their representations were materially false and misleading when they made them.  If Defendants in fact performed the due diligence activities, they claimed to have with respect to FTX, they would have been apprised through such activities of the wanton fraud, self-dealing and the complete lack of internal controls and competency present at FTX.  Defendants had knowledge, or willfully chose to ignore, that the FTX Entities were not operating in the sound and legally compliant manner that Defendants had represented to consumers and the market as a result of their experience and relationship with the FTX Entities.  Their statements to the contrary during the Class Period lacked a reasonable factual basis.

100.     Defendants' unfair and deceptive statements described herein were likely to mislead – and in fact misled – consumers and investors acting reasonably and induce them to deposit cryptocurrency and/or other assets with the FTX Entities or otherwise engage in transactions with the FTX Entities during the Class Period.

101.    Defendants' conduct has caused Class members to suffer billions of dollars in losses, as the FTX Entities ultimately collapsed and fell into bankruptcy.  Billions of dollars of assets belonging to the victims of Defendants' and FTX's wrongful acts are missing and/or unrecoverable.

### (6) FTX and Alameda are Exposed as Frauds

102.    The FTX Entities' meteoric success story began to unravel on November 2, 2022, when an article published by the cryptocurrency publication *CoinDesk* obtained a copy of Alameda's balance sheet.  The publication questioned the financial health of Alameda and the FTX Entities, reporting that Alameda held billions of dollars' worth of FTT, the native FTX token, and that most of Alameda's assets appeared to be either FTX's self-created token or cryptocurrency in which Bankman-Fried had an interest.  According to the article, "Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet":

> Billionaire Sam Bankman-Fried's cryptocurrency empire is officially broken into two main parts: FTX (his exchange) and Alameda Research (his trading firm), both giants in their respective industries.
>
> ***But even though they are two separate businesses, the division breaks down in a key place: on Alameda's balance sheet,*** according to a private financial document reviewed by CoinDesk.  (It is conceivable the document represents just part of Alameda.)
>
> ***That balance sheet is full of FTX – specifically, the FTT token issued by the exchange that grants holders a discount on trading fees on its marketplace.***  While there is nothing per se untoward or wrong about that, it shows ***Bankman-Fried's trading giant Alameda rests on a foundation largely made up of a coin that a sister company invented, not an independent asset like a fiat currency or another crypto. The situation adds to evidence that the ties between FTX and Alameda are unusually close.***
>
> The financials make concrete what industry-watchers already suspect: Alameda is big.  As of June 30, the company's assets amounted to $14.6 billion.  Its single biggest asset: $3.66 billion of "unlocked FTT."  The third-largest entry on the assets side of the accounting ledger?  A $2.16 billion pile of "FTT collateral."
>
> There are more FTX tokens among its $8 billion of liabilities: $292 million of "locked FTT."  The liabilities are dominated by $7.4 billion of loans.
>
> ***"It's fascinating to see that the majority of the net equity in the Alameda business is actually FTX's own centrally controlled and printed-out-of-thin-air token,"*** said

Cory Klippsten, CEO of investment platform Swan Bitcoin, who is known for his critical views of altcoins, which refer to cryptocurrencies other than bitcoin (BTC)....

Other significant assets on the balance sheet include $3.37 billion of "crypto held" and large amounts of the Solana blockchain's native token: $292 million of "unlocked SOL," $863 million of "locked SOL" and $41 million of "SOL collateral." **Bankman-Fried was an early investor in Solana.** Other tokens mentioned by name are SRM **(the token from the Serum decentralized exchange Bankman-Fried co-founded)**, MAPS, OXY and FIDA. There is also $134 million of cash and equivalents and a $2 billion "investment in equity securities."

Also, token values may be low. In a footnote, Alameda says "locked tokens conservatively treated at 50% of fair value marked to FTX/USD order book."

Owners of the FTT token get discounts on FTX trading fees, increased commissions on referrals and earn rewards. The value of FTT is maintained by FTX's rolling program of buying back and burning tokens, a process that eats up a third of the exchange's trading commissions, which will continue until half of all tokens are burned, according to FTX.[53]

103. Shortly after the *CoinDesk* article was published, the FTX Entities suffered massive customer withdrawals, resulting in a liquidity crisis.

104. On November 6, 2022, Changpeng Zhao, the CEO of Binance, a competing cryptocurrency asset trading platform, tweeted that "[d]ue to recent revelations that have came [sic] to light," it would be liquidating its FTT holdings.[54] He explained, "Liquidating our FTT is just post-exit risk management, learning from LUNA."[55] Binance's FTT holdings previously had been valued at over $500 million. Binance's announcement caused a collapse in the price of FTT tokens and further accelerated the pace of customer withdrawals from FTX.

105. Binance initially explored acquiring FTX, entering into a non-binding deal to acquire FTX and announced the same on November 8, 2022. Only one day later, Binance

---

[53] Ian Allison, *Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet*, CoinDesk, (Nov. 2, 2022) https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/ (accessed Mar. 2, 2023).

[54] Changpeng Zhao (@cz_binance), Twitter, (Nov. 6, 2022, 10:47 AM) https://twitter.com/cz_binance/status/1589283421704290306?lang=en (accessed Mar. 2, 2023).

[55] Changpeng Zhao (@cz_binance), Twitter, (Nov. 6, 2022, 4:49 PM) https://twitter.com/cz_binance/status/1589374530413215744?lang=en (accessed Mar. 2, 2023).

announced that it would not be moving forward because FTX's "issues [were] beyond [Binance's] control or ability to help."[56]

106.    As of November 8, 2022, Bankman-Fried had frozen all withdrawals of FTX's customers' assets.  This resulted in FTT's value plummeting, declining by 80%.  Given the circular and symbiotic nature of FTX and Alameda, and Alameda's significant collateral held by FTX – principally FTT tokens – had a significantly lower value than its outstanding obligation to FTX.  If it was not the case before, this ensured that FTX's loans to Alameda were unrecoverable.

107.    On November 9, 2022, as FTX and Alameda were in free fall, Sequoia sent the following letter to its limited partners:

> We are in the business of taking risk.  Some investments will surprise to the upside, and some will surprise to the downside.  ***We do not take this responsibility lightly and do extensive research and thorough diligence on every investment we make.  At the time of our investment in FTX, we ran a rigorous diligence process.***  In 2021, the year of our investment, FTX generated approximately $1B in revenue and more than $250M in operating income, as was made public in August 2022.[57]

108.    In contrast to Sequoia's claims above, *The Wall Street Journal* reported that on a subsequent call with investors, Sequoia indicated a need for better diligence, stating that "the firm would improve its due-diligence process on future investments" and "the firm in the future will be in a position to have even early-stage startups' financial statements audited by one of the Big Four accounting firms."[58]  Apparently, the "extensive research and thorough diligence" for Sequoia's

---

[56]    Binance    (@binance),    Twitter,    (Nov.    9,    2022,    4:00    PM) https://twitter.com/binance/status/1590449164932243456?lang=en (accessed Mar. 2, 2023).

[57] Connie Loizos, *Sequoia Capital marks its FTX investment down to zero dollars*, Yahoo!news, (Nov.    9,    2022)    https://www.yahoo.com/news/sequoia-capital-marks-ftx-investment-021347686.html (accessed Mar. 2, 2023).

[58] Berber Jin, *Sequoia Capital Apologizes to Its Fund Investors for FTX Loss*, The Wall Street Journal, (Nov. 22, 2022)  https://www.wsj.com/articles/sequoia-capital-apologizes-to-limited-partners-for-ftx-investment-11669144914 (accessed Mar. 1, 2023).

significant investment and burnishing FTX and Bankman-Fried's reputations had not included demanding audited financial statements from a respected and credible accounting firm.[59]

109.    On November 10, 2022, Bankman-Fried took to Twitter and issued a series of over twenty tweets, purporting to apologize to customers, offer an explanation for the crash, and reassure the public about FTX US's soundness.[60] His tweet storm included the following statements:



110.    Despite Bankman-Fried's claimed remorse, it soon was proven that many of these tweets contained proven falsehoods, and thus, were yet one more attempt by Bankman-Fried to cast himself in a positive light.

---

[59] *Id.*
[60] Sam Bankman-Fried (@SBF_FTX), Twitter, (Nov. 10, 2022, 9:13 AM) https://twitter.com/SBF_FTX/status/1590709166515310593 (accessed Mar. 1, 2023) (redaction added).

111.     Two days later, *The Wall Street Journal* published its bombshell an article entitled "Alameda, FTX Executives Are Said to Have Known FTX Was Using Customer Funds," which revealed, not only that FTX customer funds had been used to prop up Alameda, but that this was well known.

> Alameda Research's chief executive and senior FTX officials knew that FTX had lent its customers' money to Alameda to help it meet its liabilities, according to people familiar with the matter.

> Alameda's troubles helped lead to the bankruptcy of FTX, the crypto exchange founded by Sam Bankman-Fried.  Alameda is a trading firm also founded and owned by Mr. Bankman-Fried….

> ***In a video meeting with Alameda employees late Wednesday Hong Kong time, Alameda CEO Caroline Ellison said that she, Mr. Bankman-Fried and two other FTX executives, Nishad Singh and Gary Wang, were aware of the decision to send customer funds to Alameda, according to people familiar with the video.***  Mr. Singh was FTX's director of engineering and a former Facebook employee.  Mr. Wang, who previously worked at Google, was the chief technology officer of FTX and cofounded the exchange with Mr. Bankman-Fried.

> Ms. Ellison said on the call that FTX used customer money to help Alameda meet its liabilities, the people said.

> Alameda had taken out loans to fund illiquid venture investments, the people said.

> On Friday, FTX, Alameda, FTX US and other FTX affiliates filed for bankruptcy protection.

> Bankruptcy means that it could be a long time before individual investors and others owed their funds are able to potentially recover any of them, if ever.[61]

112.     Shortly after the foregoing disclosures, Bankman-Fried resigned as CEO of FTX, and the FTX Entities and Alameda filed for bankruptcy.  In a Delaware bankruptcy court filing, FTX's new CEO John J. Ray III ("Ray"), who had been involved with the Enron bankruptcy, stated that he had never seen "such a complete failure of corporate controls and such a complete

---

[61] Dave Michaels, Caitlin Ostroff, Elaine Yu, Alameda, FTX Executives Are Said to Have Known FTX Was Using Customer Funds, The Wall Street Journal, (Nov. 12, 2022) https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (accessed Mar. 2, 2023) (emphasis added).

absence of trustworthy financial information as occurred here… [T]his situation is unprecedented."[62]

113.　Thereafter, on November 30, 2022, Bankman-Fried was interviewed by a reporter with the *New York Times*. As his press accessibility had helped create his reputation, he looked to the media in an attempt to salvage his credibility. During the interview with reporter Andrew Ross Sorkin, Bankman-Fried claimed to accept responsibility for FTX and Alameda's failures. Bankman-Fried stated: "'I was responsible ultimately for doing the right things and I mean, we didn't. Like, we messed up big.'"[63] According to *Forbes*, Bankman-Fried had intended to make a similar *mea culpa* to Congress before he lost his job, planning to state, as he had in his tweet string prior to the bankruptcy filings, "I f****d up."[64]

114.　On December 12, 2022, Bankman-Fried was arrested in the Bahamas on the eve of what would have been roughly his fourth time providing testimony to a congressional committee in a one-year period.[65] Instead of a Bankman-Fried media friendly public relations campaign, the scheduled congressional testimony on December 13, 2022 was provided by Ray, wherein Ray testified to the existence a host of adverse facts about what his investigation to date into the FTX Entities had uncovered or confirmed.

---

[62] Eliot Brown, *New CEO Says FTX Suffered 'Complete Failure of Corporate Controls'*, The Wall Street Journal, (Nov. 17, 2022) https://www.wsj.com/livecoverage/stock-market-news-today-11-17-2022/card/new-ceo-says-ftx-suffered-complete-failure-of-corporate-controls--anHR8VGIa37oobtZDlnh (accessed Mar. 1, 2023).

[63] Andrew Ross Sorkin, *Transcript of Sam Bankman-Fried's Interview at the DealBook Summit*, The New York Times, (Dec. 1, 2022) https://www.nytimes.com/2022/12/01/business/dealbook/sam-bankman-fried-dealbook-interview-transcript.html (accessed Mar. 2, 2023).

[64] Sam Bankman-Fried (@SBF_FTX), Twitter, (Nov. 10, 2022, 9:13 AM) https://twitter.com/SBF_FTX/status/1590709166515310593 (accessed Mar. 1, 2023).

[65] Bankman-Fried has testified previously on three separate occasions before the U.S. House Committee on Financial Services on December 8, 2021, the U.S. Senate Committee on Agriculture, Nutrition and Forestry on February 9, 2022, and the U.S. House Committee on Agriculture on May 12, 2022. *FTX Policy*, FTX US, https://www.ftxpolicy.com/ (accessed Mar. 2, 2023).

115.     During his prepared remarks to Congress, Ray stated:

While many things are unknown at this stage, and many questions remain, we know the following:

**First**, customer assets from FTX.com were commingled with assets from the Alameda trading platform.

**Second**, Alameda used client funds to engage in margin trading which exposed customer funds to massive losses.

**Third**, the FTX Group went on a spending binge in late 2021 through 2022, during which approximately $5 billion was spent buying a myriad of businesses and investments, many of which may be worth only a fraction of what was paid for them.

**Fourth**, loans and other payments were made to insiders in excess of $1 billion.

**Fifth**, Alameda's business model as a market maker required deploying funds to various third party exchanges which were inherently unsafe, and further exacerbated by the limited protections offered in certain foreign jurisdictions.[66]

116.     The FTX Entities remain embroiled in bankruptcy proceedings.  Billions of dollars of assets have yet to be returned to FTX customers. Meanwhile, to date, each of the Defendants has escaped the collapse of FTX relatively unscathed and continues to operate without any major disruptions to their respective businesses.

## V.     CLASS ACTION ALLEGATIONS

117.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of a Class consisting of all persons and entities that purchased, deposited, and/or transacted in fiat currency or digital assets in accounts with the FTX Entities during the Class Period and who were damaged thereby (the "Class").  Excluded from the Class are Defendants herein, the officers and directors of Defendants, at all relevant times,

---

[66] Investigating the Collapse of FTX Part I, 117th Congress, (Dec. 13, 2022) (Testimony of John Ray III) available at  https://democrats-financialservices.house.gov/uploadedfiles/hhrg-117-ba00-wstate-rayj-20221213.pdf  (accessed Mar. 2, 2023) (emphasis in original).

members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

118. The members of the Class are so numerous that joinder of all members is impracticable. Plaintiff and members of the Class are presently unable to withdraw their assets from FTX accounts. While Plaintiff, at this time, does not possess information on the exact number of Class members, and the number of such persons may only be ascertained through appropriate discovery, Plaintiff believes that there are more than one million members in the proposed Class. For example, the FTX website currently posts a prepared statement for the May 12, 2022 testimony Bankman-Fried provided to the U.S. House Committee on Agriculture, in which it is stated: "At the time of this writing, the FTX platforms have millions of registered users, and the FTX US platform has around one million users."[67] Class members may be identified from records maintained by the FTX Entities or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in class actions. Alternatively, since one or more of the FTX Entities required customers to consent to receive communications electronically and to provide them with the customers' email addresses, email notice to Class members may also be a suitable alternative to mail notice in this action.

119. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of laws that are complained of herein.

120. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in complex class litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

---

[67] Changing Market Roles: The FTX Proposal and Trends in New Clearinghouse Models, U.S. House Committee on Agriculture, (May 12, 2022) https://www.ftxpolicy.com/posts/testimony-may-12 (accessed Mar. 2, 2023).

121.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a) whether Defendants violated Cal. Bus. & Prof. Code §§17200 et seq. and 17500 et seq.;

(b) whether Defendants violated Cal. Corp. Code §25504.1;

(c) whether Defendants violated the common law as alleged herein;

(d) whether Defendants engaged in a conspiracy as alleged herein;

(e) whether Defendants aided and abetted the violations of law of each of the other Defendants and/or the FTX Entities and their affiliates as alleged herein;

(f) whether Plaintiff and Class members are entitled to compensatory damages, restitution, punitive damages, statutory damages, declaratory relief, disgorgement, and/or other legal or equitable remedies as a result of Defendants' conduct; and

(g) the extent of damage sustained by Class members.

122.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joining all Class members is impracticable, and this action will be manageable as a class action.

**COUNT I**

**Violation of California's Unfair Competition Law
(Cal. Bus. & Prof. Code §17200 et seq.)**

123.    Plaintiff repeats and realleges each and every allegation contained above in Paragraphs 1 through 122 as if fully set forth herein.

124.    This Count is asserted against Defendants and is based upon the California Unfair Competition Law ("UCL"), which prohibits any "unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code §17200.

125.    Defendants' unfair and deceptive practices described herein were likely to mislead – and in fact did mislead – consumers acting reasonably in the circumstances into purchasing, depositing, and/or transacting in fiat currency and digital assets with accounts with the FTX Entities.

126.    **Unlawful**: During the Class Period, Defendants advertised and otherwise promoted the FTX Entities using false and/or misleading claims, such that Defendants' actions as alleged herein violate at least the following laws:

(a)  The False Advertising Law, Cal. Bus. & Prof. Code §17500 et seq.; and

(b)  Cal. Corp. Code §25504.1.

128.    **Fraudulent**: A practice is "fraudulent" under the UCL if members of the general public were or are likely to be deceived.  As detailed herein, Defendants' statements regarding, inter alia, the safety and viability of the FTX Entities and their own due diligence activities were deceptive to the public.

129.    **Unfair**: The UCL gives courts maximum discretion to address improper business practices that are "unfair."  Defendants' collective conduct with respect to the marketing and promotion of the FTX Entities is unfair because Defendants' conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers in inducing them to purchase, transact, and/or deposit fiat currency and digital assets with accounts with the FTX Entities and the utility of Defendants' conduct, if any, does not remotely outweigh the gravity of the harm to their victims. Plaintiff and the Class would not have purchased, transacted, and/or deposited fiat currency and

digital assets with accounts with the FTX Entities at the prices paid or at all had they known that Defendants' statements were misrepresentations and deceptive.

130.    Defendants' conduct with respect to the promotion of the FTX Entities is also unfair because the consumer injury is substantial, not outweighed by benefits to consumers or competition, and not one that consumers can reasonably avoid.

131.    The harm suffered by Plaintiff and the Class was directly and proximately caused by the deceptive and unfair practices of Defendants related to the promotion and marketing of the FTX Entities, as described herein.

132.    In accordance with California Business & Professions Code §17203, Plaintiff seeks an order enjoining the Defendants from continuing to conduct business through fraudulent or unlawful acts and practices and to commence a corrective advertising campaign.  On behalf of the Class, Plaintiff also seeks an order for the restitution of all monies made from Defendants' investments in or other business dealings with the FTX Entities, which were made resulting from acts of fraudulent, unfair, or unlawful competition as detailed herein.

## COUNT II

### Violation of California's False Advertising Law
### (Cal. Bus. & Prof. Code §17500 et seq.)

133.    Plaintiff repeats and realleges each and every allegation contained in in Paragraphs 1 through 122 as if fully set forth herein.

134.    This Count is asserted against Defendants and is based upon California's False Advertising Law ("FAL"), which prohibits any statement in connection with the sale of goods or services "which is untrue or misleading."  Cal. Bus. & Prof. Code §17500.

135.    As set forth herein, Defendants made statements regarding the FTX Entities and their own due diligence activities that were untrue or misleading.  They publicly represented, *inter alia*, that the FTX Entities were a viable and safe way to invest in cryptocurrency and that

1   Defendants had vetted their representations through their own due diligence efforts, statements

2   designed to deceive consumers into investing with the FTX Entities.

3       136.   Defendants' claims that the FTX Entities were, *inter alia*, viable and safe for

4   investing in cryptocurrency and that Defendants had verified these representations through robust

5   due diligence activities were untrue and manifestly false and misleading for the reasons detailed

6   herein.  For example, when the FTX Entities imploded in late 2022, it was revealed that the FTX

7   Entities had failed to employ the most basic safeguards and siphoned billions of dollars' worth of

8   customer assets for their own nefarious purposes during the Class Period. Moreover, Defendants

9   did not demand or receive from FTX audited financial statements prepared from a seasoned

10  accounting firm prior to making their false and misleading statements.

11      137.   Defendants knew, or reasonably should have known, that their claims relating to,

12  *inter alia*, the viability and safety of the FTX Entities and their own due diligence activities were

13  untrue or misleading.  Defendants failed to adequately inform Plaintiff and the Class of the true

14  nature of the FTX Entities.

15      138.   When the true nature of the FTX Entities became publicly known at the end of the

16  Class Period, the immediate public outrage, bankruptcy proceedings, and government

17  investigation reflected the degree to which consumers and the public at large felt they were

18  deceived by Defendants and the FTX Entities' business practices.

19      139.   By reason of the above conduct, Defendants are liable pursuant to Cal. Bus. & Prof.

20  Code §17500.

**COUNT III**

**Violation of Cal. Corp. Code §25504.1**

21

22

23

24      140.   Plaintiff repeats and realleges each and every allegation contained above in

    Paragraphs 1 through 122 as if fully set forth herein.

25

26      141.   California Corporations Code §25504.1 imposes joint and several liability for "[a]ny

27  person who materially assists in any violation of Section 25110…or 25401…with intent to deceive

    or defraud."

28

142.    "Materially assisting" in an alleged securities law violation, as defined under California law, may take the form of communicating misrepresentations directly to investors, or otherwise playing a material, facilitating role in the alleged securities law violation.

143.    As alleged herein, Defendants made material misrepresentations and omissions to Plaintiff and Class members regarding, *inter alia*, the viability and safety of the FTX Entities and their own due diligence activities with the intent to deceive and/or defraud investors in order to induce them to open accounts and purchase, transact in, and/or deposit securities on the FTX platforms, including securities such as the YBAs that were issued by the FTX Entities.

144.    The YBAs constituted unregistered securities sold in violation of Cal. Corp. Code §25110.  The FTX Entities, with Defendants' material assistance, offered and sold the unregistered YBAs to members of the Class.

145.    In addition, Cal. Corp. Code §25401 makes it "unlawful for any person to offer or sell a security in this state, or to buy or offer to buy a security in this state, by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading."  The FTX Entities, together with the material assistance of Defendants, sold the YBAs by means of materially false and misleading written and oral communications.

146.    As a result of this assistance, Defendants violated Cal. Corp. Code §25504.1 and Plaintiff and members of the Class sustained damages as herein described.

## COUNT IV

## Negligent Misrepresentation

147.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 122 as if fully set forth herein.

148.    Plaintiff brings this claim against Defendants for negligent misrepresentation.

149.    As detailed herein, Defendants negligently misrepresented certain material facts, including, *inter alia*, regarding the safety and viability of the FTX Entities and their own due

diligence activities in order to induce confidence in the FTX platforms and convince consumers to commit fiat currency and digital assets to the FTX platforms, thereby increasing the value of Defendants' investments in the FTX Entities.

150.    Defendants made these material misrepresentations without reasonable grounds for believing the misrepresented facts to be true.

151.    The representations made by Defendants in connection with the FTX Entities were material and would have been considered by a reasonable consumer in making decisions to engage in any transactions with the FTX Entities.

152.    Plaintiff and the Class justifiably relied on Defendants' statements in that they purchased, deposited, and/or transacted in fiat currency and digital assets with accounts with the FTX Entities, which they would not have done at the prices paid or at all had they known the true nature of the FTX platforms.    Plaintiff and the members of the Class opened accounts and purchased, transacted, and/or deposited fiat currency and digital assets into accounts with the FTX entities believing that the FTX platforms would be operated in accordance with the representations made by Defendants.

153.    As a result, Plaintiff and members of the Class were directly and proximately injured by Defendants' negligence in failing to inform Plaintiff and members of the Class of the true nature of the operations of the FTX platforms.

154.    As a result of Defendants' negligent misrepresentation during the Class Period, Plaintiff and the Class suffered damages, including because they cannot retrieve their fiat currency or digital assets currently in accounts with the FTX platforms as a result of the insolvency of the FTX Entities.

**COUNT V**

**Intentional Misrepresentation**

155.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 122 as if fully set forth herein.

156.    Plaintiff brings this claim against Defendants for intentional misrepresentation.

157.     As detailed herein, Defendants knowingly misrepresented certain material facts, including, *inter alia*, regarding the safety and viability of the FTX Entities and Defendants' due diligence activities, in order to induce confidence in the FTX platforms and convince consumers to commit fiat currency and digital assets to the FTX platforms, thereby increasing the value of Defendants' investments in the FTX Entities.

158.     Defendants made these misrepresentations with knowledge that their statements were materially misleading.

159.     The representations made by Defendants in connection with the FTX Entities were material and would have been considered by a reasonable consumer in making decisions to engage in any transactions with the FTX Entities.

160.     Plaintiff and the Class actually and justifiably relied on Defendants' statements in that they purchased, deposited, and/or transacted in fiat currency and digital assets with accounts with the FTX Entities, which they would not have done at the prices paid or at all had they known the true nature of the FTX platforms.  Plaintiff and the members of the Class opened accounts and purchased, transacted, and/or deposited fiat currency and digital assets into accounts with the FTX entities believing that the FTX platforms would be operated in accordance with the representations made by Defendants.

161.     As a result, Plaintiff and members of the Class were directly and proximately injured by Defendants' intentional misrepresentations in failing to inform Plaintiff and members of the Class of the true nature of the operations of the FTX platforms.

162.     As a result of Defendants' intentional misrepresentations during the Class Period, Plaintiff and the Class suffered damages, including because they cannot retrieve their fiat currency or digital assets currently in accounts with the FTX platforms as a result of the insolvency of the FTX Entities.

**COUNT VI**

**Fraudulent Inducement**

163. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 122 as if fully set forth herein.

164. This Count is asserted against Defendants and is based upon the claim of fraudulent inducement.

165. As detailed herein, Defendants materially misrepresented and omitted existing facts about the FTX Entities when they failed to disclose information regarding the true nature of the FTX Entities and their own due diligence efforts that was known to them.

166. The omission is material because Plaintiff and the Class would not have transacted with the FTX Entities had they known true nature of the FTX Entities.

167. Defendants marketed and promoted the FTX Entities to Plaintiff and the Class despite having knowledge of the true nature of the FTX Entities that were contrary to their public misrepresentations.

168. Defendants intended consumers and purchasers to rely on Defendants' statements regarding, *inter alia*, the safety and viability of the FTX Entities and Defendants' due diligence activities, so as to increase the user base for the FTX platforms and thereby increase the value of their investments in the FTX Entities.

169. Plaintiff and the Class were not aware of the true nature and safety of the FTX Entities' platform and could not reasonably have discovered those true characteristics.

170. Plaintiff and the Class justifiably relied on Defendants' statements in that they purchased, deposited, and/or transacted in fiat currency and digital assets with accounts with the FTX Entities, which they would not have done at the prices paid or at all had they known the true nature of the FTX platforms.

171. As a result of Defendants' fraudulent inducement of Plaintiff and the Class onto the FTX platforms, Plaintiff and the Class suffered damages, including because they cannot retrieve

their fiat currency or digital assets currently in accounts with the FTX platforms as a result of the insolvency of the FTX Entities.

## COUNT VII

## Civil Conspiracy

172.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 122 as if fully set forth herein.

173.     This Count is asserted against Defendants and is based upon the claim of civil conspiracy under common law.

174.     Defendants made misrepresentations and omissions to Plaintiff and Class members regarding, *inter alia*, the viability and safety of the FTX Entities and Defendants' due diligence activities, in order to induce confidence in the FTX platforms and convince consumers to commit fiat currency and digital assets to the FTX platforms, thereby increasing the value of Defendants' investments in the FTX Entities.

175.     As detailed herein, Defendants engaged in concerted tortious acts, particularly in the form of misrepresentations and omissions made to Plaintiff and the Class for the purposes of inducing them to commit fiat currency and digital assets to the FTX platforms, thereby increasing the value of Defendants' investments in the FTX Entities.  These acts were made in concert and pursuant to an agreement among the FTX Entities, Bankman-Fried, and Defendants to promote the FTX platforms.

176.     In addition to benefitting Defendants by increasing the value of their investments in the FTX Entities, the conspiracy substantially aided the wrongdoing conducted by the FTX Entities and Bankman-Fried.

177.     As a result of Defendants' civil conspiracy, Plaintiff and the Class suffered damages, including because they cannot retrieve their fiat currency or digital assets currently in accounts with the FTX platforms as a result of the insolvency of the FTX Entities.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COUNT VIII**

**Aiding and Abetting**

178.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 122 as if fully set forth herein.

179.    This Count is asserted against Defendants for aiding and abetting the violations of law undertaken by each other and the FTX Entities and their affiliates as alleged herein.

180.    Defendants made misrepresentations and omissions to Plaintiff and Class members regarding, *inter alia*, the viability and safety of the FTX Entities and Defendants' due diligence activities, in order to induce confidence in the FTX platforms and convince consumers to commit fiat currency and digital assets to the FTX platforms, thereby increasing the value of Defendants' investments in the FTX Entities.   As a result, Defendants provided substantial assistance to the FTX Entities in connection with the tortious activities alleged herein.

181.    Defendants had knowledge of the wrongdoing by the FTX Entities as a result of their experience and relationship with the FTX Entities, including through the due diligence that each provided in connection with their substantial investments in the FTX Entities.

182.    As a result of Defendants' aiding and abetting of the violations of law by each other and the FTX Entities and their affiliates as detailed herein, Plaintiff and the Class suffered damages, including because they cannot retrieve their fiat currency or digital assets currently in accounts with the FTX platforms as a result of the insolvency of the FTX Entities.

**COUNT IX**
**Declaratory Judgement**
**(Cal. Civ. Proc. Code §1060)**

183.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 122 as if fully set forth herein.

184.    This Count is asserted against Defendants and is based upon the violations of the California Unfair Competition Law and the California Unfair Advertising Law as alleged herein.

185.    There is a bona fide, actual, and present need for the declaratory relief requested herein; the declaratory relief prayed for herein deals with a present, ascertained, or ascertainable

state of facts and a present controversy as to the state of facts; contractual and statutory duties and rights are dependent on those facts and law applicable to the facts; the parties have an actual, present, adverse, and directly antagonistic interest in the subject matter; and the antagonistic and adverse interests are all before this Court by proper process for final resolution.

186.    Plaintiff and the Class have an obvious and significant interest in the outcome of this lawsuit.

187.    Plaintiff and the Class purchased, transacted, and/or deposited fiat currency and digital assets with accounts with the FTX Entities in reliance on Defendants' false and misleading statements.

188.    If Plaintiff and the Class knew the true facts surrounding the FTX Entities, Plaintiff and the Class would not have purchased, transacted, or deposited fiat currency and digital assets with the FTX Entities at the prices paid or at all.

189.    Thus, there is a justiciable controversy over whether the Defendants illegally solicited their purchases, deposits, and other transactions from Plaintiff and the Class.

190.    Plaintiff and the Class seek an order declaring that Defendants committed the violations of law alleged herein; enjoining Defendants from continuing such legal violations; ordering that Defendants engage in appropriate and equitable remedial measures, such as issuing public announcements to correct their misrepresentations of material fact regarding the FTX Entities and their own due diligence activities; and ordering that each of the Defendants that received financial benefits from their wrongful acts detailed herein provide appropriate and equitable restitution to Plaintiff and members of the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.      Determining that this action is a proper class action, certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Class counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding rescission or a rescissory measure of damages;

D.      Disgorgement of Defendants' ill-gotten gains;

E.      Providing the declaratory relief requested;

F.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

G.      Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

1    Dated:  March 02, 2023                Respectfully submitted,

2

3
                                          By: *Azra Z. Mehdi*
4                                         AZRA MEHDI (SBN 220406)

5                                         THE MEHDI FIRM, PC.
                                          95 Third Street
6                                         2nd Floor No. 9122
                                          San Francisco, CA 94103
7                                         Ph/Fax: 415.905.8880
                                          azram@themehdifirm.com
8
                                          HERMAN JONES LLP
9                                         John C. Herman (Ga. Bar No. 348370)
                                          (to seek admission pro hac vice)
10                                        Candace Smith (Ga. Bar No. 654910)
                                          (to seek admission pro hac vice)
11                                        Connely Doizé (Ga. Bar No. 663453)
                                          (to seek admission pro hac vice)
12                                        3424 Peachtree Road, N.E., Suite 1650
                                          Atlanta, Georgia 30326
13                                        Telephone: (404) 504-6500
                                          Facsimile: (404) 504-6501
14                                        jherman@hermanjones.com
                                          csmith@hermanjones.com
15
                                          *Counsel for Plaintiff Mark Girshovich*
16

17

18

19

20

21

22

23

24

25

26

27

28